**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Plaintiff,

          v.

PENN WEST PETROLEUM LTD., d/b/a
OBSIDIAN ENERGY LTD., TODD H.
TAKEYASU, JEFFERY A. CURRAN, and
WALDEMAR GRAB,

                           Defendants.

No. 17 Civ. 4866 (GHW)

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF JEFFERY A.
CURRAN'S MOTION TO DISMISS THE COMPLAINT**

Helen Gredd
Leigh G. Llewelyn
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, NY 10110
(212) 921-8399 (Phone)
(212) 764-3701 (Fax)

Attorneys for Defendant Jeffery A. Curran

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................................ 1

The Allegations and Omissions in the Complaint ...................................................................... 4

    A.     The Parties ................................................................................................................ 4

    B.     The directives purportedly issued by Messrs. Takeyasu and Curran ..................... 5

    C.     The purportedly fraudulent budget process ............................................................ 7

    D.     Concealment purportedly undertaken by Messrs. Takeyasu and Curran .............. 8

    E.     Warnings purportedly ignored by Messrs. Takeyasu and Curran .......................... 9

ARGUMENT ............................................................................................................................... 9

    THE COMPLAINT FAILS TO MEET RULE 9(b)'s REQUIREMENTS FOR
    PLEADING FRAUD ......................................................................................................... 9

    I.     The Complaint posits no motive for Mr. Curran to have engaged in fraud,
        and the fraudulent scheme alleged would in fact have been contrary to his
        economic interests. ................................................................................................ 11

    II.     The Complaint fails to allege particularized facts raising a strong inference
        of scienter. .............................................................................................................. 13

        A.     Much of the Complaint is devoted to conclusory and at times
            contradictory allegations. ........................................................................... 14

        B.     The Complaint's handful of attempts at more particularized
            allegations contain significant omissions and mischaracterizations
            of the documents they reference. ............................................................... 17

            1.     The Q2 2012 Reclassification ...................................................... 18

            2.     Interactions with Operations Analysis Manager Susan
                Wenstrom ..................................................................................... 20

        C.     The Complaint's allegations regarding interactions with Penn
            West's internal controls group and external auditors are more
            significant for what they omit than what they contain. .............................. 23

CONCLUSION .......................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ...................................................................8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................10

*Calfo v. Messina*,
   No. 15-cv-4010 (LGS), 2016 WL 3661548 (S.D.N.Y. July 5, 2016).....................24

*Campo v. Sears Holdings Corp.*,
   635 F. Supp. 2d 323 (S.D.N.Y. 2009)..............................................................1

*City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
   711 F.3d 754 (7th Cir. 2013) ......................................................................13

*DiVittorio v. Equidyne Extractive Indus.*,
   822 F.2d 1242 (2d Cir. 1987)......................................................................15

*In re E.Spire Commc'ns, Inc. Sec. Litig.*,
   127 F. Supp. 2d 734 (D. Md. 2001) ..............................................................12

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)........................................................................14

*Harrell v. Primedia, Inc.*,
   No. 02-cv-2893 (JSM), 2003 WL 21804840 (S.D.N.Y. Aug. 6, 2003)...................12

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ......................................................................12

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)....................................................................12, 13

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*,
   No. 03-cv-8208 (RO), 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006) ...................12

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000)..............................................................14

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04-cv-5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) .................10

*Nationwide Mut. Ins. Co. v. Morning Sun Bus Co.*,
   No. 10–CV–1777 (ADS), 2011 WL 381612 (E.D.N.Y. Feb. 2, 2011) .................................10

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ....................................................................................................16

*Owens v. Jastrow*,
   789 F.3d 529 (5th Cir. 2015) ...................................................................................................25

*PetEdge, Inc. v. Garg*,
   234 F. Supp. 3d 477 (S.D.N.Y. 2017)......................................................................12, 14, 15

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ....................................................................................................11

*SEC v. DiMaria*,
   207 F. Supp. 3d 343 (S.D.N.Y. 2016)......................................................................................10

*SEC v. Espuelas*,
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)..............................................................................16, 18

*SEC v. Parnes*,
   No. 01-cv-0763 (LLS), 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ...........................15, 18

*SEC v. Patel*,
   No. 07-CV-39-SM, 2009 WL 3151143 (D.N.H. Sept. 30, 2009)...............................11, 15, 18

*SEC v. Steadman*,
   967 F.2d 636 (D.C. Cir. 1992) ...............................................................................................25

*SEC v. Tambone*,
   417 F. Supp. 2d 127 (D. Mass. 2006) ....................................................................................18

*SEC v. Yuen*,
   221 F.R.D. 631 (C.D. Cal. 2004) .....................................................................................15, 18

*Segan v. Dreyfus Corp.*,
   513 F.2d 695 (2d Cir. 1975).....................................................................................................16

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994).....................................................................................................11

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8(a)(2).................................................................................................................10

Fed. R. Civ. P. 9(b) ............................................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................................1

Defendant Jeffery A. Curran respectfully submits this memorandum of law in support of his motion pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) to dismiss the Complaint filed in this action by the United States Securities and Exchange Commission (the "SEC").[1]

## Preliminary Statement

Particularly in light of the Complaint's heft, its lack of particularized allegations is striking.  After a multi-year investigation of Canadian issuer Penn West Petroleum Ltd. ("Penn West") involving more than 20 investigative depositions, the SEC has shown itself unable to describe with specificity a single exchange in support of its sweeping claim that Mr. Curran (formerly Vice President of Accounting and Reporting at Penn West) and co-defendant Todd Takeyasu (the company's former CFO) engaged in an extended scheme, purportedly effectuated through oral directives, to fraudulently understate Penn West's operating expenses.

Instead, in a tactic that contributes to length but not adequacy, the Complaint elects to repeatedly intone that as a result of unspecified discussions with Messrs. Curran and Takeyasu—who are described in tandem so often that they appear never to have left each other's side—Operations Controller Waldemar Grab directed his staff to "reclassify" expenses as capital expenditures without regard to whether there was a basis for doing so.[2]  Moreover, a substantial number of those unspecified discussions are alleged to have occurred at monthly meetings—referred to as "accrual meetings"—attended by multiple individuals, only one of whom other

---

[1] As required, this memorandum analyzes the adequacy of the Complaint based upon any well-pleaded allegations contained therein (which are assumed true for purposes of the motion), the documents referenced or relied upon by the Complaint, and public filings and other matters of which the Court may take judicial notice.  *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328-29 (S.D.N.Y. 2009).  Mr. Curran also respectfully adopts and incorporates by reference the memorandum filed today by Defendant Todd H. Takeyasu (the "Takeyasu Memorandum") to the extent that memorandum contains arguments that are equally applicable to Mr. Curran.

[2] The term "reclassify" appears in quotes because the Complaint nowhere alleges that the original classification assigned to the particular costs at issue reflected the application of accounting analysis, as opposed to a blanket practice followed in the field for convenience with the expectation that the classification would be revisited later.

than Mr. Grab is identified as having participated in the purported fraud.  Yet, the Complaint does not even attempt to explain how Messrs. Curran and Takeyasu managed to convey their purported directives without alerting everyone in the room to the fact that fraud was afoot.

Similarly, despite the alleged fraud having occurred in the age of email, and despite having collected a vast quantity of emails and other documents from Penn West, the SEC is unable to identify a single email involving Mr. Curran (or, for that matter, Mr. Takeyasu) that can reasonably be characterized as giving rise to even a weak inference of fraudulent intent, much less the strong inference that Rule 9(b) requires.  Instead, the paucity of support for the SEC's allegations is powerfully underscored by the fact that the Complaint refers to no more than a handful of emails—and does so in a manner that is belied by the documents themselves, and that makes clear that essential parts of the narrative have been omitted.

Moreover, certain of the emails that the Complaint characterizes as reflecting discussion of fraud were in fact exchanges with individuals whom the SEC has expressly exonerated of having participated in the purported fraud—namely, Penn West's various CEOs.[3]  And still other documents that the Complaint characterizes as indicative of fraud—namely, written materials distributed at the monthly accrual meetings—likewise had an audience that precludes them from being reasonably read as reflecting fraudulent intent.  Indeed, the openness with which the practices at issue were discussed militates strongly against any inference of fraudulent intent.

In an effort to hedge against its deficiencies, the Complaint includes a series of allegations that principally pursue recklessness as an alternative theory of scienter.  Those

---

[3] *See SEC Charges Oil and Gas Company and Top Finance Executives with Accounting Fraud*, June 28, 2017 (SEC press release announcing the Complaint in this action and further stating that "[t]he SEC's investigation found no personal misconduct by Penn West's two former CEOs, Murray Nunns and David Roberts"), available at https://www.sec.gov/news/press-release/2017-120.  For the convenience of the Court, a copy of the SEC's public statement is attached as Exhibit 1 to the Declaration of Helen Gredd dated November 3, 2017 ("Gredd Decl.").

allegations include that Messrs. Curran and Takeyasu purportedly ignored warnings that were brought to their attention and concealed or, at minimum, "failed to disclose" the accounting practices at issue to Penn West's auditors and/or its Board.  But the particularized allegations—to the limited extent there are any—do not match the headlines.  Here, too, the handful of documents alluded to in fact tell a different story, and the allegations on their face make clear that the entire story is not being told.  And, once again, the omissions in the narrative are sufficiently significant as to preclude a finding that the proposed inferences are reasonable.

Further still, the Complaint makes no attempt to allege that either Mr. Curran or Mr. Takeyasu had any personal motive to fraudulently understate Penn West's operating expenses. Nor was that omission inadvertent.  Midway through the 27-month period described in the Complaint as the "Relevant Period," Penn West publicly announced that it had adopted a fixed-formula method for determining incentive compensation, and that the formula would give much greater weight to capital efficiency than it would to operating efficiency.  That announcement is significant because the fraud alleged in the Complaint is one that improved operating efficiency by worsening capital efficiency.  Otherwise stated, Messrs. Curran and Takeyasu are alleged to have engaged in a fraudulent scheme that operated to the detriment of their personal economic interests—and to have done so despite having not received (as the SEC has publicly acknowledged) any direction or encouragement to do so from any of the company's CEOs.  Far less implausible theories of fraud have been found wanting under Rule 9(b).

Notably, the SEC had an extra measure of assistance in its investigation of Penn West. As the SEC has publicly stated, it partnered with the Alberta Securities Commission ("ASC"), Penn West's home regulator, in taking testimony and gathering documents.  And, no less notably, the ASC ultimately declined to join the SEC in alleging that fraud occurred at Penn

West.  Instead, on the day that the SEC filed its sprawling Complaint, the ASC publicly and pointedly stated that "our investigation led us to a different conclusion to that of the SEC."[4]

Those circumstances are notable because they underscore the importance of scrutinizing the Complaint's adequacy—both by assessing what has been alleged, and by assessing what has *not* been alleged, as well as what allegations could reasonably be expected given the substantial investigative resources available to the SEC.  To be clear, we do not contend that the ASC's opinion is entitled to any evidentiary weight.  No regulator's opinion is entitled to evidentiary weight.  And, ultimately, that is precisely why the Complaint in this action fails.  The Complaint amounts to little more than a prolonged expression of a regulator's opinion, without the particularized support needed to back up that opinion and satisfy Rule 9(b).

All of the Complaint's causes of action against Mr. Curran are indisputably premised on averments of fraudulent intent.  Having elected to proceed on a theory that subjects the entire Complaint to the requirements of Rule 9(b), and having failed to satisfy those requirements, the Complaint against Mr. Curran must be dismissed in its entirety.

## The Allegations and Omissions in the Complaint

### A.  The Parties

During the Relevant Period, Penn West was a Canadian issuer, headquartered in Calgary, and engaged in the business of oil and gas production.  (Compl. ¶¶ 2, 17.)  Mr. Takeyasu joined Penn West in 1994 as its Vice President of Finance and became its CFO in 2006.  (*Id*. ¶ 18.)  Mr. Curran joined Penn West in 2008 as its Vice President of Accounting and Reporting and held that position until his termination in June 2014.  (*Id*. ¶ 19.)  In addition, Mr. Curran served as

---

[4] *See* S. Lynch and N. Williams, *U.S. charges Penn West Petroleum, ex-executives with accounting fraud*, Reuters, June 28, 2017 (quoting ASC spokeswoman Alison Trollope), available at https://www.reuters.com/article/us-penn-west-sec-idUSKBN19J227.

interim CFO for 37 days between the termination of Mr. Takeyasu in March 2014 and the arrival of Mr. Takeyasu's replacement in May 2014.  (*Id*. ¶¶ 18-19.)

The length of Mr. Grab's tenure at Penn West is not specified in the Complaint, but he is identified as having served as the company's Operations Controller from 2005 until his termination in June 2014.  (*Id.* ¶ 20.)  As Operations Controller, Mr. Grab "was responsible for ensuring Penn West's accounting statements accurately reflected the true nature of expenditures by the company and were fully documented and supported."  (*Id*. ¶ 5)

Penn West and Messrs. Takeyasu, Curran and Grab are all named as defendants in the Complaint.  No other individuals are listed, either by name or function, as fellow participants in the purportedly fraudulent scheme, though Mr. Grab is described as having directed several individuals to make journal entries without adequate support.  (*Id*. ¶¶ 49, 62, 69-70, 74, 79-81.) In addition, the Complaint alleges—without elaboration—that Messrs. Takeyasu and Curran "discussed the fraudulent reclass to capital journal entries with [Mr.] Grab and other members of the accounting and finance teams . . . at monthly 'accrual meetings.'"  (*Id*. ¶ 51.)  The Complaint notably omits to contend, however, that all attendees at the accrual meetings were aware of the purportedly fraudulent scheme, and instead identifies only the Manager of Operations Analysis (Susan Wenstrom) as having participated in discussions about it.  (*Id*.)[5]

**B.  <u>The directives purportedly issued by Messrs. Takeyasu and Curran</u>**

Although the Complaint defines the Relevant Period as beginning in 2012, it broadly asserts that Penn West's purported scheme to fraudulently understate its operating expenses dates back to at least 2005 (three years before Mr. Curran joined Penn West).  (Compl. ¶ 41.) The Complaint further alleges that the fraudulent reclassification to capital ("reclass to capex")

---

[5] Ms. Wenstrom is identified by title rather than name in the Complaint, but her name appears in documents relied upon in the Complaint.

scheme was necessary because operating efficiency—typically expressed in terms of operating expenses ("opex") per barrel of oil equivalent ("opex/boe")—was an important metric for the investment community, and Penn West struggled to keep its operating expenses under control. (*Id.* ¶ 2.)  The Complaint omits to address, however, why Penn West would have been willing to improve operating efficiency to the detriment of capital efficiency—a necessary consequence of the purported reclass to capex scheme.  And that omission is of particular significance for the Relevant Period because Penn West announced during that time that it would weigh capital efficiency more heavily than operating efficiency in calculating incentive compensation.[6]

The Complaint likewise provides scant explanation of how the purportedly fraudulent reclass to capex scheme was implemented—other than to make clear that Mr. Grab was at the heart of it.  With respect to the alleged participation of Messrs. Curran and Takeyasu, the Complaint resorts to repeated reference to unspecified discussions and generalized allegations that actions were taken "at the direction" or "with the knowledge" of Messrs. Curran and Takeyasu.[7]  Specifics as to what was said by any of the three individuals are not provided for a single conversation.

In addition, with only two exceptions, the Complaint does not even attempt to correlate specific reclassification entries with purported directives from either Mr. Curran or Mr. Takeyasu.  And the two sets of reclassification entries featured in the Complaint do not support

---

[6] *See, e.g.*, Gredd Decl. Ex. 2 (Penn West Petroleum Ltd., Form 6-K, Management Proxy Circular (May 1, 2014)) at 35-36, 44-50 (noting, first, that under the stock incentive program adopted in early 2013, capital efficiency (but not operating efficiency) would be a discrete criterion and, second, that in calculating cash bonuses, capital efficiency would be accorded approximately four times more weight than operating expenses (30% vs. 7.5%)).

[7] *See, e.g.*, Compl. ¶¶ 48 ("with Takeyasu and Curran's knowledge and oversight"); 50 ("directed by Takeyasu and Curran"); 56 ("Takeyasu and Curran oversaw, approved, and encouraged").  Other examples of pleading that relies on labels, conclusions, innuendo, and vague assertions, rather than particularized allegations, can be found at ¶¶ 1-8, 24-26, 30, 41-47, 51-54, 76-80, 84, 88, 96-97, 100-106, 108, 126, 134, 136-138, 140, 143-145, 148, 150-151, 153, 155-157, 160, 162 and 163.

the narrative the Complaint seeks to advance.  To the contrary, one of the instances involves a $2 million reclassification (the "March 2014 Reclassification") that was promptly reversed after Mr. Curran learned that Mr. Grab had not yet assembled support for it.  *See* Section II.B.2 *infra*.  The second instance involved a series of reclassifications that occurred after a retrospective review of costs for Q2 2012 (the "Q2 2012 Reclassification"), as to which the Complaint openly resorts to speculation in lieu of describing any conversations or documents regarding the reclassification decision, and further omits to allege—undoubtedly because it cannot—that Penn West's senior management and Board were unaware of the reclassification.  *See* Section II.B.1 *infra*.

**C.  The purportedly fraudulent budget process**

The Complaint also contains conclusory assertions that Penn West's corporate budget—which, at least for 2013 and 2014, is alleged to have included a reclass to capex line item—was central to the fraudulent scheme.  As the Complaint would have it, the budget process was a "key" part of the fraudulent scheme because the reclass to capex line item was purportedly determined by Messrs. Curran and Takeyasu based upon what they anticipated needing to reclassify to get opex/boe to a desired level, rather than a good-faith assessment of which anticipated field costs would likely qualify for reclassification.  (Compl. ¶¶ 44-45.)  But while the Complaint's assertions about Penn West's budget process may well reflect the SEC's opinion of that process—which, of course, is entitled to no weight—they fail to specify any particularized basis for that opinion.

The Complaint fails to allege any specifics regarding how the reclass to capex line items for 2013 or 2014 were determined—much less any particulars suggesting that Mr. Curran did not reasonably believe that the line items reflected a good-faith assessment of anticipated field costs that should be capitalized.  Indeed, the sole support cited by the Complaint for its claim that the

$85 million reclass to capex line item for 2013 was viewed as "essentially a 'cookie jar' account of capital to move out of operating expenses when deemed auspicious" (Compl. ¶ 68) is an email exchange with Penn West CEO David Roberts—whom the SEC has publicly exonerated of any wrongdoing at Penn West.[8]

### D. <u>Concealment purportedly undertaken by Messrs. Takeyasu and Curran</u>

The section of the Complaint that accuses Messrs. Takeyasu and Curran of concealing the accounting practices at issue from Penn West's auditor and/or Board is likewise—to borrow a phrase used by the SEC in its pre-motion letter to the Court—long on rhetoric and short on substance.  Rather than pointing to instances of concealment that would support an inference of fraudulent intent, the Complaint simply assumes fraudulent intent as a given and then criticizes Messrs. Takeyasu and Curran for having "concealed" their fraudulent intent from the auditors. (Compl. ¶¶ 126-35.)

Tellingly, the Complaint fails to identify a single instance in which either Mr. Takeyasu or Mr. Curran directed or requested that information not be shared with Penn West's auditors. Nor does the Complaint contain any allegation that either Mr. Takeyasu or Mr. Curran took steps to hide the fact that Penn West reclassified certain costs as capital from the company's auditors.[9]

---

[8] *See* Gredd Decl. Ex. 3 (email referenced in ¶ 68 of the Complaint).  *See also* n.15 and accompanying text *infra* (further discussing the email sent to Mr. Roberts).  Nor is the absence of particularized allegations about the 2013 and 2014 budget process remedied by the Complaint's passing reference to an email from 2009. (Compl. ¶ 46.) Wholly apart from the failings in the SEC's case demonstrated by its need to resort to an email that precedes the Relevant Period by fully three years, *see, e.g.*, *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239-40 (10th Cir. 2016) (as amended) (inference of scienter not supported by remarks made several months before the relevant period), the email does not support an inference that Mr. Curran believed the budget process to be anything other than a good-faith effort to predict how much in field costs were likely to qualify as capital expenditures. Indeed, both the email cited in the Complaint and the PowerPoint it attaches expressly reference the importance of properly reporting capital.  (Gredd Decl. Ex. 4 (email referenced in ¶ 46 of the Complaint).)

[9] Indeed, the SEC was so unsuccessful in its search for evidence of concealment of information from the auditors that its sole allegation in that regard is in fact no more than an unremarkable request by Mr. Curran for an internal document so that it could be forwarded—without alteration—to Penn West's auditors.  (Compl. ¶ 135; Gredd Decl. Ex. 5 (email referenced in ¶ 135 of the Complaint).)  And particularly given that the Complaint does not allege that Mr. Curran or any purported co-schemer designed the format of the document, and does not explain why one might

And, in fact, the manner in which reclassifications were reported and reviewed—namely, through written monthly reports broadly circulated to the accounting and finance teams and discussed at monthly meetings—obviously increased the likelihood that Penn West's auditors would be well aware of the accounting practices at issue. *See* Section II.C *infra*.[10]

###### E. Warnings purportedly ignored by Messrs. Takeyasu and Curran

Finally, the defects on display elsewhere in the Complaint likewise permeate the section addressed to warnings purportedly ignored by Messrs. Takeyasu and Curran. The first of the warnings purportedly ignored is described as coming from the company's Business Controls and Risk Group ("BCR Group"). But despite the SEC's readiness to craft a Complaint exceeding 80 pages, it devotes four short paragraphs—collectively occupying less than a page—to the BCR Group. (Compl. ¶¶ 109-12.) And those four short paragraphs are far more significant for what they omit than what they contain. *See* Section II.C *infra*.

Similarly, while a bit more real estate is afforded to the Complaint's allegations about concerns of Ms. Wenstrom that purportedly went unheeded—11 paragraphs instead of four (Compl. ¶¶ 113-123)—those allegations likewise suffer from significant omissions. Moreover, and no less importantly, the particularized allegations taken as a whole refute rather than support a claim that Mr. Curran ignored Ms. Wenstrom's concerns. *See* Section II.B.2 *infra*.

### ARGUMENT

### THE COMPLAINT FAILS TO MEET RULE 9(b)'s REQUIREMENTS FOR PLEADING FRAUD

It is well settled that district courts play an important role as gatekeepers against

---

reasonably have expected to see a reference to a subcategory of Plant, Property and Equipment when no other subcategory was referenced, the email cited by the Complaint adds nothing to an inference of scienter. *See also* Section II.C *infra* (further discussing interactions with auditors).

[10] Similarly, the sole paragraph devoted in the Complaint to alleged concealment of reclassification practices from Penn West's Board merely confirms that there is in fact no basis for alleging concealment. *See* Section II.B.1 *infra*.

permitting unfounded claims to move forward.  Even in cases that do not allege fraud, Fed. R.

Civ. P. 8(a)(2) requires district courts to dismiss complaints unless they "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "Where a complaint pleads facts that are merely consistent with a defendant's liability,

it stops short of the line between possibility and plausibility of entitlement to relief.  To avoid

dismissal, plaintiffs must nudge[] their claims across the line from the conceivable to plausible."

*SEC v. DiMaria*, 207 F. Supp. 3d 343, 352 (S.D.N.Y. 2016) (quoting *Iqbal* and *Twombly*)

(internal quotation marks and citations omitted).

Moreover, while well-pleaded allegations must be accepted as true for purposes of a

motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Id*. (quoting *Iqbal*) (internal quotation marks and

citations omitted).  As a result, a complaint that offers "labels and conclusions" or "naked

assertion[s] devoid of further factual enhancement" will not survive a motion to dismiss.  *Iqbal*,

556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).  In addition, courts "need not accept as

true any allegations that are contradicted by documents deemed to be part of the complaint, or

materials amenable to judicial notice."  *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *12

(S.D.N.Y. Oct. 25, 2006).  Nor, unsurprisingly, do inconsistent allegations or general claims that

are contradicted elsewhere by more specific allegations qualify as well-pleaded allegations that

must be accepted as true.  *See, e.g.*, *Nationwide Mut. Ins. Co. v. Morning Sun Bus. Co.*, No. 10–

CV–1777, 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011).

Further still, if a complaint rests on averments of fraud, the district court's role as

gatekeeper is significantly expanded.  In order to provide fair notice, prevent coercive actions,

and "safeguard a defendant's reputation from improvident charges of wrongdoing," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks and citation omitted), Rule 9(b) of the Federal Rules of Civil Procedure requires dismissal of claims sounding in fraud unless the complaint alleges particularized facts that "give rise to a strong inference of fraudulent intent." *Id.* (citations omitted).  And where, as here, the entire complaint sounds in fraud, the entire complaint must be dismissed unless the pleading requirements of Rule 9(b) are met.  *See Rombach v. Chang*, 355 F.3d 164, 171-72 (2d Cir. 2004); *SEC v. Patel*, No. CIV. 07-CV-39-SM, 2009 WL 3151143, at *4 (D.N.H. Sept. 30, 2009).[11]

Measured against those settled standards, the SEC's Complaint against Mr. Curran cannot stand.

## I.  The Complaint posits no motive for Mr. Curran to have engaged in fraud, and the fraudulent scheme alleged would in fact have been contrary to his economic interests.

Importantly, the Complaint does not even attempt to contend that Mr. Curran had any personal motive to fraudulently understate Penn West's operating expenses.  Instead, the Complaint does no more than allege generally that operating efficiency was an important metric for Penn West (Compl. ¶ 2) and that, at one point during the Relevant Period, there was a desire to prevent analysts from downgrading Penn West's stock due to a triggering of debt-to-EBITDA ratios in Penn West's debt covenants.  (*Id*. ¶ 59.)  But even if such allegations were sufficient to

---

[11] As the Second Circuit explained in *Rombach*, "[b]y its terms, Rule 9(b) applies to all averments of fraud. This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  355 F.3d at 171 (internal quotation marks and citation omitted). As a result, claims that rely on averments of fraud are subject to the test of Rule 9(b) even if the plaintiff need not prove fraud to proceed under the claim.  *Id*. (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("Fraud allegations may damage a defendant's reputation regardless of the cause of action in which they appear, and they are therefore properly subject to Rule 9(b) in every case.")).  And it cannot credibly be disputed that all of the SEC's causes of action rely on averments of fraud.  Paragraphs 1 through 180 of the Complaint are replete with accusations of fraud, and Paragraphs 1 through 180 are then expressly incorporated by reference into each cause of action against Mr. Curran.  (Compl. ¶¶ 181, 194, 199, 214, 222, 231, 237.)

plead motive as to Penn West—and they are not[12]—they are insufficient as a matter of law to plead motive for an individual defendant.

It has long been the law in this Circuit that "[m]otives that are generally possessed by most corporate directors and officers" do not give rise to the strong inference of fraudulent intent required by Rule 9(b). *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 494-95 (S.D.N.Y. 2017) (quoting and collecting cases) (internal quotation marks and citations omitted).  Thus, as one court has explained, "[t]he mere fact that Defendants had a desire to see the company succeed does not provide a motive to engage in serious fraud." *Harrell v. Primedia, Inc.*, No. 02-cv-2893 (JSM), 2003 WL 21804840, at *3 (S.D.N.Y. Aug. 6, 2003).  Indeed, even general "allegations that defendants stand[] to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-cv-8208 (RO), 2006 WL 1008138, at *10 (S.D.N.Y. Apr. 18, 2006) (internal quotation marks and citation omitted).  Instead, the sort of motive that must be shown to plead a strong inference of fraudulent intent is a "concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted).

The Complaint does not—because it cannot—allege that Mr. Curran gained any "concrete and personal benefit" from participating in the serious fraud alleged in the Complaint, much less a benefit so substantial that it would have caused him to put his livelihood and liberty at risk.  Despite having long had access to Mr. Curran's trading through Penn West's public filings, the SEC's Complaint alleges no suspicious pattern of trading suggesting an effort to

---

[12] *See, e.g.*, *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) (noting the relationship between complying with debt covenants and the universal corporate motive to maintain a high credit rating); *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 744 (D. Md. 2001) (observing that if scienter could be pleaded simply on the basis of a desire to maintain a credit rating or comply with a debt covenant, "virtually every company in the United States experiencing a down turn in the price of its stock would be forced to defend securities fraud actions") (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996)).

"cash in" on a fraudulent understatement of Penn West's operating expenses.

The Complaint likewise does not suggest—again, because it cannot—that Mr. Curran had any concrete reason to believe that increasing Penn West's operating efficiency would result in increased compensation to him personally.  In fact, as Penn West's public filings demonstrate, the guidance given by the company on that point was to the contrary.  As noted above, when Penn West converted in early 2013 to a fixed-formula method for calculating incentive compensation, the formula weighted capital efficiency much more heavily than operating efficiency.  Thus, if anything, Mr. Curran had a personal motive to *resist* the fraudulent scheme alleged in the Complaint.  Stated otherwise, if it is assumed that Mr. Curran was willing to base his accounting decisions on perceived personal benefit, he would have pressed for the capitalization of *fewer* rather than *more* of the costs at issue.

II.     **The Complaint fails to allege particularized facts raising a strong inference of scienter.**

The absence of motive is not in and of itself fatal to a claim of fraud, but it does raise the bar even higher for establishing a basis to proceed.  As the Second Circuit has repeatedly explained, where motive is not apparent, there must be "correspondingly greater" evidence suggesting "conscious misbehavior."  *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted).  That rule is grounded in the common-sense proposition that "without a motive to commit securities fraud, businessmen are unlikely to commit it."  *City of Livonia Emp. Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) (Posner, J.).  And where—as here—an individual had reason to believe that engaging in the alleged fraud would run counter to his personal economic interests, the strength of the allegations supporting an inference of fraudulent intent should, as a matter of logic, be greater still.  *Cf. Kalnit*, 264 F.3d at 140 (affirming dismissal of a complaint where plaintiff's theory of fraud "defie[d] economic

13

reason").

The Complaint in this action does not come close to overcoming the inference suggested by the absence of a motive to commit fraud—much less what is suggested by the presence of a motive that runs **counter** to the alleged fraud **plus** the absence (as the SEC has acknowledged) of any directive or encouragement from the corporate suite to commit fraud.[13]

**A.  Much of the Complaint is devoted to conclusory and at times contradictory allegations.**

Far from offering particularized allegations sufficient to support a strong inference of fraudulent intent, much of the Complaint is devoted to precisely the sort of vague and conclusory allegations that this Court and others have characterized as insufficient to give rise to a strong inference of fraudulent intent.  *See, e.g.*, *PetEdge*, 234 F. Supp. 3d at 493 (collecting cases).  As noted above, those allegations reflect:

- reliance on bare assertions that actions were taken "at the direction" or "with the knowledge" of or "were caused" by Messrs. Curran and Takeyasu;

- conclusory assertions that conversations occurred at which the fraudulent scheme was discussed or directions were given;

- failure to provide specifics for even a single one of those conversations; and

- failure to differentiate between Messrs. Curran and Takeyasu, typically referring to them collectively rather than individually.

---

[13] In addition to the arguments below—which, like the Complaint itself, focus primarily on reclass to capex— Mr. Curran also adopts and incorporates by reference the arguments made in the Takeyasu Memorandum regarding: (a) the Complaint's passing criticism of two other accounting practices (royalty payment reclassification and a practice referred to by Mr. Grab as "accrual softening"); and (b) the Complaint's suggestion that an inference of scienter is supported by the fact that Penn West restated its financial results for the Relevant Period.  As demonstrated in the Takeyasu Memorandum, the specifics of the restatement in fact **undercut** an inference of scienter, and even if the accounting practices at issue were incorrect—which the Complaint assumes but does not allege with particularity— that in and of itself is not suggestive of fraudulent intent.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) ("Allegations of . . . accounting irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." (internal quotation marks and alterations omitted)); *In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 703-04 (S.D.N.Y. 2000).

As a result, those allegations contribute nothing to an inference of fraudulent intent and also run afoul of Rule 9(b)'s requirement that the manner in which an individual participated in a fraud be alleged with specificity.  *See, e.g.*, *PetEdge*, 234 F. Supp. 3d at 493 (insufficient to assert that actions were taken "at the direction of" or were "caused" by another); *SEC v. Parnes*, 2001 WL 1658275, at *4-5 (S.D.N.Y. Dec. 26, 2001) (dismissing fraud claims where complaint made "undifferentiated references" to defendants); *SEC v. Yuen*, 221 F.R.D. 631, 636 (C.D. Cal. 2004) (same); *see also, e.g.*, *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987) (Rule 9(b) requires that the complaint "inform each defendant of the nature of his alleged participation in the fraud"); *Patel*, 2009 WL 3151143, at *12-13 (same).

Moreover, the Complaint's approach demonstrates the wisdom of the requirement that a claim of fraud be based upon particularized allegations, rather than labels, conclusions, or generalities.  The Complaint does not ***expressly*** allege that it is inherently nefarious to:

- reclassify costs to capital;

- budget for the amount of costs likely to be reclassified;

- determine whether particular costs qualify for reclassification;

- track performance against budgets or forecasts; or

- assess the reasons for differences between performance and budgets or forecasts.

Yet, the Complaint treats all of the foregoing as inherently nefarious activities, explicitly citing them as "evidence" that Messrs. Takeyasu and Curran were engaged in a fraudulent scheme to understate Penn West's operating expenses,[14] and appearing to characterize conversations limited to those topics as conversations in furtherance of fraud.

---

[14] *See, e.g.*, Compl. ¶ 43 (monitoring Penn West's operating expenses); ¶ 53 (same); ¶ 55 (same); ¶ 64 (discussion of reclass to capex entries at monthly accrual meetings held with members of the accounting and finance teams); and ¶ 71 (monitoring Penn West's performance against budget); ¶¶ 72-74 (same); ¶ 78 (same); ¶ 82 (same).

In fact, however, each of the foregoing activities is fully consistent with good faith and thus contributes nothing to an inference of fraudulent intent.  *See, e.g.*, *SEC v. Espuelas*, 579 F. Supp. 2d 461, 474 (S.D.N.Y. 2008) ("allegations consistent with innocent conduct are never sufficient for a strong inference").  Moreover, to the extent the SEC believes there to be specifics that cause the discussions referenced in the Complaint to cross the line from good-faith business activity to actionable conduct, the Complaint consistently elects not to provide them.  And that close-to-the-vest approach is impermissible for actions that sound in fraud.  *See Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) ("A suit charging fraud may not be based on facts so secret that the defendants cannot be told what they are.") (quoting *Segan* v. *Dreyfus Corp.*, 513 F.2d 695, 696 (2d Cir. 1975) (emphasis and internal quotation marks omitted)).

The Complaint's apparent readiness to characterize all conversations about reclass to capex as conversations in furtherance of fraud also puts the SEC in the untenable position of accusing a broad array of individuals—including some whom it has publicly exonerated—of participating in a fraudulent scheme.  Thus, as noted above, the sole support for the Complaint's claim that the line item for reclass to capex in Penn West's 2013 budget was in furtherance of a fraudulent scheme is an email with then-CEO David Roberts, whom the SEC has publicly exonerated from participating in the purported fraud.  And, in fact, as the SEC plainly recognized in exonerating Mr. Roberts, the email's reference to the 2013 budget does no more than note that the budget included a prediction that $85 million in repair and maintenance costs would qualify for capitalization, but that the prediction may not prove to be precisely accurate.[15]

---

[15] *See* Gredd Decl. Ex. 3 (email referenced in ¶ 68 of the Complaint).  Nor is that the only example of allegations that use labels or conclusory assertions to ascribe fraudulent conduct to individuals whom the SEC has publicly exonerated.  *See also* Compl. ¶ 26 (alleging that CEO Murray Nunns "falsely observed" on an earnings call that Penn West's "cost structure was in control and moving downward"); *id.* ¶ 61 (characterizing an email exchange that included Mr. Nunns as a discussion of the purportedly fraudulent Q2 2012 Reclassification); *id.* ¶ 93 (characterizing statements by Mr. Takeyasu in an email exchange with CEO David Roberts as admissions of fraudulent conduct).  *See also* Gredd Decl. Ex. 6-7 (emails referenced in ¶¶ 61 and 93 of the Complaint).

Similarly, by virtue of having asserted (without specifics) that the fraudulent reclass to capex scheme was discussed at accrual meetings (Compl. ¶ 51)—a tactic that enables the Complaint to repeatedly allege (equally without specifics) that conversations in furtherance of fraud took place "before or at accrual meetings"—the Complaint potentially accuses a large group of senior executives of having participated in a serious fraud.  But the Complaint also appears to retreat from the claim since it goes on to identify only Ms. Wenstrom as having discussed the alleged fraud with Messrs. Takeyasu, Curran, and Grab at accrual meetings.  (*Id.*)

To the extent the Complaint intends to allege that all attendees of the accrual meetings were "in on the fraud," it fails to provide sufficient particulars about who the attendees were to assess the plausibility of that contention.  Thus, by way of example, if the attendees included anyone from Penn West's internal controls group, that would plainly render implausible any claim that discussions or documents distributed at the meetings were reflective of fraud.  Similarly, the larger the group, the unlikelier it is that all were willing to participate in fraud— particularly when none had a motive to do so.

Conversely, to the extent the Complaint is not contending that all attendees of the accrual meetings were participants in the purported fraud, it fails to explain how the fraud could have been discussed at meetings that included those not "in the know."  And, of course, the fact that a reader of the Complaint is left to wonder about those issues is among the reasons why the allegations in the Complaint fail to support a strong inference of fraud.

### B.  The Complaint's handful of attempts at more particularized allegations contain significant omissions and mischaracterizations of the documents they reference.

Nor is the Complaint rescued by its handful of attempts at more particularized allegations.  To the contrary, the paucity of those allegations—particularly when coupled with the extent to which the allegations reflect gaps in the narrative, inconsistencies, and

mischaracterizations of the documents cited—further demonstrates why the Complaint does not satisfy the requirements of Rule 9(b). Moreover, in assessing the import of those failings, this Court can and should consider that the SEC is no ordinary plaintiff, but instead one with significant investigative resources. *See, e.g.*, *Espuelas*, 579 F. Supp. 2d at 481 (finding the "paucity of the SEC's allegations of scienter . . . particularly telling" given that the Complaint was filed after 17 investigative depositions and noting that, if further particulars existed to support the SEC's claims, "surely [they] should have found [their] way into the Complaint").[16]

## 1. The Q2 2012 Reclassification

The Q2 2012 Reclassification—which, as noted above, involved a retrospective reassessment of costs for the second quarter of 2012—is one of only two instances in which the Complaint attempts to link specific reclassification entries with purported directives from Mr. Takeyasu or Mr. Curran. But even though the SEC apparently regards the Q2 2012 Reclassification as significant, it still offers no allegations as to what was discussed or what Penn West's documents reveal regarding the decision to reclassify. Instead, the SEC simply speculates that the reclassifications were unjustified entries made in reaction to a negative report from an analyst and/or a desire to increase the likelihood that Penn West would remain in compliance with its debt covenants. (Compl. ¶¶ 57, 59-60.) Speculation contributes nothing to an inference of scienter, however, and the SEC's disinclination to include any specifics about discussions or documents resulting in the Q2 2012 Reclassification yields the inference that the specifics are unlikely to be helpful to the SEC. *Espuelas*, 579 F. Supp. 2d at 481.

In an effort to create at least the illusion of wrongdoing, the Complaint's discussion of the

---

[16] *See also, e.g.*, *Parnes*, 2001 WL 1658275, at *5 (noting that the SEC had conducted a three-year investigation but still produced allegations that were not sufficiently specific as to certain defendants); *SEC v. Tambone*, 417 F. Supp. 2d 127, 131 (D. Mass. 2006) (declining the SEC's invitation to relax the requirements of Rule 9(b) and noting that the SEC took testimony of 23 witnesses and conducted extensive document discovery during investigation phase). *Accord, e.g.*, *Yuen*, 221 F.R.D. at 636–37; *Patel*, 2009 WL 3151143, at *14-15.

Q2 2012 Reclassification includes a passing attempt to suggest that Messrs. Curran and Grab concealed the reclassification from Penn West's Board.  (Compl. ¶ 65.)  But that effort to suggest concealment fails for several reasons.  First, and importantly, the email exchange referenced in the Complaint belies the Complaint's description of it.  Mr. Grab did not express concern about disclosing the reclassification to the Board; instead, he simply questioned whether reference to the reclassification "add[ed] any value" in the context of an individual PowerPoint slide.  (Gredd Decl. Ex. 8 (email referenced in ¶ 65 of the Complaint).)  And given that the full email exchange shows that it was Mr. Grab who initially suggested including a reference to the reclassification, it can scarcely be suggested that he wanted to conceal it from the Board.

Moreover, Mr. Curran's response—"Agree, just bury it in Operated Opex"—cannot reasonably be characterized as a conspiratorial instruction since it was conveyed to an individual who is not alleged to have participated in the purported fraudulent scheme, and who cannot have been expected to be amenable to concealing matters from the Board.[17]  Nor, notably, does the Complaint offer any basis for concluding that it was unreasonable for Mr. Curran to agree that reference to reclass to capex did not make sense in a summary slide that focused on bottom-line numbers rather than the components of those numbers.

Further still, the Q2 2012 Reclassification was anything but a secret at Penn West. Instead, as a document quoted elsewhere in the Complaint demonstrates, it was openly discussed with senior members of management—including one of the CEOs whom the SEC has exonerated.  (Gredd Decl. Ex. 6 (email referenced in ¶ 61 of the Complaint).)  And the Complaint carefully refrains from comment on whether the Q2 2012 Reclassification had been

---

[17] That individual was Mark Chyc-Cies, who was part of the corporate planning and investor relations team.  *See* Gredd Decl. Ex. 5 (identifying Mr. Chyc-Cies as the Manager of Corporate Analysis). Moreover, the Complaint conspicuously omits to allege that Mr. Chyc-Cies interpreted the term "bury" as suggesting ill intent—as opposed to, for example, shorthand commonly used by Mr. Curran for showing fewer rows or columns on a slide.

discussed in any prior presentations to the Board.

If no such discussion had occurred, the Complaint surely would have so alleged to strengthen its proposed inference of intent to conceal (though the factors recited above still would have made that inference implausible).  But if the Q2 2012 Reclassification had in fact been mentioned in prior written presentations to the Board, that fact would preclude the inference the Complaint seeks to draw.  As a result—and especially in light of the Complaint's habit of commenting elsewhere on the presence or absence of written communications—its failure to do so here is a further indication that the inference of intent to conceal is unfounded.

### 2.   Interactions with Operations Analysis Manager Susan Wenstrom

The Complaint's only other effort to link a specific reclassification entry with purported directives from Messrs. Curran and/or Takeyasu is likewise the product of pleading that is, at best, selective in the extreme.

The March 2014 Reclassification makes two appearances in the Complaint.  In its first appearance, the $2 million entry is characterized as having been "directed" by Mr. Curran, although in keeping with the Complaint's conclusory approach, no specifics are offered about the exchange that yielded the purported "directive."  (Compl. ¶ 81.)  That portion of the Complaint also acknowledges that the March 2014 Reclassification was reversed after Ms. Wenstrom expressed concern about it, and promises further discussion of that topic later in the Complaint.

But when the March 2014 Reclassification reappears—42 paragraphs later—no mention of the reversal is made, and Ms. Wenstrom's concern is instead presented as one in a series of examples of Mr. Curran purportedly ignoring concerns brought to his attention.  (*Id.* ¶ 123.) And, in an effort to create the impression that Mr. Curran ignored Ms. Wenstrom's concern, Paragraph 123 cites the email in which Ms. Wenstrom raised her concern and then simply states: "Curran does not appear to have responded in writing and does not recall doing so."

20

Even without the admission tucked away earlier in the Complaint, Paragraph 123's approach to pleading would fail to achieve its goal.  Alleging that Mr. Curran did not respond in writing does not, of course, establish—or even suggest—that Mr. Curran did not respond by other means.  An important piece of the narrative is missing, thus rendering it unreasonable to conclude that Mr. Curran had in fact ignored Ms. Wenstrom's concern.  And, with the added piece of the narrative yielded by Paragraph 81 (which acknowledges that the entry at issue was reversed), it is clear that the correct inference is the **opposite** of the one Paragraph 123 seeks to suggest:  When a concern was brought to Mr. Curran's attention, he in fact did not hesitate to respond promptly and appropriately—even if not "in writing."

Further still, Paragraph 123's approach to pleading is fully in keeping with the approach taken in the entirety of the section in which that paragraph appears.  The section leads with the headline that Mr. Curran "ignored" Ms. Wenstrom when she "sounded the alarm about improper accounting practices."  (Compl. Heading F.2. (capitalization omitted).)  But despite asserting that Mr. Curran did nothing in response to concerns expressed by Ms. Wenstrom—or, at minimum, nothing that can be characterized as "meaningful" (*id.* ¶ 125)—the Complaint's own allegations demonstrate the contrary.  Read together, those allegations demonstrate that after Ms. Wenstrom expressed concern to Mr. Curran in the fall of 2013 that she personally had not seen supporting documentation for the reclass to capex entries that had been made year-to-date, Mr. Curran:

- promptly requested at the next accrual meeting an analysis of the basis for the year-to-date reclass to capex (*id.* ¶ 115);

- suggested that Ms. Wenstrom likewise follow up with Mr. Grab to keep the process moving (*id.* ¶ 116); and

- requested that Ms. Wenstrom remind him if her concerns had not been resolved before any additional reclass to capex entries were made.  (*Id.* ¶ 120; Gredd Decl. Ex. 9 (email referenced in ¶ 120 of the Complaint).)

21

In addition, the Complaint's own particularized allegations—as opposed to its conclusory criticism and speculation—further demonstrate that Mr. Curran's actions in 2013 were sufficiently satisfactory to Ms. Wenstrom that she did not hesitate to approach Mr. Curran again when Mr. Grab directed her group several months later to make an entry based solely upon his assurance that adequate documentation existed and was in the process of being gathered. (Compl. ¶ 123, Gredd Decl. Ex 10 (email referenced in ¶ 123 of the Complaint).)  Further still, as demonstrated above—and in direct contrast to the impression that Paragraph 123 seeks to create—Mr. Curran responded by directing reversal of the entry.

In short, wholly apart from the gaps, gyrations, and conclusory assertions that mark the Complaint's narrative, its own particularized allegations contradict its claim that Mr. Curran ignored concerns that were brought to his attention.  In addition, the gaps in the narrative strongly suggest—especially in light of the extensive investigation undertaken by the SEC—that a more complete record would be even more fatal to the SEC's effort to support an inference of fraudulent intent on the part of Mr. Curran.[18]

---

[18] Nor is that analysis altered by the Complaint's inclusion of a peculiarly worded assertion that following the September 2013 accrual meeting, "[Mr.] Grab **admitted to** [Ms. Wenstrom] that no list of projects capitalized to date existed, and that [Mr.] Curran was aware of that fact."  (Compl. ¶ 115 (emphasis added).)  As made clear by the terms of his settlement on file with the Court, Mr. Grab has a cooperation agreement with the SEC.  As a result, if in fact Mr. Grab was prepared to testify that he told Mr. Curran (or that Mr. Curran knew by some other means) that no support existed for the 2013 reclass to capex, or even that Mr. Grab himself believed that no support existed, the Complaint would surely have included allegations to that effect.  And it does not.  Instead, the Complaint offers a tortured phrasing that suggests that Mr. Grab in fact is prepared to testify to the contrary, and that the SEC is prepared to attempt to impeach its own cooperating witness and interpret an exchange in a manner that would be disputed by Mr. Grab, and quite possibly by Ms. Wenstrom as well.  Moreover, even assuming that the 2013 reclass to capex could not be supported—a fact that is conclusorily asserted but not established by the Complaint's allegations—its further allegations regarding the actions of Mr. Curran and Ms. Wenstrom in the fall of 2013 flatly belie any suggestion that Mr. Curran knew that no support existed (otherwise, he scarcely would have asked for a report analyzing the support) or that Ms. Wenstrom believed that Mr. Curran knew that no support existed (otherwise, she scarcely would have sought his assistance in confirming its existence).

C. **The Complaint's allegations regarding interactions with Penn West's internal controls group and external auditors are more significant for what they omit than what they contain.**

Similarly, the gaping omissions in the Complaint's paragraphs regarding interactions with Penn West's internal controls group and external auditors are far more telling than the handful of conclusory assertions contained in those paragraphs.

As noted above, the Complaint devotes all of four paragraphs (comprising less than a page) to its sweeping assertion that Messrs. Curran and Takeyasu purportedly ignored warnings from the BCR Group (Penn West's internal controls group) that all was not well at Penn West. Turning first to what the four paragraphs contain, the Complaint alleges that: (a) the BCR Group determined during its 2012 testing that one-third of the journal entries it had sampled lacked supporting documentation; (b) the majority of those entries came from Mr. Grab's group; (c) the head of the BCR Group determined that the policy, as designed, was deficient; (d) the head of the BCR Group "reported the group's findings" to Messrs. Takeyasu and Curran; and (e) the BCR Group considered the policy to be "ineffective" for more than a year. (Compl. ¶¶ 109-12.)

But tellingly—and despite having had the benefit of more than 20 investigative depositions and access to a vast quantity of documents produced by Penn West—the Complaint:

- offers *no* specifics as to what the head of the BCR Group actually said to Messrs. Takeyasu and Curran in his presumably oral report;

- does *not* allege that anyone in the BCR Group believed that their testing sample was sufficient to suggest that one-third of Penn West's journal entries—either overall or in Mr. Grab's group—in fact lacked adequate documentation;

- does *not* allege that the head of the BCR Group told Messrs. Takeyasu or Curran that, in light of the group's findings, he would not be able to certify that Penn West's internal controls were effectively designed and operating effectively;

- does *not* allege that the head of the BCR Group ever declined to certify that Penn West's internal controls were effectively designed and operating effectively;

23

- does **not** allege that the head of the BCR Group regarded either Mr. Takeyasu or Mr. Curran as ever being unresponsive to anything he reported;

- does **not** allege that the head of the BCR Group believed that either Mr. Takeyasu or Mr. Curran should have been doing more than they already were to monitor or strengthen internal controls;

- does **not** allege that the head of the BCR Group expressed dissatisfaction—or was in fact dissatisfied—with steps being taken within the accounting and finance groups to strengthen internal controls; and

- does **not** allege that the head of the BCR Group ever expressed a concern—or even had a concern—that his group's findings suggested that adequate support for Penn West's journal entries did not in fact exist.

And by omitting comment on all of those topics, the Complaint's four paragraphs on the BCR Group—at best—provide too little information to support the inference it would have the Court draw. *See, e.g.*, *Calfo v. Messina*, No. 15-cv-4010 (LGS), 2016 WL 3661548, at *12 (S.D.N.Y. July 5, 2016) ("being put on notice about internal control deficiencies does not on its own rise to the level of being put on notice of fraud").

In the same vein, the Complaint attempts to suggest—but fails to offer particularized allegations that in fact suggest—that Messrs. Curran and Takeyasu concealed Penn West's accounting practices from Penn West's auditors. As noted above, the Complaint:

- does not identify a single instance in which either Mr. Takeyasu or Mr. Curran directed or requested that information not be shared with Penn West's auditors; and

- does not contain any allegation that either Mr. Takeyasu or Mr. Curran took steps to hide the fact that Penn West reclassified certain costs as capital from the company's auditors.

Indeed, although the Complaint attempts through innuendo to create the contrary impression, it does not even allege—undoubtedly because it cannot—that Penn West's auditors were unaware that reclass to capex entries were made at Penn West.

Moreover, the manner in which reclass to capex was handled at Penn West can scarcely

24

be characterized as secretive.  As the Complaint itself alleges, the practice was discussed openly at monthly accrual meetings—attended by an array of senior members of the accounting and finance groups, all of whom undoubtedly were in contact with Penn West's auditors.  In addition, far from reporting on reclass to capex against budget in the dead of night or in hushed tones, the written materials prepared by Mr. Grab's group for the accrual meetings openly included the information on charts distributed to all who attended the meetings.

Tellingly, the Complaint refrains from comment on whether the accrual packets found their way to any members of Penn West's external audit team.  But even if the SEC would prefer not to speak to whether they did, it is nonetheless indisputable that, by putting the information on paper and distributing it at widely attended monthly meetings, the likelihood of that information being available to Penn West's auditors was significantly increased.  And that sort of transparency powerfully undercuts any claim of fraudulent intent.  *See, e.g.*, *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) (disclosure of activity at issue was "hardly the sort of behavior one would expect from the perpetrator of securities fraud"); *Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (transparency negates an inference of scienter).

*        *        *        *        *        *

In its pre-motion letter to the Court, the SEC urged that its Complaint be assessed holistically.  We wholeheartedly join in that request because, when the Complaint is assessed holistically, the picture that emerges is one of a regulator's opinion—without the particularized support required to transform that opinion into viable averments of fraud, and with so many omissions and inconsistencies that it cannot reasonably be regarded as raising any inference (much less the requisite strong inference) of fraudulent intent.  Under the settled law of this Circuit, the Complaint does not meet the test of Rule 9(b) and accordingly must be dismissed.

## <u>CONCLUSION</u>

For the reasons stated, the Complaint should be dismissed in its entirety as to Mr. Curran.

Dated: November 3, 2017

/s/ Helen Gredd
Helen Gredd
Leigh G. Llewelyn
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Tel: (212) 921-8399
Fax: (212) 764-3701
hgredd@lswlaw.com
lllewelyn@lswlaw.com

*Counsel for Defendant Jeffery A. Curran*