**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND : 
EXCHANGE COMMISSION, :
:
          Plaintiff, :
:
     v. : No. 17 Civ. 4866 (GHW)
:
PENN WEST PETROLEUM LTD., d/b/a :
OBSIDIAN ENERGY LTD., TODD H. : **Oral Argument Requested**
TAKEYASU, JEFFERY A. CURRAN, and :
WALDEMAR GRAB, :
:
          Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT
# OF TODD H. TAKEYASU'S MOTION TO DISMISS

Richard F. Albert
Jasmine Juteau
Priya Raghavan
MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.    The SEC Fails to Allege Facts Showing that Mr. Takeyasu Had Motive and
      Opportunity to Commit Fraud ............................................................................... 4

      A.    The SEC Has Not and Cannot Allege that Mr. Takeyasu Benefitted
            Personally From the Alleged Fraud ........................................................... 4

      B.    The SEC's Allegations of Corporate Motive are Irrational and
            Insufficient ................................................................................................. 5

II.   The SEC Fails to Allege Facts that Constitute Strong Circumstantial Evidence
      of Conscious Misbehavior or Recklessness .......................................................... 8

      A.    The SEC Fails to Plead Facts Showing Mr. Takeyasu Knew or Was
            Reckless in Not Knowing that the Challenged Accounting Was Improper ........... 9

            1.    The Challenged Accounting Was Not *Per Se* Improper,
                  and the SEC Fails to Allege that Mr. Takeyasu Knew or
                  Was Reckless in Not Knowing of Any Improper Accounting ..............10

            2.    The Transparency of the Challenged Accounting Negates
                  Any Inference of Scienter .................................................................14

      B.    The SEC Fails to Plead Facts Showing that Budgeting Reclassifications
            is Improper ................................................................................................. 16

      C.    The SEC Fails to Plead Facts Showing that Mr. Takeyasu Was on
            Notice of Unsupported Adjustments ........................................................... 20

      D.    The SEC Fails to Plead Facts Showing that Mr. Takeyasu Withheld
            Pertinent Information from Auditors ........................................................... 22

      E.    The SEC Fails to Allege Facts Supporting a Strong Inference Scienter
            Despite a Two-and-a-Half Year Investigation ............................................. 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbad v. Amman,*
  285 F. Supp. 2d 411 (S.D.N.Y. 2003) ................................................................. 5

*Anderson v. Spirit Aerosystems Holdings, Inc.,*
  827 F.3d 1229 (10th Cir. 2016) ........................................................................ 13

*Atl. Gypsum Co. v. Lloyds Int'l Corp.,*
  341 U.S. 214 (1951) ............................................................................................ 7

*Chill v. General Elec. Co.,*
  101 F.3d 263 (2d Cir.1996) ................................................................... 3, 8, 20

*Cincinnati, New Orleans & Texas Pac. Ry. Co. v. United States,*
  424 F.2d 563 (Ct. Cl. 1970) ............................................................................. 10

*City of Livonia Emp. Ret. Sys.,*
  711 F.3d 754 (7th Cir. 2013) ............................................................................. 8

*Doré Energy Corp. v. Prospective Inv. & Trading Co.,*
  No. 05 cv 1657, 2010 WL 4068802 (W.D. La. Oct. 14, 2010) ............................. 10

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2d Cir. 2000) ............................................................................... 3

*Goplen v. 51jobs, Inc.,*
  453 F. Supp. 2d 759 (S.D.N.Y. 2006) .............................................................. 24

*In re Bristol-Myers Squibb Sec. Litig.,*
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......................................................... *passim*

*In re Browning-Ferris Indus. Inc. Sec. Litig.,*
  876 F. Supp. 870 (S.D. Tex. 1995) ................................................................. 16

*In re Chevron U.S.A., Inc.,*
  109 F.3d 1016 (5th Cir. 1997) ......................................................................... 21

*In re Intelligroup Sec. Litig.,*
  527 F. Supp. 2d 262 (D.N.J. 2007) ................................................................... 6

*In re Merrill Lynch & Co.,*
   273 F. Supp. 2d 351 (S.D.N.Y. 2003)........................................................................... 4

*In re N. Telecom Ltd. Sec. Litig.,*
   116 F. Supp. 2d 446 (S.D.N.Y. 2000)........................................................................... 5

*In re Satyam Computer Servs. Ltd. Sec. Litig.,*
   915 F. Supp. 2d 450 (S.D.N.Y. 2013)......................................................................... 20

*In re Stonepath Grp., Inc. Sec. Litig.,*
   397 F. Supp. 2d 575 (E.D. Pa. 2005) ........................................................................... 5

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001)..................................................................................... 7, 8

*Kushner v. Beverly Enterprises, Inc.,*
   317 F.3d 820 (8th Cir. 2003) ...................................................................................... 23

*Lentell v. Merrill Lynch & Co.,*
   396 F.3d 161 (2d Cir. 2005)......................................................................................... 4

*Novak v. Kasaks,*
   216 F.3d 300 (2d Cir. 2000)..................................................................................... 3, 5

*Okla. Firefighters Pension & Ret. Sys. v. Ixia,*
   No. CV 13-08440, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015)................................ 8

*Owens v. Jastrow,*
   789 F.3d 529 (5th Cir. 2015) ...................................................................................... 15

*PetEdge, Inc. v. Garg,*
   234 F. Supp. 3d 477 (S.D.N.Y. 2017).......................................................................... 9

*Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp.,*
   499 F. App'x 345 (5th Cir. 2012) ............................................................................... 19

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)......................................................................................... 3

*Schwab v. E\*TRADE Fin. Corp.,*
   No. 16-CV-05891 (JGK), 2017 WL 2929501 (S.D.N.Y. July 10, 2017) ..................... 3, 4, 5, 8

*S.E.C. v. DiMaria,*
   207 F. Supp. 3d 343 (S.D.N.Y. 2016)........................................................................... 19

*S.E.C. v. Espuelas,*
   579 F. Supp. 2d 461 (S.D.N.Y. 2008)................................................................ 6, 13, 16, 24

*S.E.C. v. Lucent Techs. Inc.,*
   363 F. Supp. 2d 708 (D.N.J. 2005) ............................................................................... 3

*S.E.C. v. Patel,*
   No. CIV. 07-CV-39-SM, 2009 WL 3151143 (D.N.H. July 7, 2009) ........................... 3, 24, 25

*S.E.C. v. Parnes,*
   No. 01-CV-0763 (LLS), 2001 WL 1658275 (S.D.N.Y. Dec. 26, 2001) ................................ 3

*S.E.C. v. Yuen,*
   221 F.R.D. 631(C.D. Cal. 2004) ................................................................................. 24

*Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.,*
   No. 07-14348, 2009 WL 10667541 (S.D. Fla. Mar. 31, 2009)................................................ 16

*Shields v. Citytrust Bankcorp,*
   25 F.3d 1124 (2d Cir. 1994)................................................................................. 3, 5, 8

*Thomas v. Shiloh Indus.,*
   No. 15-CV-7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ....................... 17, 18

*Toussaint v. JJ Weiser & Co.,*
   No. 04 CIV 2592 (MBM), 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005) ............................... 23

*Vogel v. Sands Bros. & Co.,*
   126 F. Supp. 2d 730 (S.D.N.Y. 2001)........................................................................... 24

*Wolfe v. Aspenbio Pharma, Inc.,*
   587 F. App'x 493 (10th Cir. 2014) ............................................................................... 13

*Zucco Partners v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ..................................................................................... 12

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6)............................................................................................. 1, 25

Defendant Todd H. Takeyasu respectfully submits this memorandum in support of his motion to dismiss the Complaint ("Complaint") filed by Plaintiff United States Securities and Exchange Commission ("SEC") pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6).  For the reasons stated below, the Complaint should be dismissed in its entirety as to Mr. Takeyasu.[1]

## PRELIMINARY STATEMENT

Despite its bulk—and though the SEC has had the benefit of more than two-and-a-half years of investigation concerning Penn West Petroleum Ltd. ("Penn West" or the "Company") *and* at least one cooperating witness at the center of the conduct—the Complaint fails to allege particularized facts supporting any inference, much less a strong inference, of fraudulent intent with respect to Mr. Takeyasu.  As Penn West's primary regulator, the Alberta Securities Commission ("ASC"), has effectively acknowledged, the ASC's and SEC's lengthy joint investigation revealed that the facts simply do not support such a claim, and the SEC has failed in its struggle to plead around the facts.  The out-of-context half-truths, conclusory allegations and assignment of corrupt intent to ordinary business conduct set forth in the Complaint fall far short of the applicable legal standard.

The Complaint amounts to a strained effort to convert disparate accounting issues identified in a Restatement into a top-down fraud directed by Mr. Takeyasu, the former CFO, and Mr. Curran, the former Vice President of Accounting.  The SEC's theory is untenable for a number of reasons.  Foremost among them is that the core issue identified in the Restatement was a technical deficiency:  the reclassification of certain expenses from operating to capital ("reclass to capex") by means of journal entries that did not contain sufficient back-up

---

[1] Mr. Takeyasu respectfully joins in the memorandum filed today by Defendant Jeffrey A. Curran and incorporates by reference the arguments therein that are equally applicable to Mr. Takeyasu.

documentation.  Ensuring timely and appropriate support for such journal entries was the responsibility of Waldemar Grab and other members of Penn West's accounting staff.  Even if it were enough to raise a strong inference of fraudulent intent—and it is not—there is simply no evidence, in the Complaint or anywhere else, that Mr. Takeyasu knew of or condoned any employee's failure to properly carry out their duties in this regard.  And the Complaint suffers a glaring omission:  there is no allegation that Penn West did not, in fact, undertake capital projects sufficient to support the sums reclassified to capex.  Thus, though the SEC purports to claim that expense figures were fabricated, it cannot credibly claim they were even substantively wrong, much less plead compelling facts suggesting that Messrs. Takeyasu or Curran knew or were reckless in not knowing that was the case.

Allegations of a CFO-directed fraud to reduce Penn West's reported operating expenses ("opex") are inherently irrational for several additional reasons:  (i) the alleged scheme would actually reduce the personal compensation of Messrs. Takeyasu and Curran; (ii) Penn West was simultaneously reclassifying expenses in the *reverse* direction, thereby *increasing* opex; (iii) as the Complaint's own allegations demonstrate, the accounting practices at issue were discussed openly and regularly; and (iv) there is no claim that the accounting practices at issue were unknown to or rejected by Penn West's external auditor, KPMG LLP (Canada) ("KPMG").

In the place of facts the Complaint offers rhetoric, and a few demonstrably insufficient attempts at checking boxes on the standard template for accounting fraud complaints, including a misleading suggestion that the Company's internal controls review group put Mr. Takeyasu on notice of the fraud, and a strikingly weak insinuation that Mr. Takeyasu hid the accounting practices at issue from the Company's auditors. Viewed singly and in combination, the SEC's claims against Mr. Takeyasu (and, for that matter, Mr. Curran) fall far short of the type of

2

substantive and detailed fraud allegations that are required to survive a motion to dismiss in this Circuit.

## ARGUMENT

In the Second Circuit, a complaint alleging securities fraud must allege facts that give rise to a strong inference of scienter with the particularity demanded by Rule 9(b) of the Federal Rules of Civil Procedure.[2] *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000); *Shields* v. *Citytrust Bankcorp*, 25 F.3d 1124, 1128 (2d Cir. 1994). "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996); *see S.E.C. v. Parnes*, No. 01-CIV-0763 (LLS), 2001 WL 1658275, at *5 (S.D.N.Y. Dec. 26, 2001).

"The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128. "In order to plead scienter adequately, the plaintiff must allege facts supporting a strong inference with respect to each defendant." *Schwab v. E*TRADE Fin. Corp.*, No. 16-CV-05891 (JGK), 2017 WL 2929501, at *8 (S.D.N.Y. July 10, 2017). The SEC fails to

---

[2] Rule 9(b) applies to all of the claims asserted in the Complaint because they all sound in fraud. The SEC's Complaint begins by alleging a "multi-year accounting fraud scheme," and incorporates these allegations by reference in each claim. Compl. ¶¶ 1, 181, 190, 194, 199, 208, 214, 218, 222, 227, 231, 237, 242, 246, 250. In these circumstances Rule 9(b)'s heightened pleading standard applies whether or not scienter is a required element of the SEC's claims. *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (Rule 9(b)'s "heightened pleading standard" applies to all claims that "sound in fraud" and "is not limited to claims styled or denominated as fraud . . . insofar as the claims are premised on allegations of fraud"). This includes, among others, alleged Exchange Act Section 13 books and records rules violations when, as here, they are based on allegations of fraud. *See, e.g.*, *S.E.C. v. Lucent Techs. Inc.*, 363 F. Supp. 2d 708, 727-28 (D.N.J. 2005) (aiding and abetting claims under Exchange Act Section 13(a) and related rules subject to Rule 9(b) particularity requirement when the allegations "sound in fraud"); *S.E.C. v. Patel*, No. CIV. 07-CV-39-SM, 2009 WL 3151143, at *4 (D.N.H. July 7, 2009) (applying Rule 9(b) to Section 13 claims). Accordingly, Mr. Takeyasu's motion applies to all claims against him: Claims I, III, IV, VI, VIII and X-XIV.

allege any facts that would establish Mr. Takeyasu's fraudulent intent and the Complaint must therefore be dismissed for failing to satisfy the Rule 9(b) standard for pleading scienter.

I.     **The SEC Fails to Allege Facts Showing that Mr. Takeyasu Had Motive and Opportunity to Commit Fraud**

    A.     **The SEC Has Not and Cannot Allege that Mr. Takeyasu Benefitted Personally From the Alleged Fraud**

To raise a strong inference of scienter through motive and opportunity to defraud, a plaintiff must allege that the defendants "benefitted in some concrete and personal way from the purported fraud." *Schwab*, 2017 WL 2929501, at *8. However, the SEC alleges no cognizable motive at all for Mr. Takeyasu (or, for that matter, Mr. Curran) to engage in the alleged fraud, nor does it allege that Mr. Takeyasu personally benefitted from the fraud in any way.

The SEC could not plausibly make such a claim, as it is fully aware that Mr. Takeyasu would in fact have received higher compensation if the alleged fraud had *not occurred*. The accounting adjustments at issue lowered reported opex and increased reported capex, thereby worsening Penn West's capital efficiency, a metric used both to assess Penn West's overall performance, and for determining executive bonuses including Mr. Takeyasu's.[3] In calculating Mr. Takeyasu's bonus, Penn West weighed capital efficiency (30% of the calculation) four times as heavily as operating costs (7.5% of the calculation). Mgmt. Proxy Circular at 44. Therefore, the conduct constituting the alleged fraud, specifically the increase in capex, had the effect of lowering Mr. Takeyasu's compensation. In fact, Mr. Takeyasu would have earned higher compensation if opex and capex had been recorded as they were in the Restatement.

---

[3] Penn West Petroleum Ltd., Form 6-K, Management Proxy Circular (May 14, 2014), at 44, available at https://www.sec.gov/Archives/edgar/data/1334388/000119312514197342/d727914dex991.htm, hereinafter, "Mgmt. Proxy Circular." In considering a motion to dismiss under Rule 12(b)(6), this Court may consider documents attached to the Complaint or incorporated by reference, disclosure documents publicly filed with the SEC and facts of which judicial notice may properly be taken under Federal Rule of Evidence 201. *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 357 (S.D.N.Y. 2003), *aff'd sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005).

The SEC has failed to allege a cognizable motive because the "publicly available documents [] demonstrate that [the] defendant['s] motive[] could only have been the opposite of what is alleged in the complaint." *Abbad v. Amman*, 285 F. Supp. 2d 411, 418 (S.D.N.Y. 2003), *aff'd*, 112 F. App'x 97 (2d Cir. 2004); *see Shields,* 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463 (S.D.N.Y. 2000) (failure to plead scienter where "[t]o the contrary, [company] executives had a financial incentive *not* to engage in the alleged fraudulent scheme").

### B.     The SEC's Allegations of Corporate Motive are Irrational and Insufficient

Failing to make any allegation of personal benefit or motive, the SEC instead makes the generalized allegations that Messrs. Takeyasu and Curran participated in the fraud in order to "artificially lower reported operating costs and make Penn West's financial condition appear more robust than it was," and in the year 2012, to "lower[] [Penn West's] ratio of senior debt to EBITDA and keep[] the company from exceeding the 3.0 debt-to-EBITDA ceiling" imposed by Penn West's debt covenants that year.  Compl. ¶¶ 6, 30, 59-60.  These allegations similarly fail to establish a motive sufficient to plead a strong inference of scienter.  To the contrary, these allegations fall squarely within the category of "motives possessed by virtually all corporate insiders, including . . . the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability . . . ." *Novak*, 216 F.3d at 307 (internal quotation omitted); *see Schwab*, 2017 WL 2929501, at *8 (same)*; In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 593 (E.D. Pa. 2005) (defendant's desire to comply with debt covenants is a

motive generally possessed by most directors and officers and is insufficient to support an inference of scienter).[4]

Moreover, the SEC's theory that the Defendants engaged in a fraudulent accounting scheme in furtherance of their "common objective to artificially lower reported operating costs and make Penn West's financial condition appear more robust than it was" (Compl. ¶ 6) is belied by the Restatement itself.  Penn West's Restatement not only found that certain opex were incorrectly reclassified as capex, but also that, conversely, capex were "incorrectly classified as operating expenses," a highly inconvenient fact that the SEC simply ignores.[5]  The amounts the Restatement found to be erroneously added to opex were substantial:  $59 million over the course of the Relevant Period of 2012 through first quarter 2014.  *Id*.

The SEC offers no explanation why Penn West had a reclassification process working at cross-purposes with the alleged "scheme to reduce Penn West's . . . overall reported [opex]." Compl. ¶ 30.  Indeed though the SEC expressly cites the January 2013 "accrual packet"—a "monthly written report" provided to Messrs. Takeyasu and Curran—as an example of the alleged method the Defendants used to monitor the "improper reclassifications" to lower opex (*id*. ¶¶ 53, 71-73), it ignores that the very same document also reported capex which "[i]ncludes

---

[4] The SEC's allegations that the Defendants participated in the fraud in order to comply with debt covenants are also insufficient because they fail to account for the alleged fraud in other years, providing no explanation for the continuation of the alleged fraud in 2013 and the first quarter of 2014.  *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 342 n.58 (D.N.J. 2007) (finding plaintiff's motive allegations insufficient where the alleged motive failed to explain the continuation of the alleged fraud through the final twelve months of the class period).  Moreover, the SEC's debt covenant theory does not explain why the challenged accounting practices were used by the Company for many years prior to 2012, which the SEC implicitly acknowledges by citing documents from years before the "Relevant Period" (2012 through Q1 2014), such as August 2009 and August 2010.  Compl. ¶¶ 2, 41, 46, 93; *see S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 479 (S.D.N.Y. 2008) (historical use of accounting practice supported defendants' view that it was legitimate).

[5] Penn West Petroleum Ltd., Report of Foreign Issuer on Form 6-K (Sept. 18, 2014), Ex. 99.2 at 2, available at https://www.sec.gov/Archives/edgar/data/1334388/000119312514345800/d791751dex992.htm, hereinafter "Restatement Rel."

*Reclass to OPEX*," *i.e.,* the ongoing accounting process whereby certain expenditures were

reclassified from capex to opex, in direct opposition to the purported scheme.  Ex. 1 at

PEN0028638 (emphasis added).[6]  The fact that accounting staff who ultimately reported to Mr.

Curran and Mr. Takeyasu were simultaneously emptying and filling the supposed "cookie jar"

contradicts the SEC's theory that they deliberately and fraudulently used the reclass to capex

process to decrease the Company's reported opex numbers.  Compl. ¶¶ 6, 68.  In addition, the

Restatement found that the alleged "accrual softening" had no impact on Penn West's reported

operating expenses, because "[t]he effect of these over-accruals . . . was to overstate" capex in

2013 and 2014, with no impact in 2012, thereby serving only to reduce the Company's reported

capital efficiency, with no benefit whatsoever to the alleged scheme to reduce reported opex.

Restatement Rel. at 3.

      Far from "mak[ing] Penn West's financial condition appear more robust than it was," the

accounting practices criticized in the Restatement did the opposite:  they decreased Penn West's

net income in 2013 and the first quarter of 2014 by 3% and 7%, respectively.  Compl. ¶ 6;

Restatement Rel. at 4.  These fundamental flaws in the SEC's theory doom any inference of

fraudulent intent.  It is "nonsensical" and "defies economic reason" that the Defendants would

have engaged in an elaborate, multi-year scheme to artificially move opex to capex only to

concurrently move tens of millions of dollars in the opposite direction and cause a decrease in

Penn West's net income.  *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (internal quotation

omitted); *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990)

(dismissing complaint for failure to plead scienter where the defendant-lenders' alleged conduct

---

[6] Citations to "Ex.__" refer to exhibits to the Declaration of Richard F. Albert in Support of Todd H.
Takeyasu's Motion to Dismiss, filed herewith.

made repayment of their loans less likely, a "theory of an alleged scheme to defraud [that] defies logic"); *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440, 2015 WL 1775221, at *21 (C.D. Cal. Apr. 14, 2015) (noting that "it defies economic reason, and is therefore implausible that a company would intentionally engage in a scheme to *understate* its revenue and *overstate* its losses in years the company was losing money and missing its guidance").

## II.    The SEC Fails to Allege Facts that Constitute Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness

Where, as here, the Defendants' motive to commit fraud is lacking, "the strength of the circumstantial allegations [that a defendant consciously or recklessly misbehaved] must be correspondingly greater." *Kalnit*, 264 F.3d at 142; *Schwab*, 2017 WL 2929501, at *9.  This requirement is based on the logical proposition that "without a motive to commit securities fraud, businessmen are unlikely to commit it." *City of Livonia Emp. Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013).  Reckless misbehavior is found only where the conduct "is highly unreasonable and . . . represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Chill*, 101 F.3d at 269.

Unable to allege specific facts demonstrating Mr. Takeyasu's knowledge or conduct, the SEC instead relies heavily on assertions of uncontroversial facts, distorted presentations of documents and mischaracterizations of others' conduct, culminating in the claim that Mr. Takeyasu "knew or was reckless in not knowing" about alleged improprieties.  Compl. ¶ 129; *id.* ¶¶ 171, 182, 184, 196, 200, 202, 216, 224, 233.  But, under law well-established in this Circuit, a pleading technique that merely "couple[s] a factual statement with a conclusory allegation of fraudulent intent . . . [will] not satisfy the requirements of Rule 9(b)." *Shields*, 25 F.3d at 1129; *see In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("In order

to avoid dismissal, plaintiffs must do more than plead mere conclusory allegations or legal conclusions masquerading as factual conclusions.") (internal quotation omitted).

The substance of the SEC's allegations is the claim that Mr. Takeyasu would "cause and permit" the actions of the individual who has become the SEC's cooperating witness, Waldemar Grab. Compl. ¶ 47. The Complaint incants repetitively that Grab acted with Mr. Takeyasu's "knowledge and oversight," that Mr. Takeyasu "oversaw, approved, and encouraged" Grab, or that Grab was "directed" by him. *Id.* ¶¶ 48, 50, 56, 68. But despite the SEC's cooperation agreement with Grab, strikingly absent from the Complaint is any specification of the words Mr. Takeyasu supposedly spoke or the deeds he supposedly undertook to cause or encourage or direct Mr. Grab's actions. Because the Complaint "contains no particularized factual allegations to support these conclusory assertions" it cannot stand. *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (collecting cases and dismissing complaint alleging that actions were taken "at [defendant's] direction" or "with his knowledge and approval"). As we discuss in greater detail, *infra*, the SEC's limited and highly strained attempts to bolster its claims against Mr. Takeyasu with specifics are insufficient to sustain its Complaint.

### A.    The SEC Fails to Plead Facts Showing Mr. Takeyasu Knew or Was Reckless in Not Knowing that the Challenged Accounting Was Improper

The Complaint relies on three particular accounting practices—the reclass of opex to capex, the reclass of opex to royalty payments ("UOCR"), and the application of accrued opex—and rolls them all into what it characterizes as "a scheme to reduce Penn West's reported opex/boe and its overall reported operating expenses." Compl. ¶ 30. However, there is nothing inherently improper about the accounting practices at issue, all of which are contemplated by the relevant accounting standards. Nor has the SEC alleged facts sufficient to claim that Mr. Takeyasu knew or was reckless in not knowing that these accounting practices were improper as

9

applied.  Indeed the fact that all of these accounting practices were utilized for several years before the Relevant Period, and openly discussed among senior management, undermines the contention that they were nothing more than tools to carry out an allegedly fraudulent scheme.

> **1.     The Challenged Accounting Was Not *Per Se* Improper, and the SEC Fails to Allege that Mr. Takeyasu Knew or Was Reckless in Not Knowing of Any Improper Accounting**

First, with respect to the reclass from opex to capex, the SEC concedes that "[u]nder IAS 16, in certain circumstances an expense can be capitalized . . . instead of [treated as] an operating expense on the income statement—if the expense extends the useful life of property, plant, and equipment," and that "determining whether an expenditure can be recognized as [opex] or [capex] requires the application of professional judgment and analysis based on the specific circumstances of each expenditure." *Id.* ¶¶ 38-39.  Indeed it is well recognized in the oil and gas industry and generally that the determination of whether costs are operating or capital requires the significant exercise of judgment.[7]  Similarly, the SEC notes that the "accrual method" used by Penn West is a proper accounting approach "in accordance with IAS 1.27 and 1.28 and IFRS Conceptual Framework Sections 4.49 and 4.52." *Id.* ¶ 36.  Further, the SEC fails to cite a single provision of IFRS, Canadian GAAP, or other accounting authority applicable to UOCR, and certainly none that bar the practice generally.  It is clear the SEC cannot allege that the challenged practices were *per se* improper under applicable accounting standards.

---

[7] *See Doré Energy Corp. v. Prospective Inv. & Trading Co.*, No. 05 cv 1657, 2010 WL 4068802, at *7 (W.D. La. Oct. 14, 2010) (recognizing in an oil drilling contract dispute that "the determination of operating expenses is often a fact-intensive inquiry . . . requir[ing] an assessment of the purpose of the expense"; while "[g]enerally accepted accounting procedures . . . may lead to one determination . . . equally accepted accounting practices, using acceptable and alternate methods and practices, can result in [] opposite result[s]") (internal quotation omitted); *Cincinnati, New Orleans & Texas Pac. Ry. Co. v. United States*, 424 F.2d 563, 582 (Ct. Cl. 1970) ("[T]he differentiation of capital expenditures and operating expense disbursements is largely a matter of sound discretion and experienced business judgment.").

Moreover, the SEC fails to plead with specificity any facts supporting Mr. Takeyasu's direction or awareness of an improper application of these complex accounting rules.  Instead, the SEC offers only the most conclusory characterizations that these accounting treatments were "fraudulent," not "legitimate," "misleading" or "improper" (*see*, *e.g.*, Compl. ¶¶ 7(b), 30, 46, 68), while failing to allege "facts from which a strong inference can be drawn that [Mr. Takeyasu] knew or [was] reckless in not knowing that the accounting . . . was wrong and, therefore, that the financials recognizing revenue [were] wrong."  *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 568.  With respect to reclass to capex, the SEC never states what amounts of capex were improperly recognized that should otherwise have been treated as opex.  Indeed the Restatement the SEC relies upon is likewise silent on this score, reporting only that increases in Penn West's reported capex "appear to have been made without adequate supporting documentation," (Restatement Rel. at 1 (also concluding the same for UOCR amounts)) and notably nowhere concluding that sufficient capital projects to support the sums reclassified to capex were not undertaken.

The SEC's "accrual softening" allegations are similarly lacking in necessary detail.  The SEC alleges that Penn West was required to reverse any excess accruals in its operating expense account at the end of each accounting period.  Compl. ¶ 99.  However, the applicable accounting provision cited—IAS 37.59, pertaining to contingent liabilities and assets—further states that a reversal is required only "[i]f an outflow [is] no longer probable."  The SEC never claims that Mr. Takeyasu knew or was reckless in not knowing that the outflows for Penn West's accruals during the Relevant Period were no longer probable.  The Complaint contains no factual allegations as to Mr. Takeyasu's knowledge or recklessness as to whether accruals were not being handled appropriately—for example, facts indicating his alleged awareness of anticipated

11

expenses and over-accruals, or that accruals releases lacked connection to accrued expenses.  *See In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 569 ("Plaintiffs make no specific factual allegations of Defendants' actual knowledge or access to knowledge that the reserves in question were inappropriate at the time they were established or reversed . . . allegations of GAAP violations, standing alone, do not establish scienter.")  Generic invocations of "an improper accounting practice called 'accrual softening'" are not sufficient.  Compl. ¶ 96.

The SEC similarly fails to particularize allegations that Mr. Takeyasu knew the UOCR process was improper.  At best the Complaint alleges that he believed that Penn West was "a bit unique" in its application and was aware that certain Penn West personnel disagreed with the practice, despite the fact that Penn West had used it "for many years."  *Id.* ¶¶ 93-94.[8]  But even when adequately set forth, "disagreement among employees with regard to [an accounting practice], is not enough to establish a cogent or compelling scienter allegation—especially where, as here, there is no indication that [] management acted with deliberate recklessness in choosing the [accounting practice]."  *Zucco Partners v. Digimarc Corp*., 552 F.3d 981, 999 (9th Cir. 2009), *as amended* (Feb. 10, 2009).  Most notably, the Complaint nowhere alleges that the Company's auditor, KPMG, was ignorant of the Company's UOCR practice or that KPMG ever suggested that the Company discontinue it.

The Complaint likewise is devoid of particularized facts indicating that Mr. Takeyasu knew or was reckless in not knowing that Grab and his accounting staff were not faithfully

---

[8] The SEC also misleadingly states that a chartered accountant at Penn West "raised concerns to Takeyasu" about the UOCR process, selectively quoting an email not sent to Mr. Takeyasu in which the accountant indicated he would do away with UOCR but "Todd [Takeyasu] thinks otherwise."  Compl. ¶ 94 (quoting email).  Setting aside the fact that the email was not sent to Mr. Takeyasu, an email reciting a purported difference of opinion between the author and Mr. Takeyasu hardly supports the assertion that the author "*raised concerns*," however vague, with Mr. Takeyasu.  This is neither the first nor last time the Complaint utilizes documents in a disingenuous manner.  *See* discussion *infra* Part II.C.

applying their "professional judgment" in determining whether the expenses reclassified from opex "extend[] the useful life of property, plant, and equipment" or were otherwise not appropriately allocating royalty expenses or accruals.  Compl. ¶¶ 38-39.[9]  Absent these crucial facts, there is nothing to support the allegation that Mr. Takeyasu instructed others to *improperly* reclassify expenses and apply accruals, or had any awareness they were doing so.  Thus, while the SEC's allegations "establish knowledge of" the accounting adjustments, they fall well short of averring "knowledge of the impropriety of their accounting."  *Espuelas*, 579 F. Supp. 2d at 480-81.  To the contrary, the Complaint acknowledges that Mr. Takeyasu received quarterly certifications from Grab during the Relevant Period stating that "the employees within my assigned areas of responsibility understand and are complying with the relevant policies, procedures and controls" and "I am maintaining sufficient evidence to provide reasonable support for any process review / assessment."  Compl. ¶¶ 163-64.  Mr. Takeyasu was entitled to rely, and did rely, on Grab's and others' work concerning the appropriate application of the challenged accounting treatments.

The Complaint is little more than an effort to transmute technical accounting mistakes by a subordinate that largely relate to failures to attach adequate documentary support to journal entries—errors that were ultimately discovered, investigated and identified in the Restatement— into a claim of fraud undertaken with Mr. Takeyasu's "knowledge and oversight," or at his

---

[9] In a weak attempt to implicate Mr. Takeyasu, the SEC relies on a November 2005 email from Grab to Mr. Takeyasu.  Compl. ¶ 41.  As an initial matter, the document is far too remote, over six years prior to the start of the Relevant Period, to create any inference of scienter.  *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016), *as amended* (July 6, 2016) (finding that a defendant's remarks about a company's problems, made months before the relevant period, would not establish scienter during the relevant period); *see also Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 498 (10th Cir. 2014) (same).  Tellingly, the Complaint is devoid of even the merest peep from the SEC's cooperator, Grab, connecting the 2005 email to the alleged scheme.  Moreover, Grab's November 2005 email is wholly inapposite because (1) it is a discussion of the reclass from capex to opex, adjustments moving in the *opposite* direction of the alleged fraud, and (2) it is simply a poorly-expressed reference to the entirely legitimate concept of materiality.

"direction." *Id.* ¶¶ 48, 50, 56, 68.  "Such *ipse dixits* are insufficient to meet the requirements of

Rule 9(b)."  *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 570.

### 2.   The Transparency of the Challenged Accounting Negates Any Inference of Scienter

Moreover, it is clear from the Complaint, despite its contradictory allegations that

Messrs. Takeyasu and Curran "concealed the accounting fraud scheme from Penn West's Board

and senior management" (Compl. ¶¶ 185-86), there was nothing hidden about the existence of

the challenged accounting treatments.  Mr. Takeyasu, Mr. Curran and others at the company

openly discussed Penn West's reclass to capex, UOCR and accruals practices:

- The Complaint concedes that the accrual meetings "were held as part of Penn West's internal control processes" (*id.* ¶ 29), but nowhere claims that representatives from the Business Controls and Risks ("BCR") group were not in regular attendance, or that the accrual packets or discussions were in any way concealed from the BCR group or KPMG;

- Other senior accounting executives—who are not claimed to have participated in the alleged fraud—attended the accrual meetings where the SEC claims that the allegedly fraudulent accounting practices were openly discussed.  Ex. 1 at PEN0028610;

- Messrs. Takeyasu and Curran routinely asked questions at the accrual meetings about "the amount of operating expenses, Penn West's opex/boe numbers, and [] adjustments to reported operating expenses."  Compl. ¶ 52;

- The accrual packets provided at the accrual meetings detailed "the reclass to capital amounts that had been moved, or needed to be moved," and the accrual packets also discussed accrual softening entries for several months in 2013.  *Id.* ¶¶ 53, 103;

- Mr. Takeyasu referenced the reclass from opex to capex in an email to fellow senior executives on September 10, 2012, stating:  "We are capitalizing an additional $40 [million] of opex, $10 [million] of which we did in Q2."  *Id.* ¶ 61;

- Following year-end 2012, Mr. Takeyasu asked that a slide be prepared for the Penn West Board describing the final 2012 opex/boe calculation, including $40 million in reclassifications.  *Id.* ¶ 65;

- Mr. Takeyasu discussed the reclass budget with Penn West's Vice President of Production in an email dated October 31, 2012, including "the impact that the reclass to capital target would have on projected opex/boe for 2013."  *Id.* ¶ 67;

- Mr. Takeyasu referenced the reclass budget in an email to Penn West's CEO, David Roberts, stating, "on Opex we loosely have the R&M [repair and maintenance] of $85MM." *Id.* ¶ 68; and

- Mr. Takeyasu also referenced the UOCR practice in an email to Mr. Roberts, stating that Penn West was "a bit unique with this reclass," and in an email to Penn West's former CEO, Murray Nunns, stating that the practice had been maintained at the Company "for many years." *Id.* ¶ 93.

The open and transparent manner in which these practices were discussed, in the presence of Penn West's senior management, CEO and Board, is "hardly the sort of behavior one would expect from the perpetrator of securities fraud" and negates any inference of scienter. *S.E.C. v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) (reversing district court finding of scienter); *see Owens v. Jastrow*, 789 F.3d 529, 541 (5th Cir. 2015) (transparency negates an inference of scienter). That is particularly the case where, as here, the SEC has publicly stated its determination that neither of the two CEOs with whom Mr. Takeyasu communicated about the challenged accounting practices and their impact on opex/boe, David Roberts and Murray Nunns, engaged in any personal misconduct.[10]

Simply put, the mere fact that Mr. Takeyasu knew that Penn West employed recognized and appropriate accounting adjustments does not establish that he was aware of any impropriety in how they were applied, much less that he directed that they be used in a fraudulent scheme to misstate expenses. Nor is that sufficiently supported by any of the other purported facts put forth by the SEC.

---

[10] *See* Compl. ¶¶ 68, 93; *SEC Charges Oil and Gas Company and Top Finance Executives with Accounting Fraud*, SEC Press Release, June 28, 2017, available at https://www.sec.gov/news/press-release/2017-120.

**B.     The SEC Fails to Plead Facts Showing that Budgeting Reclassifications is Improper**

Because the SEC has failed to allege that Mr. Takeyasu knew or was reckless in not knowing that reclassifications of opex were improper, its allegations regarding the budgeting for such reclassifications must also fail.  And yet the focal point of the SEC's allegations against Mr. Takeyasu relate to his role in regard to the budget, including reclassifications (*see*, *e.g*., Compl. ¶¶ 3, 44-45, 46, 67, 73, 76, 88), an entirely legitimate and appropriate business activity that the SEC pejoratively characterizes as "[a] key part of Defendants' accounting fraud scheme." *Id.* ¶ 44.  The SEC's near-exclusive reliance on an ordinary, appropriate corporate activity to purport to show Mr. Takeyasu's participation in the alleged fraud speaks volumes, as it is "unremarkable . . . [that] management must play a role in the preparation of budgets and forecasts." *In re Browning-Ferris Indus. Inc. Sec. Litig*., 876 F. Supp. 870, 901 (S.D. Tex. 1995).

Efforts to track budgets, or actually achieve something close to the budgeted numbers, are also unremarkable evidence of normal business activities.  They are not—without additional particularized facts—allegations supporting fraud.  *See, e.g*., *Sheet Metal Workers Local 28 Pension Fund v. Office Depot, Inc.*, No. 07-14348, 2009 WL 10667541, at *9 (S.D. Fla. Mar. 31, 2009) (allegations that defendants encouraged lower-level staff to meet budget numbers "could not reasonably be interpreted as ordering or even encouraging the fraud alleged").  The SEC's allegations that Messrs. Takeyasu and Curran discussed the reclass to capital at monthly accrual meetings, monitored the reclass to capital journal entries against the budget, or "oversaw, approved, and encouraged [Wally] Grab . . . to make numerous accounting journal entries to achieve targets" (*see*, *e.g*., Compl. ¶¶ 4, 51-53, 60-61, 64, 73), are merely evidence of routine business activities, not fraud.  *Espuelas*, 579 F. Supp. 2d at 474 (explaining that "certain allegations consistent with innocent conduct are never sufficient for a strong inference [of

16

fraudulent intent].  Allegations that corporate officers took affirmative action to meet revenue, earnings, or profit estimates contribute little to a strong inference.").  As discussed above, the reclassification of expenses is a wholly proper accounting practice; thus, establishing or monitoring a budget to anticipate such reclassifications is hardly fraud—it is prudent financial forecasting.

The SEC attempts to bolster its theory with allegations that the reclass to capex budget "did not reflect any attempt to estimate the amount of [opex] . . . properly [] classifiable as [capex]" and was made "without meaningful contribution from Penn West's production department."  Compl. ¶ 45.  But these claims are refuted by another document selectively quoted in the Complaint, an October 2012 email from Mr. Takeyasu to Penn West's Senior Vice President of Production, Gregg Gegunde.  *Id.* ¶ 67.  In the email, a discussion concerning "the reclass to capital target" for 2013, Gegunde states with regard to opex that "I agree that we have not been capitalizing enough $$."  *Id.*; Ex. 2 at PW01497189.  Substantive involvement by the senior-most production executive in this budget item (not to mention many other communications with production personnel concerning the reclass to capital budget of which the SEC staff is well aware) negates the inherently unlikely claim that as CFO, Mr. Takeyasu personally established a budget line "without any inquiry" into actual expenditures.  Compl. ¶ 185.

Further, even if they were accurate, the SEC's budget allegations lack the requisite specificity.  Indeed, in *Thomas v. Shiloh Indus.*, No. 15-CV-7449 (KMW), 2017 WL 1102664, at *3 (S.D.N.Y. Mar. 23, 2017), the court rejected more forceful and detailed allegations regarding a senior executive's role in budgeting than those posited here.  In that case, the plaintiffs alleged accounting fraud when a lower-level employee misallocated steel surcharges, resulting in an understatement of the cost of sales.  Plaintiffs alleged that the individual defendants' role in the

fraud was predicated on their participation in setting budgets, pressuring employees to meet budgets with "impossible targets" and failure to ask questions "probing into the numbers."  *Id.* at *3; *Thomas*, Corr. Amd. Compl. ¶¶ 69, 106 (Feb. 23, 2016) ("*Thomas* CAC").  The *Thomas* CAC included allegations that accounting personnel would develop a budget, only to have senior management "'knock it down' four or five times, [so] that, as a result, some budgets were ludicrous." *Id.* ¶ 54.  The district court dismissed such claims, explaining that "[s]everal insufficient allegations of recklessness can never add up to a compelling inference of scienter." *Thomas*, 2017 WL 1102664, at *4-6.

The SEC's claims that Messrs. Takeyasu and Curran did not question entries made by Grab in "large" or "round" numbers, or ask Grab or others to reconcile monthly reclass entries against actual spending (Compl. ¶¶ 50, 56, 185, 197, 204, 216, 223, 233-34), are similarly insufficient.[11]  As noted in the Complaint, Penn West prepares its financial statements using the "accrual method." *Id.* ¶ 36.  The accrual method recognizes assets or liabilities for amounts expected to be received or paid in the future; thus, "[i]n many cases, cost or value must be estimated."[12]  Because the journal entries relating to reclass to capex thus reflected estimates of anticipated expenditures, it is unsurprising that they were made in round number entries, which of course would have been fully visible to Penn West's auditors, KPMG.  Furthermore, allegations that senior management did not "ask questions probing into the numbers," or did not pick up on abnormalities in accounting entries, fail to establish a compelling inference of scienter.  *Thomas*, 2017 WL 1102664, at *3, *6 (finding no particularized allegation "that the

---

[11] The SEC nowhere in the Complaint alleges that Mr. Takeyasu had access to the actual journal entries at issue.

[12] IFRS Conceptual Framework Section 4.41, available at http://www.frascanada.ca/international-financial-reporting-standards/resources/unaccompanied-ifrss/item71833.pdf.

Individual Defendants had personal knowledge of the accounting discrepancies at issue");
*Pipefitters Local No. 636 Defined Ben. Plan v. Zale Corp.*, 499 F. App'x 345, 350 (5th Cir. 2012) (defendants' failure to verify "suspicious numbers" failed to support a strong inference of scienter).[13]

By comparison to these insufficient allegations, what is absent from the Complaint is even more telling.  There is no allegation that the production department or any of its employees disputed the amount budgeted for reclass to capital, and certainly no claim they brought any such disagreement to the attention of Mr. Takeyasu.  There is no claim that the amount allotted for the reclass was inconsistent with the business's prior experience for capital expenditures.  Nor, crucially, is there any allegation that capital projects sufficient to support the budgeted reclass were not, in fact, undertaken during the Relevant Period.  Without such critically important details, the SEC's Complaint alleges nothing more than the CFO's run-of-the-mill oversight of the budget process, which provides no support for a claim of fraudulent intent.[14]

---

[13] Likewise, the allegation that the "internal target was being met at or very close to the dollar" (Compl. ¶ 68) fails to support a strong inference of scienter.  *Compare In re Bristol-Myers Squibb*, Amd. Compl. ¶¶ 43, 220 (April 14, 2003) (alleging that the "precision with which the defendants met the[] targets" where the company "met or exactly exceeded [targets] by one penny" "support[ed] a strong inference of scienter"), *with In re Bristol-Myers Squibb,* 312 F. Supp. 2d at 568 (dismissing Amd. Compl.).  Moreover, as the Complaint concedes, in 2013 Penn West missed its target of $85 million by $500,000, or 6%—hardly supporting the allegation that the target was met "at or very close to the dollar."  Compl. ¶¶ 68, 74.

[14] In stark comparison, the complaint before this Court in *S.E.C. v. DiMaria* included allegations such as: (i) a defendant directed others to book audit fees improperly and wrote in an email:  "I don't care if the[] [auditors] complain, we can say it was a mistake."; (ii) he told recipients of his instructions on adjustments to "keep it under the radar"; (iii) after one division's accountants refused to book an entry as directed, the defendant told employees that he was "going to rip [the division CEO's] f[***]ing head off" and fire the accountants if they "f[***] up the accounting"; and (iv) another defendant participated in emails expressing "serious concerns about the validity" of the booking of certain revenue and wrote:  "We need to be very careful how this gets reflected or be able to have some basis for the estimate to show [the auditor] if they happen to figure it out."  207 F. Supp. 3d 343, 348-50 (S.D.N.Y. 2016).

C.     **The SEC Fails to Plead Facts Showing that Mr. Takeyasu Was on Notice of Unsupported Adjustments**

The Complaint's allegations that Mr. Takeyasu ignored supposed red flags alerting him to widespread deficiencies in Penn West's journal entry policy are demonstrably inadequate, both as pled and upon examination of yet more documents misleadingly cited by the SEC.

First, the SEC does not allege—because it cannot—that either the BCR group or Penn West's external auditor, KPMG, ever found or reported a material weakness or even a significant deficiency[15] concerning Penn West's journal entry policy.[16] An allegation of the lowest level finding of a mere deficiency is far from an adequate basis to claim that the danger of improper accounting adjustments "was either known to [Mr. Takeyasu] or so obvious that [he] must have been aware of it." *Chill*, 101 F.3d at 269; *see In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 480 (S.D.N.Y. 2013) (auditor providing notice of internal control deficiencies did not by itself raise an inference "about how [a] more thorough investigation into these deficiencies would have led the . . . [d]efendants to discover the fraud").

Further, the allegations are inadequate on their face.  In Paragraph 110, the Complaint alleges that the BCR group tested Penn West's journal entry policy for the fourth quarter of 2012 and found that "*nearly* one-third of the journal entries *sampled* lacked supporting documentation" (emphasis added).  The Complaint then inexplicably inflates this allegation to a much broader

---

[15] "The threshold for material weaknesses is a 'higher bar' than that of significant deficiency; a material weakness is a deficiency, or a combination of deficiencies, in internal controls such that there is a reasonable possibility that a material misstatement of the reporting issuer's financial reports will not be prevented or detected on a timely basis."  Likewise, the threshold for significant deficiency is a "higher bar" than that of a mere "deficiency."  *See Guide to Going Public in Canada*, Ernst & Young LLP, at 13, available at http://www.ey.com/Publication/vwLUAssets/EY-Guide-to-going-public-in-Canada/$FILE/EY-Guide-to-going-public-in-Canada.pdf.

[16] Indeed, the Complaint concedes that Mr. Grab, who was named among the parties responsible for remediating the journal entry deficiency identified by the BCR group, certified to Mr. Takeyasu that he was "accountable for maintaining an effective internal control structure in my assigned process(es)" and was "not aware of any material or significant control deficiencies."  Compl. ¶ 164.

claim, namely, that Messrs. Takeyasu and Curran were therefore on "notice that at least one third of journal entries"—not only entries sampled—lacked documentary support and that the "journal entry policy" was deemed "ineffective" for one year. *Id*. ¶¶ 111-12. The Complaint never explains why Messrs. Takeyasu and Curran should have concluded from a finding based on a sample of unstated size that there was a pervasive problem with Penn West's journal entry practices.[17]

Indeed, the Complaint disingenuously distorts and exaggerates the BCR group's actual findings. The documents the SEC relies upon tell a strikingly different story, of a limited and technical issue in meeting a protocol regarding how to "attach" backup documentation for individual journal entries on Penn West's accounting system.[18] The document the SEC quotes in the Complaint states that for nine journal entries (all posted in Q3 2012), among thirty sampled from Q3 2012 and Q4 2012:

> Our inquiry indicated that supporting documentation relating to multiple entries are not recreated and attached to each applicable entries [*sic*]. Such documentation are attached to only one of the entries. The other entries do no [*sic*] provide information of where or who to contact to locate the supporting documentation.

Ex. 3 at 1, 7, 11. Thus, in other words, the issue was that backup for multiple entries was attached to only one of the entries, and not adequately cross-referenced to the others: not that it was missing, not that it did not exist, and not that it did not adequately support the relevant entries.

---

[17] The Complaint alleges no facts regarding what Mr. Takeyasu was told about the BCR group's finding, including the number of sampled and failed journal entries, whether they represented a significant or even statistically relevant number of entries, much less whether they offered a sufficient basis to extrapolate conclusions regarding the company's journal entry policy as a whole. *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) (refusing to extrapolate sample trial liability findings to a group of mass tort plaintiffs, given the absence of "competent, scientific, statistical evidence" regarding relevant variables and sufficiency of sample size to provide sufficient confidence that sample trial results were statistically valid).

[18] The SEC's allegations are based upon and quote from two very lengthy and dense documents: an Excel spreadsheet documenting the BCR group's findings for all quarters of 2012, and an Excel spreadsheet documenting the BCR group's findings for the first, second and third quarters of 2013. Exs. 3 and 4 (providing relevant excerpts).

And there is more that demonstrates how narrow and technical was the issue that the BCR group identified:

- *First,* there were no exceptions found in *any* of the entries tested that were posted in the fourth quarter 2012 (that is, ten out of ten entries tested attached proper backup documentation), indicating that the issue was not consistently observed.  Ex. 3 at 1, 12.

- *Second,* Exhibit 3 reveals that the BCR group had established (and presumably also reported up the chain) a remediation plan to be carried out by lower-level accounting and finance personnel.  Ex. 3 at 1, 7.

- *Third,* Exhibit 4 reveals that the "ineffective" finding related only to two out of ten aspects of the journal entry policy, while the others were found to be effective.  Ex. 4 at 1.

- *Lastly*, Exhibit 4 shows that when this aspect of the journal entry policy was tested in third quarter 2013, only *one of thirty* entries sampled lacked supporting documentation.  Ex. 4 at 4-5.

In short, it is simply false to assert that if Messrs. Takeyasu and Curran had been provided with the actual details regarding the issues the BCR group had identified (which is not alleged) they should have been on notice that there was any systematic failure to provide backup for journal entries, or that "the journal entry policy" as a whole was deemed "ineffective" for "over a year," much less that Mr. Grab was engaging in any alleged fraud.  These deeply flawed allegations are not cognizable.  *See In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 555 ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.") (internal citation omitted).  The much more plausible inference is that Messrs. Takeyasu and Curran had every reason to believe that any technical issues with the application of the journal entry policy were being carefully monitored by the BCR group and remediated as appropriate.

### D.  The SEC Fails to Plead Facts Showing that Mr. Takeyasu Withheld Pertinent Information from Auditors

Despite the SEC's broad access to the staff and documents of Penn West's auditor, KPMG, during the SEC's investigation, the Complaint does not—because it cannot—assert that

KPMG was unaware that Penn West was engaging in the challenged accounting practices, or that KPMG ever raised a concern about these accounting practices, undermining any inference of scienter.  *See*, *e.g.*, *id.* at 570 (rejecting allegations of scienter where the accounting issue "was a common practice approved by the Company's independent auditors"); *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003) ("It is telling . . . that [the company]'s outside auditors did not question its accounting practices.").  It defies reason that on the order of $85 million per year in supposedly bogus capital reclassifications, and millions of dollars in other allegedly fraudulent adjustments, simply escaped KPMG's notice year after year.

The SEC attempts to plead around this inconvenient reality by implying that Mr. Takeyasu "concealed" the relevant information from KPMG, alleging that he "failed to disclose Defendants' use of the [challenged accounting] practices to [KPMG], and, on information and belief, only provided documents to [KPMG] that did not discuss the practices."  Compl. ¶ 134. But, the Complaint is devoid of any allegations concerning what supposed role Mr. Takeyasu, the CFO, actually had in describing the Company's specific accounting practices to its auditor (in fact, he had none).  Nor is there a word in the Complaint—even one "on information and belief"—about what accounting documents Mr. Takeyasu was responsible for providing, or did provide, to KPMG (also, in fact, none).[19]

It is hardly reasonable to infer, without any facts alleged, that the CFO of a company with a substantial accounting staff (*see* Compl. ¶¶ 5, 51, 53) among its nearly 1,500 employees in 2013[20] was personally responsible for providing documents addressing three specific accounting

---

[19] Allegations "on information and belief" are insufficient to support a strong inference of fraudulent intent, even where, unlike here, a plaintiff did not have the luxury of a two-and-a-half year investigation with full subpoena power.  *See Toussaint v. JJ Weiser & Co*., No. 04 CIV. 2592 (MBM), 2005 WL 356834, at *10 (S.D.N.Y. Feb. 13, 2005).

[20] Penn West Petroleum Ltd., Form 40-F/A, Revised Annual Information Form (Sept. 17, 2014), at 11, available at https://www.sec.gov/Archives/edgar/data/1334388/000119312514345798/d791407dex991.htm.

adjustments to KPMG.  *See Patel*, 2008 WL 782483, at \*12 (finding failure to plead fraud with particularity where complaint did not specify who was responsible for providing documentation to auditors or role each individual played in withholding documentation).[21]  It defies reason that after its lengthy investigation, the SEC can muster nothing more helpful to its theory than the conclusory insinuation alleged.

### E.   The SEC Fails to Allege Facts Supporting a Strong Inference Scienter Despite a Two-and-a-Half Year Investigation

After stripping away the rhetoric and conclusions, the facts alleged in the Complaint with regard to Mr. Takeyasu, taken as a whole, fail to support an inference of fraudulent intent.  "The paucity of the SEC's allegations of scienter . . . is particularly telling when one considers" the SEC has taken testimony from nearly two dozen witnesses and has had access to hundreds of thousands of documents over the course of a two-and-a-half-year investigation.  *Espuelas*, 579 F. Supp. 2d at 481 (where SEC had taken testimony of seventeen witnesses, "[h]ad the SEC gathered any evidence upon which it could have alleged the defendants' reckless or knowing involvement  . . . surely it should have found its way into the Complaint"); *S.E.C. v. Yuen*, 221 F.R.D. 631, 637 (C.D. Cal. 2004) ("SEC's substantial pre-filing investigatory powers and the significant discovery already conducted in th[e] case" rendered its reliance on conclusory allegations inappropriate).

---

[21] The Plaintiff's remaining allegations concerning Mr. Takeyasu's disclosures to KPMG rest entirely on the derivative, and therefore insufficient, assertion that the management representation letters he signed were false because he did not affirmatively disclose the alleged fraud.  Compl. ¶¶ 127-32; *see Espuelas*, 579 F. Supp. 2d at 469 (signature of management representation letters that "did not disclose the 'true economic realities' of the challenged transactions," without more, failed to support a strong inference of scienter).  This so-called form of concealment is nothing more than a failed attempt to bootstrap insufficient fraud claims.  Plaintiff's allegations based on Mr. Takeyasu's alleged failure to disclose the supposed fraud in his public statements and Penn West's public statements and filings fail for the same reason.  *Goplen v. 51jobs, Inc*., 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (plaintiffs who did not identify source for defendants' knowledge contrary to public statements failed to plead scienter); *Vogel v. Sands Bros. & Co*., 126 F. Supp. 2d 730, 743 (S.D.N.Y. 2001) (same).

Despite an exhaustive investigation, the SEC has put forth only the most conclusory allegations with respect to Mr. Takeyasu, and has failed to allege facts that give rise to a strong inference of scienter with the particularity demanded by Rule 9(b).  Since the SEC has already collected "nearly everything that could possibly be relevant," its failure to satisfy the requirements for pleading fraud can mean only one thing—there is no cognizable fraud claim to be made.  *Patel*, 2009 WL 3151143, at *14-15.

<u>**CONCLUSION**</u>

For all of the foregoing reasons, all of the SEC's claims against Todd H. Takeyasu should be dismissed pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

s/  Richard F. Albert
_____
Richard F. Albert
Jasmine Juteau
Priya Raghavan
MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
ralbert@maglaw.com
jjuteau@maglaw.com
praghavan@maglaw.com

*Counsel for Defendant Todd H. Takeyasu*