# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>               Plaintiff,<br><br>v.<br><br>PENN WEST PETROLEUM LTD., d/b/a OBSIDIAN ENERGY LTD., TODD H. TAKEYASU, JEFFERY A. CURRAN, and WALDEMAR GRAB,<br>               Defendants. | No. 17 Civ. 4866 (GHW)<br>**Request for International**<br>**Judicial Assistance**<br>**(Letters Rogatory)** |

## LETTERS ROGATORY FOR THE
## TAKING OF EVIDENCE FROM WITNESSES

**To the Court of Queen's Bench in the Province of Alberta, Canada:**

The United States District Court for the Southern District of New York, located at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY, 10007, United States of America, presents its compliments to the Court of Queen's Bench, and requests the following assistance to obtain evidence to be used in a civil proceeding, *United States Securities and Exchange Commission v. Penn West Petroleum Ltd.*, *et al.* (the "U.S. Action"), now pending before the undersigned as civil action No. 17 Civ. 4866 in the United States District Court for the Southern District of New York. Certain of the parties to this action are presently acting under an order from this Court to gather facts relevant to the claims of the United States Securities and Exchange Commission ("SEC") and the defenses of two Canadian citizens and residents of Alberta, Todd H. Takeyasu and Jeffery A. Curran (collectively with the SEC, the "Non-Settling Parties"). This Court has the authority to submit these Letters Rogatory under 28 U.S.C. § 1781(b)(2).

This Court requests the assistance described herein as necessary in the interests of justice and to enable resolution of the U.S. Action as to the Non-Settling Parties. Certain individuals, who reside

within the Province of Alberta, Canada (the "Resident Witnesses"), need to be examined under oath as witnesses in the U.S. Action. A list of the names and last known addresses of the Resident Witnesses is annexed hereto as Appendix I.

Counsel for the Non-Settling Parties have contacted all known counsel for the Resident Witnesses with the goal of agreeing upon, if possible, procedures for the taking of evidence from the Resident Witnesses. In addition, counsel for the Non-Settling Parties have assured this Court that they will, as necessary, continue discussions with counsel for the Resident Witnesses with the goal of: (i) presenting, insofar as possible, the Court of Queen's Bench with unopposed orders for the enforcement of these Letters Rogatory; and (ii) in any event limiting, insofar as possible, any areas of disagreement that would require resolution by the Court of Queen's Bench.

This Court requests that, in accordance with the documents annexed hereto, the Court of Queen's Bench permit and, if necessary, compel the appearance of the Resident Witnesses to give videotaped deposition testimony for use by the Non-Settling Parties and this Court in the full resolution of the U.S. Action.

In addition, with respect to two additional witnesses who reside in provinces other than Alberta (the "Non-Resident Witnesses")—as to whom separate applications are being made to the appropriate courts of those provinces, and who have been offered the alternative of providing evidence either in the province in which they currently reside or in the Province of Alberta—this Court requests that the Court of Queen's Bench assume jurisdiction over the Non-Resident Witnesses in the event that the Non-Resident Witnesses elect to proceed with the examination in Alberta and expressly attorn to the jurisdiction of the Court of Queen's Bench.[1]

---

[1] The two Non-Resident Witnesses are Rajesh Ghosh, who resides in the Province of Ontario, and Kimble Meagher, who resides in the Province of Nova Scotia. If either Mr. Ghosh or Mr. Meagher elects to provide evidence in the Province of Alberta, rather than in their current province of residence, the relevant Non-Resident Witness through legal counsel will expressly indicate to the Court of Queen's Bench that the Non-Resident Witness has elected to attorn to the jurisdiction of the

## I.    NATURE AND PURPOSE OF PROCEEDINGS AND SUMMARY OF FACTS

The following is an abbreviated summary of the relevant aspects of the U.S. Action.  The

proceeding is a civil enforcement action brought under the laws of the United States against Penn West

Petroleum Ltd. ("Penn West"), now doing business as Obsidian Energy Ltd., and three of Penn West's

former senior finance and accounting employees.  The plaintiff in the action is the SEC, which, among

other things, is charged with the civil enforcement of the federal securities laws of the United States of

America.

Defendant Penn West is a Canadian oil and gas company with its principal place of business in

Calgary, Alberta.  One or more classes of Penn West's common stock trade on the Toronto Stock

Exchange and the New York Stock Exchange.  Defendant Todd H. Takeyasu resides in the Province of

Alberta, and was Penn West's Chief Financial Officer ("CFO") from 2006 until 2014.  Defendant

Jeffery A. Curran also resides in the Province of Alberta, and was Penn West's Vice President of

Accounting and Reporting from 2008 until 2014.  Mr. Curran also was Penn West's Interim CFO from

March 2014 until May 2014.  Defendant Waldemar Grab resides in the Province of Alberta, and was an

Operations Controller for Penn West from 2005 through 2014.

On September 18, 2014, Penn West announced that it was restating its financial results for 2012,

2013, and the first quarter of 2014.  Beginning at or around that time, and continuing into 2017, the SEC

and the Alberta Securities Commission ("ASC") each investigated the accounting practices that were the

subject of Penn West's restatement, and those two agencies frequently coordinated with one another in

the taking of testimony.  On June 28, 2017, the SEC commenced the U.S. Action by filing a complaint

(the "SEC Complaint") alleging violations of the antifraud, recordkeeping, internal controls, and

---

Court of Queen's Bench, and will provide a copy of the relevant Letters Rogatory and any order enforcing the Letters
Rogatory in the Non-Resident Witness's resident jurisdiction, which will automatically be stayed in favor of any order of the
Court of Queen's Bench.

reporting provisions of the United States securities laws. The SEC Complaint is annexed hereto as Appendix II. The ASC has not commenced proceedings against Penn West or any of its employees.

Mr. Grab and Penn West have settled the SEC's claims against them. The U.S. Action remains pending against Messrs. Takeyasu and Curran. It is in connection with the claims and defenses of the Non-Settling Parties that assistance is needed in obtaining testimonial evidence.

Broadly stated, the SEC Complaint alleges that Messrs. Takeyasu and Curran participated in a multi-year fraud designed to artificially lower Penn West's reported operating expenses, principally by improperly reclassifying operating expenses to capital expenses, and also by improperly reclassifying certain operating expenses as royalty and improperly using certain accruals. Messrs. Takeyasu and Curran have disputed the claims alleged in the SEC Complaint and have moved to dismiss the Complaint on the ground that it fails to meet United States pleading requirements for alleging fraud. By order of this Court, discovery is to proceed while the Court considers the motions made by Messrs. Takeyasu and Curran, and deposition discovery is currently set to be completed by August 6, 2018.

If this Court denies the pending motions to dismiss the SEC Complaint, either in whole or in part, then discovery in the form of gathering documentary and testimonial evidence will be needed to resolve—either by this Court upon a motion for judgment as a matter of law or, if necessary, by a jury at trial—the validity of any claims that are permitted to proceed against Messrs. Takeyasu and Curran. If the Court grants the pending motions to dismiss the SEC Complaint, then discovery would still be needed if the SEC seeks and receives leave to amend its Complaint. If a ruling on the motions to dismiss or any subsequent amendment of the SEC Complaint alters the Non-Settling Parties' need for assistance, then the Court of Queen's Bench shall be notified promptly, and this Letter of Request shall be amended or withdrawn accordingly.

## II.      NECESSITY OF THE WITNESSES' TESTIMONY AND SUBJECT MATTER ABOUT WHICH THEY WILL BE EXAMINED

The testimony sought is needed to resolve the Non-Settling Parties' claims and defenses because the Resident Witnesses and Non-Resident Witnesses have specific knowledge of the facts relating to the accounting decisions and practices at issue in the SEC Complaint.  Certain of the witnesses, for example, participated in meetings at which the SEC alleges the accounting decisions and practices at issue were discussed.  Other witnesses communicated with Messrs. Takeyasu and Curran or with other Penn West employees about the events described in the SEC Complaint.  Still other witnesses have detailed knowledge of the business and financial practices at Penn West that relate to the allegations in the SEC Complaint.  A more detailed description of the subject matter about which each of the Resident Witnesses would be examined is annexed hereto as Appendix III.[2]

Sworn testimony from 13 of the Resident Witnesses (the "Previously Examined Witnesses") was taken by the SEC and/or the ASC in connection with their respective investigations of Penn West, thus confirming the relevance of those witnesses to resolution of the U.S. Action.  However, Messrs. Takeyasu and Curran did not have an opportunity to participate in the questioning of the Previously Examined Witnesses, and thereby memorialize any testimony relevant to their defenses.  As a result, all of the Non-Settling Parties seek the testimony of the Previously Examined Witnesses in order to present their respective claims and defenses in the U.S. Action.  In addition, Messrs. Takeyasu and Curran have advised this Court that they regard the testimony of the Previously Examined Witnesses, as well as 10 additional witnesses described in Appendix III, as important to their defense against the SEC's claims.  The testimony sought cannot be obtained by other means, because all of the Resident Witnesses are Canadian citizens and residents and outside the subpoena power of this Court.

---

[2] A more detailed description of the subject matter about which the Non-Resident Witnesses would be examined is provided in the Letters Rogatory being submitted to the appropriate courts of the provinces in which those witnesses reside.

### III.    PROCEDURES TO BE FOLLOWED

This Court respectfully requests that the Court of Queen's Bench:

1.  Cause the Resident Witnesses to be summoned to attend an examination under oath before a person authorized to administer oaths at the offices of Canadian counsel for Mr. Takeyasu, or at such other place as may be agreed upon by the witness and the Non-Settling Parties, at a time to be agreed upon by the witness and the Non-Settling Parties, but no later than the date set for the completion of depositions in the U.S. Action;

2.  Permit the Resident Witnesses to be examined by counsel for the Non-Settling Parties on the relevant subject matter within the witnesses' personal knowledge;

3.  Permit the examination to be governed by the Canada Evidence Act, the Alberta Evidence Act and the Alberta Rules of Court or, if the witness agrees, by the United States Federal Rules of Civil Procedure and the United States Federal Rules of Evidence;

4.  Permit the Resident Witnesses to refuse to give evidence only insofar as they have a privilege or duty to refuse to give evidence under the laws of Canada or the United States of America, or pursuant to the order and direction of the Court of Queen's Bench of Alberta;

5.  Permit the examination to be videotaped and a verbatim transcript of the examination to be taken; and

6.  If either or both of the Non-Resident Witnesses elect to provide evidence in the Province of Alberta, rather than in the province in which they currently reside, and expressly attorn to the jurisdiction of the Court of Queen's Bench, direct such witnesses to appear in Alberta and give evidence in accordance with the procedures described above in Paragraphs 1 through 5.

### IV.    REIMBURSEMENT FOR COSTS

Conduct money to be paid to witnesses in accordance with the Court of Queen's Bench of Alberta witness allowance fee schedule will be borne by the Non-Settling Parties in an allocation to be agreed upon by those Parties or, if necessary, determined by this Court.

### V.    APPLICATION OF STIPULATED CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER

Any evidence provided by any witness pursuant to an order enforcing this Letters Rogatory is Discovery Material within the meaning of the Stipulated Confidentiality Agreement and Protective Order entered in the U.S. Action (the "Protective Order," a copy of which is annexed hereto as

Appendix IV), and any witness providing such evidence is a Producing Party within the meaning of the Protective Order, and both shall have all of the rights and protections accorded thereto under the Protective Order.

In addition, any witness providing evidence pursuant to an order enforcing this Letters Rogatory and any legal counsel to such witness may be provided access to Confidential Discovery Materials (as that term is defined in the Protective Order) by executing a modified version of the Non-Disclosure Agreement appended to the Protective Order (the "Modified Non-Disclosure Agreement"). Such Modified Non-Disclosure Agreement shall consist of the first two sentences of the Non-Disclosure Agreement (which govern the use and treatment of Confidential Discovery Materials) and shall amend the third sentence of the Non-Disclosure Agreement to state: "By acknowledging these obligations under the Protective Order, I understand and agree that I am subject to the jurisdiction of the Court of Queen's Bench for the purpose of adjudicating any claim that I have violated any term of the Protective Order or this Non-Disclosure Agreement."

## VI.    LIST OF COUNSEL

For the convenience of the Court of Queen's Bench, a list of the known counsel for the Non-Settling Parties, the Resident Witnesses and the Non-Resident Witnesses is annexed hereto as Appendix V.

## VII.    RECIPROCITY

In the furtherance of justice and by the proper and usual process of this Court, this Court assures the Court of Queen's Bench that it is willing to provide similar cooperation and assistance to the judicial authorities of Canada in the event that Canada requests similar assistance. This Court takes this opportunity to extend its highest consideration to the Court of Queen's Bench.

Date of Request:  _____

 

_____
Honorable Gregory H. Woods
UNITED STATES DISTRICT JUDGE
United States District Court
Southern District of New York
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007
United States of America

_____
SEAL OF COURT

# Appendix I

# APPENDIX I

| | Witness Name | Home Address |
|---|---|---|
| 1 | Gord Aker | 133 Tuscany Ridge Park NW<br>Calgary, Alberta T3L 2H6 |
| 2 | William Andrew | 4195 Edge Valley Landing NW<br>Calgary, Alberta T3A 5V2 |
| 3 | Cory Bain | 114 Chapalina Close SE<br>Calgary, Alberta T2X 3W4 |
| 4 | Laurence Broos | 57 Tuscany Estates Terrace NW<br>Calgary, Alberta T3L 0C4 |
| 5 | Mark Chyc-Cies | 210 – 16th Street NW<br>Calgary, Alberta T2N 2B9 |
| 6 | David Dyck | 31261 Coyote Valley Road<br>Calgary, Alberta T3L 2RI |
| 7 | Christopher Everett | 382 Tuscany Ravine Road NW<br>Calgary, Alberta T3L 3A9 |
| 8 | Mark Fitzgerald | 60 Sterling Springs Crescent<br>Calgary, Alberta T3Z 3JZ |
| 9 | Gregg Gegunde | 40 Mount Douglas Point SE<br>Calgary, Alberta T2Z 3J6 |
| 10 | Blair Grant | 15 Pickwick Lane<br>Lacombe, Alberta T4L 1T6 |
| 11 | Wendy Henkelman | 420 Aspen Meadows Hill SW<br>Calgary, Alberta T3H 0G3 |
| 12 | Darren Jackson | P.O. Box 853<br>Cochrane, Alberta T4C 1A9 |
| 13 | Cam King | 113 Crystal Green Bay<br>Okotoks, Alberta T1S 2N4 |
| 14 | Murray Nunns | 1005 318 26th Avenue SW<br>Calgary, Alberta T2T 2T9 |

| | Witness Name | Home Address |
|---|---|---|
| 15 | Kevin Radomske | 214 MT Douglas Close SE<br>Calgary, Alberta T2Z 3R9 |
| 16 | Derek Riewe | 2529-17th Street SE<br>Calgary, Alberta T2G 3V8 |
| 17 | Gary Ross | 729-26th Avenue NW<br>Calgary, Alberta T2M 2E8 |
| 18 | Geoffrey Rossos | 33 Signal Hill Place SW<br>Calgary, Alberta T3H 2M6 |
| 19 | Richard Schiller | 440 Edgeview Place NW<br>Calgary, Alberta T3A 4X5 |
| 20 | James Smith | 389-10th Street SW<br>Calgary, Alberta T2T 3JT |
| 21 | Paul Weevers | 9 Grandview Grove<br>Calgary, Alberta T3Z 0A7 |
| 22 | Matthew Wetmore | PwC Canada<br>Suncor Energy Centre<br>111 5th Avenue SW, Suite 3100, East Tower<br>Calgary, Alberta T2P 5L3 |
| 23 | Garrett Wilson | Box 5 Site 5 RR2<br>Carstairs, Alberta T0M 0N0 |

# Appendix II

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                      :

**U.S. SECURITIES AND EXCHANGE**  :
**COMMISSION,**                       :

                       :     **17 Civ.  4866**

           **Plaintiff,**     :

                       :     **COMPLAINT**

           **v.**               :

                       :     **JURY TRIAL DEMANDED**

**PENN WEST PETROLEUM LTD., d/b/a** :
**OBSIDIAN ENERGY LTD.**       :     **ECF CASE**

                       :
**TODD H. TAKEYASU**        :

                       :
**JEFFERY A. CURRAN**       :

                       :
           **and**          :

                       :
**WALDEMAR GRAB,**        :

                       :
         **Defendants.**   :
-------------------------------------------------------x

       Plaintiff United States Securities and Exchange Commission (the "Commission" or the
"SEC") alleges:

**I.**      <u>**SUMMARY**</u>

       1.     This action involves violations of the antifraud, recordkeeping, internal controls,
and reporting provisions of the federal securities laws arising from a multi-year accounting fraud
scheme orchestrated and implemented by the Defendants: (i) Penn West Petroleum Ltd., d/b/a
Obsidian Energy Ltd. ("Penn West"); and three former senior accounting and finance managers
at Penn West, (ii) Todd H. Takeyasu ("Takeyasu"), former Chief Financial Officer; (iii) Jeffery

A. Curran ("Curran"), former Vice President of Accounting and Reporting; and (iv) Waldemar Grab ("Grab"), former Operations Controller.

2.      Penn West was one of the largest oil producers in Canada, but historically struggled to keep its operating costs—a key financial metric that the investing public looks to when evaluating the financial health of an oil and gas company—under control.  As a result, in 2012, 2013, and the first quarter of 2014 (the "Relevant Period"), Defendants executed a scheme to make the annual and quarterly financial reports that Penn West, a publicly traded company, submitted to the SEC and disclosed to investors tell a different story about the company's financial condition than the one that actually existed.  The object of the scheme was to deceive the investing public by understating Penn West's publicly reported operating expenses and related financial metrics and making the company appear to be managing costs more efficiently than it actually was.  In other words, as a result of Defendants' scheme, it appeared that Penn West was spending less money to get oil out of the ground than it actually was.

3.      Takeyasu was Penn West's Chief Financial Officer, a member of Penn West's Disclosure Committee (the Penn West committee for reviewing the company's financial disclosures), and a designated accountant, experienced in the oil and gas industry.  Takeyasu was responsible for the accuracy of the company's financial statements and its disclosures to the investing public.  Takeyasu was specifically responsible for establishing Penn West's annual budgets and for obtaining approval of those budgets from Penn West's senior executives and Board of Directors.  Takeyasu repeatedly certified to the SEC, throughout the Relevant Period, that he was unaware of any fraudulent accounting practices at Penn West during the reporting period.  Instead of fulfilling his duties to ensure the implementation of an effective system of internal controls over financial reporting at Penn West and to verify that Penn West's accounting

statements were grounded in reality and sound accounting processes, Takeyasu carefully

managed the process to hit a predetermined (and false) number and circumvented international

accounting standards and internal accounting controls.  In other words, Takeyasu headed the

very accounting fraud that his false certifications to the SEC concealed.

      4.     Curran was Penn West's Vice President of Accounting and Reporting, a member

of Penn West's Disclosure Committee, and a designated and experienced accountant.  Like

Takeyasu, Curran was responsible for ensuring the accuracy and propriety of Penn West's

financial statements and its disclosures to the investing public.  As Grab's immediate supervisor,

Curran was responsible for ensuring that Grab and the accounting staff followed accounting rules

and processes, Penn West's internal accounting controls, and international accounting standards

to ensure that the company's financial statements were accurate.  Instead, together with

Takeyasu, Curran set targets for key financial metrics that had no basis in reality, and oversaw,

approved, and encouraged Grab (who, unlike Takeyasu and Curran, was not a designated

Chartered Accountant) to make numerous accounting journal entries to achieve targets, despite

the fact that those accounting entries were wholly unsupported and indefensible under both

applicable international accounting standards and Penn West's internal accounting controls.

      5.     Grab, as Penn West's Operations Controller, was responsible for ensuring Penn

West's accounting statements accurately reflected the true nature of expenditures by the

company and were fully documented and supported.  Grab directed the individual journal entries

through which Defendants accomplished their fraud and supervised the accounting staff,

including Penn West's Manager of Operations Analysis, who implemented many of the entries.

Grab was required by international accounting standards and Penn West's internal accounting

controls to ensure that there was an adequate basis and proper support for the entries.  Where he

directed his accounting staff to make and approve journal entries, Grab was responsible for ensuring his employees followed applicable international accounting standards and Penn West's internal accounting controls.

6.      In furtherance of their common objective to artificially lower reported operating costs and make Penn West's financial condition appear more robust than it was, Defendants employed fraudulent accounting practices to "reclassify" operating expenses into other parts of the company's financial statements, in order to artificially and improperly reduce Penn West's reported operating expenses.  Specifically, after Penn West's accounting staff had entered the company's operating expenses in its financial statements, Defendants intentionally and improperly reclassified hundreds of millions of dollars of operating expenses as capital expenditures or royalties, without adequate documentary support or basis in reality.  This fraudulent accounting device artificially reduced Penn West's operating costs, and, in turn, falsely improved reported metrics for operating efficiency and other measures of profitability and efficiency.  Defendants' accounting devices did not reflect the reality of Penn West's true economic activity and made no attempt to do so.  Instead, the accounting adjustments were aimed at moving large amounts of operating expenses to other parts of the company's financial statements so that Penn West's operating cost efficiency looked better than it really was. Defendants each took steps to conceal their scheme from others within Penn West and Penn West's independent auditor.  As a result of Defendants' fraud and concealment, Defendants consistently underreported Penn West's operating expenses in their annual and quarterly filings with the SEC during the Relevant Period.

7.      Defendants engaged in three principal types of improper accounting practices in furtherance of their scheme:

a.      *First*, Defendants improperly moved certain expenses that had been recorded in Penn West's operating expense accounts to its capital expenditure accounts, a reclassification practice known internally at Penn West as "reclass to capital."  This had the effect of moving the expenses from the company's income statement, where they appeared as expenses, to the company's balance sheet, where they appeared as assets, thus lowering the company's reported operating expenses and making it appear that Penn West was investing capital in support of increased production.  The reclass to capital practice was implemented by Grab, at the direction of and with the oversight and approval of Takeyasu and Curran.  Defendants made the reclassifications to capital without inquiring into whether the reclassified expenses properly qualified as capital expenditures or obtaining documentary support for the reclassifications.  Instead, the accounting entries were made to achieve pre-set reclass to capital targets established by Takeyasu, with assistance by and involvement of Curran, to artificially lower Penn West's reported operating expenses.  This practice had the effect of making it appear that Penn West had expended millions of dollars less on operating expenses, and millions more in long-term capital expenditures, than it actually had.

b.      *Second*, Defendants improperly moved certain operating expenses to Penn West's royalty account, a line item on the company's income statement intended to show money expended paying royalties to the owners of land on which Penn West drilled. This practice was referred to internally as "reclass to royalty" or "UOCR."  Takeyasu and Curran oversaw the use of this misleading accounting practice.

c.      *Third*, Defendants improperly took excess operating expense amounts that had been accrued in prior accounting periods, but not expended, which should have been

written off, and instead reduced those accruals in subsequent periods to reduce Penn West's operating expenses and make them appear more consistent over the course of the year.  This practice, referred to internally as "accrual softening," was directed by Takeyasu and Curran and implemented by Grab.

8.     Collectively, these improper accounting devices in furtherance of Defendants' fraudulent scheme were not in accordance with international accounting standards and internal accounting controls, resulted in Penn West submitting false and misleading financial reports to the SEC, and contributed to Penn West's material understatement of its 2012, 2013, and first quarter 2014 operating expenses by 16%, 20%, and 16%, respectively.  The improper accounting devices also distorted the company's net income during the Relevant Period, often by material amounts, and Penn West's distorted financial results were discussed during earnings calls during the Relevant Period.

9.     In September 2014, following an internal company review, Penn West publicly restated its financial statements for the years ending on December 31, 2012 and December 31, 2013 and for the quarter ending on March 31, 2014, based on the accounting practices set forth above, which Penn West admitted "were not supportable and required adjustment."

10.     During the Relevant Period, by engaging in the misconduct described herein:

a.     Penn West, Takeyasu, and Curran violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

b.     Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Takeyasu and Curran aided and abetted Penn West's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

c.      Grab violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. § 240.10b-5].

d.      Penn West violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

e.      Takeyasu, Curran, and Grab violated Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

f.      Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Takeyasu and Curran aided and abetted Penn West's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

g.      Penn West violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-16 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1 & 240.13a-16]; and Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

h.      Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Takeyasu, Curran, and Grab aided and abetted Penn West's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 thereunder [17 C.F.R. § 240.12b-20, 240.13a-1 & 240.13a-16]; and Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

i.      Takeyasu, Curran, and Grab violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 [17 C.F.R. § 240.13b2-1].

j.      Takeyasu and Curran violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

k.      Takeyasu violated Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

l.      Takeyasu violated Section 304(a) of the Sarbanes-Oxley Act of 2002 ("SOX") [15 U.S.C. § 7243(a)].

11.     Each defendant will continue to and again violate the foregoing statutes and rules unless restrained or enjoined by this Court.

12.     The Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable relief from Penn West.  The Commission seeks injunctive relief, including an officer and director bar, civil penalties, and other appropriate and necessary equitable relief from Takeyasu, Curran, and Grab.

13.     Penn West, Takeyasu, and Grab have entered into agreements with the SEC in which they agreed to toll, for various periods and various lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  Penn West's two tolling agreements cover the period between December 15, 2014 and December 31, 2016; Takeyasu's two tolling agreements cover the period between November 20, 2014 and May 21, 2016; Grab's tolling agreement covers the period between February 14, 2017 and February 14, 2018.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t & 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), & 78aa].

15.     Each defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue in this District is proper pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Penn West transacts business in this District and because certain of the acts, practices, transactions, and courses of business alleged in the Complaint occurred here.  During the Relevant Period, Penn West's common stock was registered with the SEC pursuant to Section 12(b) of the Exchange Act and its shares were listed and traded on the New York Stock Exchange under the symbol "PWE."

## III.     **DEFENDANTS**

17.     **Penn West Petroleum Ltd., d/b/a Obsidian Energy Ltd.**, is a Canadian issuer with its principal place of business in Calgary, Alberta.  Penn West's common stock is registered with the SEC pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78*l*].  During the Relevant Period, its shares were listed and traded on both the Toronto Stock Exchange and the New York Stock Exchange under the symbols "PWT" and "PWE," respectively.  During the Relevant Period, Penn West filed annual reports with the SEC on Form 40-F and quarterly and furnished other reports to the SEC on Form 6-K.  These SEC submissions were filed with SEC headquarters in Washington, D.C. via the SEC's internet-based EDGAR system, as required of all foreign issuers during the Relevant Period, and were publicly available to U.S. investors through the SEC's website.  Penn West also regularly held earnings calls, which were attended by U.S.-based analysts.  On June 26, 2017, Penn West announced that its shareholders approved a name change to Obsidian Energy Ltd., effective immediately.  In conjunction with its name change, its stock symbol was replaced with "OBE" on both the Toronto Stock Exchange and New York Stock Exchange, effective in three to five business days.

18.     **Todd H. Takeyasu**, age 56, resides in Calgary, Alberta.  From 2006 until his termination on March 24, 2014, Takeyasu was Penn West's Chief Financial Officer.  From 1994 to

2006, Takeyasu served as Penn West's Vice President of Finance.  Takeyasu was designated as a

Chartered Accountant in Canada in 1988 and held that designation during the Relevant Period.

19.     **Jeffery A. Curran**, age 48, resides in Calgary, Alberta.  From 2008 until March

2014, Curran was Penn West's Vice President of Accounting and Reporting.  During that time,

Curran reported directly to Takeyasu.  Between Takeyasu's termination in March 2014 and May 1,

2014, Curran served as Penn West's Interim Chief Financial Officer.  Curran was terminated by

Penn West on June 11, 2014.  Curran was designated as a Chartered Accountant in Canada in 1996

and held that designation during the Relevant Period.

20.     **Waldemar (Wally) Grab**, age 58, resides in Carstairs, Alberta.  Grab became Penn

West's Operations Controller for Revenue, Expenses, and Capital in June 2005, and remained in

that position until 2008.  From 2008 until his termination on June 19, 2014, Grab was Penn West's

Operations Controller for Expenses and Capital.  During the Relevant Period, Grab reported

directly to Curran.  Grab has never held a Chartered Accountant designation in Canada.

## IV.     <u>FACTUAL ALLEGATIONS</u>

### A.     **Penn West Struggled to Keep Operating Expenses in Check**

21.     Because the prices of oil and gas are set by the market, one of the few ways that an

oil and gas producer can earn profits and distinguish itself from its peers is by reducing the cost of

extracting and processing a barrel of oil or gas for sale, an expense measured and tracked in the

industry through the "operating expense per barrel of oil equivalent" or "opex/boe" metric—a

metric closely followed by securities analysts and the investing public.

22.     Penn West's operating expenses impacted other significant publicly reported

financial metrics, such as the level of Penn West's "netbacks" (the amount earned from a barrel of

oil, less the costs associated with bringing that barrel of oil to market, including operating costs and

royalties) and its "funds flow," representing the total amount of cash generated by Penn West's operating activities, net of expenses.  During a November 6, 2013 earnings call, Penn West acknowledged that "predictability in terms of operating results and growth and returns" was critical to share price growth, and that funds flow, netbacks, and operating expenses per barrel of oil were among the "key drivers of those outcomes" and among "the most important of our core metrics."

23.     During the Relevant Period, Penn West was considered one of the highest-cost producers in the oil and gas industry and had been for many years.  Penn West struggled to keep expenses under control through legitimate cost-cutting measures and still lagged behind other Canadian oil and gas producers in opex/boe and overall operating expenses.

24.     Penn West reported its operating expenses, opex/boe, netbacks, and funds flow in the "Management's Discussion and Analysis" sections of its annual and quarterly reports filed with the SEC.  During the Relevant Period, Penn West's annual and quarterly reports submitted to the SEC made false and misleading: (i) statements concerning Penn West's financial results; (ii) statements regarding the existence and adequacy of, and adherence to, the company's internal accounting controls and international accounting standards; and (iii) certifications about the accuracy of Penn West's financial results.

25.     For example, on May 4, 2012, Penn West announced its financial results for first quarter 2012 and furnished the results to the SEC on Form 6-K, which Takeyasu signed, reporting: (i) operating expenses of $273 million ($17.93/boe)[1]; (ii) netbacks of $27.34/boe; (iii) funds flow of $337 million; (iv) capital expenditures of $338 million; (v) royalties of $10.59/boe; and (vi) net income of $59 million.  These financial results were false and misleading and materially overstated

---

[1]  Except as otherwise noted, all dollar amounts used herein are in Canadian dollars.

Penn West's net income.  In Penn West's Form 40-F for fiscal year 2013 filed with the SEC on

March 7, 2014, certified by Takeyasu, Penn West reported operating costs of $853 million, down

from $1.019 billion in 2012, and falsely and misleadingly attributed "[t]he reduction in operating

costs in 2013 compared to 2012 to the asset dispositions that closed late in 2012 along with field

staff reductions and other cost reduction initiatives in 2013 aimed at streamlining our operations."

In fact, reductions in operating costs in 2013 were largely achieved through the fraudulent

accounting devices described herein, which created the false impression that Penn West had

successfully reduced costs.

26.     Senior Penn West executives discussed the company's focus on reducing costs on

earnings calls.  For example, in an earnings call on August 10, 2012, in which Takeyasu

participated, Penn West's Chief Operating Officer misleadingly stated that:  "While weakness in

the commodity prices is outside our control, we've been very active in addressing our costs, both

capital expenditures and operating expenses."  He went on to detail specific cost-cutting initiatives,

while omitting any mention of the improvement of operating expenses as a result of the fraudulent

accounting devices detailed herein.  On Penn West's November 6, 2013 earnings call, in which

Takeyasu participated, Penn West's Chief Executive Officer falsely observed that, "[o]ur cost

structure is in control and moving downward, and we're having success in what has been termed

a very soft market, and tightening up our portfolio with asset divestiture.  All these are real steps

allowing us to focus ever more tightly on making this a premier competitor in the space."  Penn

West's Chief Executive Officer further assured investors that, as the company executed its plan,

"[o]ur cost per barrel will be going down, aided by production growth, to be sure, but largely

driven by our control of the gross number."  He assured investors that "we will systematically

break down and understand our costs in these categories, and create standards and processes that

cross the enterprise to drive them lower."  On Penn West's May 1, 2014 earnings call, attended by Curran, Penn West's Investor Relations Manager stated that the company's results were driven by a large reduction in operating costs from the prior quarter:  "We continue to work hard on reducing costs in the business and realized a CAD28 million decrease in operating expenses, which represents a 14% reduction from the fourth quarter of 2013."

27.    Industry analysts closely tracked and publicly reported on Penn West's operating expenses, and Penn West's poor showing relative to its competitors.

28.    The issue of reducing Penn West's reported operating expenses was a frequent topic of conversation at meetings of senior management, including meetings with the Chief Executive Officer and Board of Directors, which Takeyasu and Curran attended.

29.    Takeyasu shared these conversations and senior management's concerns about reducing operating expenses with Curran and Grab, including at monthly "accrual meetings" that were held as part of Penn West's internal control processes, at which accounting and finance issues were discussed.

30.    The concerns about reducing Penn West's reported operating expenses caused Penn West, Takeyasu, Curran, and Grab to devise and carry out a scheme to reduce Penn West's reported opex/boe and its overall reported operating expenses, to make the company's financial condition appear better than it was.  Defendants carried out this scheme through three principal improper and fraudulent accounting devices: (i) reclass to capital; (ii) reclass to royalty; and (iii) accrual softening.

**B.** **Relevant International Accounting Standards and Internal Accounting Controls**

31.     During the Relevant Period, Penn West was subject to various international accounting standards, as well as internal accounting controls.  International accounting standards and internal accounting controls of particular note are enumerated in this Section.

32.     Penn West's Code of Ethics for Directors, Officers and Senior Financial Management provided that all such employees—which included Takeyasu, Curran, and Grab— must, to the best of their knowledge and ability, "[k]eep and present all of Penn West's records in accordance with the appropriate laws, regulations and all applicable professional standards"; "[e]nsure that all books, records and accounts fairly and accurately reflect in reasonable detail Penn West's assets, liabilities, equity, revenues and expenses and do not contain any false or misleading information"; "[e]nsure that all transactions are supported by accurate documentation in sufficient detail and recorded correctly"; and "[e]nsure that no employee, or no person acting on the direction of an employee, will take an action to contravene our accounting policies or circumvent our systems of internal control."  Penn West's Code of Business Conduct and Ethics further underscored the responsibility of Directors, Officers and Senior Financial Management for ensuring that Penn West maintained accurate books and records, as well as the importance of those books and records to those inside and outside the company.

33.     On January 1, 2011, Penn West adopted the International Financial Reporting Standards ("IFRS"), a set of accounting standards developed by the International Accounting Standards Board and used in various countries outside the United States.  IFRS includes the International Accounting Standards ("IAS"), which pre-dated IFRS.  The International

Accounting Standards Board also promulgated "Conceptual Frameworks" to guide management decisions in cases where no IFRS or IAS standard applies.

34.     According to IAS Conceptual Framework § QC26, financial statements must be verifiable.  According to the Framework, verifiability helps assure users that information faithfully represents the economic phenomena it purports to represent, such that "independent observers could reach consensus, although not necessarily complete agreement, that a particular depiction is a faithful representation."

35.     As a control for ensuring compliance with the requirement of "verifiability" under IAS, Penn West maintained a journal entry procedure.  To record operating expenses in Penn West's books and records, an accounting staff member would make a journal entry using Penn West's accounting software.  A journal entry would describe, among other things, the amount of the expense, the accounting period in which it occurred, the nature of the expense, and the accounting treatment it was to receive.  Penn West's journal entry procedure stated that "[a]ll journal entries must have supporting documentation that show the nature of the entry and provide adequate support to show how the amounts are calculated."  Penn West's journal entry procedure further required that supporting documentation be scanned and uploaded to the company's accounting system as an attachment to each journal entry and provided to the authorizer for review. The supporting documentation used by accounting staff typically consisted of invoices, short memos describing the transaction and the justification for its accounting treatment, spreadsheet analyses, and similar documents.  After a journal entry was created, it would need to be approved by a different accounting staff member.

36.     Penn West prepared its financial statements using the "accrual method," in accordance with IAS 1.27 and 1.28 and IFRS Conceptual Framework Sections 4.49 and 4.52,

which required Penn West to record expenses on its income statement in the period incurred.  Penn West was similarly required to recognize capital expenditures on property, plant, and equipment at the time of occurrence, in accordance with IAS 16.7 and 16.10.

37.     Under IFRS, expenses incurred in the production of oil and gas are generally treated as operating expenses and are charged against the company's revenues in arriving at net income.

38.     Under IAS 16, in certain circumstances an expense can be capitalized and included as an asset on a company's balance sheet—instead of an operating expense on the income statement—if the expense extends the useful life of property, plant, and equipment, such as an oil well.

39.     Pursuant to IAS 16, determining whether an expenditure can be recognized as an operating expense or a capital expenditure requires the application of professional judgment and analysis based on the specific circumstances of each expenditure.

40.     A Penn West property, plant, and equipment accounting policy similar to IAS 16 allowed certain repair and maintenance expenditures to be recognized as capital expenditures "provided it is probable that future economic benefits in excess of cost will be realized and such benefits are expected to extend beyond the current operating period."

**C.      Defendants Improperly Reclassified Operating Expenses as Capital Expenditures to Materially Understate Opex/BOE and Operating Expenses**

**1.      Defendants Devised and Implemented a Scheme to Keep Opex/BOE and Operating Expenses Artificially Low**

41.     Prior to the Relevant Period, Defendants, at numerous times, used the deceptive accounting practices summarized above to keep Penn West's disclosed opex/boe and operating expenses artificially low.  As Grab acknowledged in a November 2005 email to Takeyasu, "[t]he

16

direction we need from this meeting tomorrow is to understand [Penn West's] tolerance towards costs that are *truly* Opex [operating expenses] but will remain in Capex [capital expenses] …. The intent is to have as much remaining in Capex without raising flags with our external auditors." (emphasis added).

42.     Despite knowing, through his receipt of this email in November 2005, of Grab's intention to "have as much remaining in Capex without raising flags with our external auditors," Takeyasu not only continued to entrust Grab with communications with the auditors, but also delegated to Grab significant responsibility for oversight of Penn West's financial statements, including the reclass to capital process.  By the Relevant Period, Takeyasu, Curran, and Grab caused the improper accounting tactics to be used on a regular—typically monthly—basis, to enable Penn West to reach the targets established by Takeyasu and Curran for Penn West's publicly reported opex/boe metric.

43.     During the Relevant Period, Takeyasu, Curran, and Grab closely monitored Penn West's operating expenses each month, which would be publicly reported as the company's "actual" operating expenses.  If those expenses would produce opex/boe numbers in excess of targets set by Takeyasu and Curran, then Grab would implement accounting entries to reclassify operating expenses as capital expenditures in amounts sufficient to artificially lower Penn West's "actual" operating expenses, such that Penn West could publicly report opex/boe numbers deemed acceptable by Takeyasu and Curran.

44.     A key part of Defendants' accounting fraud scheme was the creation of Penn West's annual internal budgets, a process undertaken at the highest levels of Penn West.  During the annual budget process, Takeyasu and Curran created a budget line item called "reclass to capital" and determined its amount.  This line item represented Takeyasu and Curran's estimate of

how many millions of dollars in operating expenses would need to be reclassified as capital expenditures over the course of the coming year for Penn West's reported opex/boe to meet management and investor expectations, while at the same time ensuring that capital expenditures did not get too high.  For instance, in late 2012, Takeyasu and Curran set the reclass to capital line item at $85 million for 2013, and in late 2013, they set the reclass to capital line item at $79 million for 2014.

45.     The reclass to capital line item was not a true budget.  Unlike a real budget, the reclass to capital line item did not reflect any attempt to estimate the amount of operating expenses that, under international accounting standards and internal accounting controls, would properly be classifiable as capital expenditures, rather than operating expenses, consistent with the company's actual operations activity throughout the year.  Indeed, Takeyasu and Curran generally established the reclass to capital number without meaningful contribution from Penn West's production department, which was responsible for forecasting and analyzing the repair and maintenance capital costs to be incurred by Penn West.

46.     The reclass to capital line item was nothing more than a tool in furtherance of Defendants' fraud, representing the total dollar amount of deceptive accounting entries to be made throughout the course of the year that Takeyasu and Curran forecasted would be sufficient to produce opex/boe numbers acceptable to Penn West.  In an email to Curran in August 2009, Grab observed that the reclass to capital practice was not informed by Penn West's actual operations in the field, but was instead in furtherance of Defendants' manipulation of Penn West's financial metrics.  Grab wrote that "regarding transfers from opex to capex," "the field guys don't have much say," but the practice "is done Corporately to meet guidelines communicated to the

shareholders ....." Thus, rather than acting as a constraint on economic activity like a real budget, the reclass to capital line item represented a target for fraudulent accounting entries.

47.     Having set a target for the total amount of money to be transferred from operating expenses to capital expenditure accounts via reclass to capital entries, Takeyasu and Curran would then cause and permit Grab to draw from that amount over the course of the year through directing and making reclass to capital journal entries. Takeyasu, Curran, and Grab did this as needed to keep Penn West's opex/boe artificially low by manipulating the amount of Penn West's operating expenses that were capitalized.

48.     As Penn West's Operations Controller, Grab oversaw and implemented the mechanics of the reclass to capital practice. Grab supervised the accounting staff members who made the journal entries moving millions of dollars of operating expenses from operating expense accounts to capital accounts, thereby reducing Penn West's opex/boe. On a monthly basis, Grab calculated the expected opex/boe for the month. When opex/boe was higher than expected—which was typically the case—Grab, with Takeyasu and Curran's knowledge and oversight, directed his staff to make journal entries to reclassify a portion of Penn West's operating expenses as capital expenditures in amounts necessary to bring opex/boe in line with expectations.

49.     The journal entries directed by Grab were made without the required analysis and supporting documentation necessary to determine whether the operating expenses at issue were truly capital in nature. In numerous instances—in direct contravention of international accounting standards and Penn West's internal accounting controls—these journal entries had no supporting documentation attached. Journal entries made by an accounting staff member were required to be approved by an authorized staff member. Despite the lack of support for the journal entries, they were approved without comment or inquiry, at Grab's direction.

50.     The reclass to capital entries directed by Takeyasu and Curran and implemented by Grab bore no relation to any actual economic activity by Penn West, and did not relate to specific operations projects whose expenses need to be capitalized.  For instance, the reclass to capital journal entries were often made in large, round number amounts.  Actual operating expenses, in contrast, were originally booked in a range of amounts that were most often non-round numbers, reflecting the actual cost of parts and labor.  In addition, for most reclass to capital journal entries, Grab directed that the amount be apportioned on a pro rata basis to each operations superintendent group, rather than to a specific group incurring the expense, as would be expected if the journal entry actually related to a real, specific operating project that needed to be capitalized.

51.     Takeyasu and Curran discussed the fraudulent reclass to capital journal entries with Grab and other members of the accounting and finance teams, including the Manager of Operations Analysis (one of Grab's direct reports and the member of the accounting staff frequently called upon to make journal entries in support of Defendants' fraudulent reclassifications), at monthly "accrual meetings."  These meetings were held in the first part of each month to discuss revenue, expenses, and other issues related to Penn West's accounting books and records for the previous month.  After discussion and resolution of any open issues, Takeyasu and Curran would approve the preceding month's books for closing and finalization.

52.     Prior to and at the accrual meetings, Takeyasu and Curran focused on reducing Penn West's opex/boe.  They routinely asked questions about the amount of operating expenses, Penn West's opex/boe numbers, and what adjustments to reported operating expenses needed to be made to produce opex/boe numbers more in line with expectations.

53.     Prior to or at the accrual meetings, Grab and his accounting staff provided Takeyasu and Curran with monthly written reports, referred to as "accrual packets," detailing

20

(among other things) the reclass to capital amounts that had been moved, or needed to be moved, to achieve the opex/boe target for the month.  The majority of the accrual packets from the Relevant Period reflected and memorialized reclassifications of large amounts of operating expenses as capital expenditures to reach specific opex/boe targets established by Takeyasu and Curran and to reduce operating expenses.

54.     Prior to or at each of the monthly accrual meetings, Grab would present Takeyasu and Curran with the total amount of expenses moved from operating expenses to capital expenditure accounts during the month via reclass to capital journal entries.  Takeyasu and Curran then approved those amounts.  The amount of the reclassified operating expenses was typically a large, round number, unconnected to any underlying repair and maintenance, or other operating, costs.

55.     At the conclusion of each of the accrual meetings and as part of Penn West's internal controls, Curran and Grab both signed a cover sheet to the accrual packets—referred to as an "Accruals Review Checklist"—attesting, among other things, that "[o]perating costs for the [m]onth" and "[c]ost per boe" were reviewed.

56.     Despite knowing that accounting staff had been provided reclass to capital targets in advance and that they were making large, round number journal entries to hit those targets, Takeyasu did not ask Grab or any of the accounting staff members that made the reclass to capital journal entries to reconcile that month's reclass to capital entries against actual project costs to determine whether the accounting for the entries was correct.  Moreover, on some occasions, in an effort to further lower opex/boe, Takeyasu and Curran oversaw, approved, and encouraged additional reclass to capital entries be made following the accrual meetings, as discussed below.

### 2.   In 2012, Defendants Took Specific Steps in Furtherance of the Reclass to Capital Accounting Device

57.     In mid-July 2012, Takeyasu received an industry analyst's report announcing a downgrade of Penn West stock to "3-Underweight" from "2-Equal Weight," due to, among other things, his assessment that Penn West had the "highest operating costs" among competitors. Shortly thereafter, Takeyasu and Curran instructed Grab and the Manager of Operations Analysis to reclassify $10 million of operating expenses as capital to reduce opex/boe for the previous quarter.

58.     Following this directive, and after Penn West's books for June had closed, Penn West's Manager of Operations Analysis made the $10 million "reclass to capital" entry as directed. Because Penn West's books had already closed for the June accounting period, Penn West was required to undertake the extraordinary step of reopening the prior accounting period's books in order to make the reclass to capital entry, which required special approval by Penn West's Corporate Controller and implementation by the Manager of Finance.

59.     In addition to concerns about the downgrade of its stock, in mid-2012, Penn West was also struggling with a poor ratio of senior debt to EBITDA, an accounting metric measuring earnings before interest, taxes, depreciation, and amortization.  Debt covenants outstanding at Penn West at the time prohibited the company from exceeding a debt-to-EBITDA ratio of 3.0.  By the middle of 2012, Penn West's ratio approached 2.9, causing alarm among corporate executives that Penn West would be found out of compliance with its debt covenants, triggering contractual penalties, including a higher interest rate.

60.     At or around the time they discussed the $10 million reclass to capital entry for the second quarter of 2012, Takeyasu and Curran also directed Grab and Penn West's Manager of

Operations Analysis to transfer an additional $30 million in reclass to capital entries from operating expenses to capital expenditure accounts over the remainder of the year to lower Penn West's opex/boe.  These reclass to capital entries lowered Penn West's reported operating expenses and increased its EBITDA, thereby lowering its ratio of senior debt to EBITDA and keeping the company from exceeding the 3.0 debt-to-EBITDA ceiling.

61.     Takeyasu reported this achievement to fellow senior executives in a September 10, 2012 email entitled "MARKET RUMOURS," writing that:  "There are rumours apparently out of London on our debt covenants.  Getting calls.  With the hedge monetization and opex of $40, we forecast that at year end 2012 we will be around 2.7 times (senior debt to EBITDA) ... and 2.9 times without the hedges and opex."  When an executive responded, "[w]hat[']s the opex reference of $40??," Takeyasu replied:  "We are capitalizing an additional $40 [million] of opex, $10 [million] of which we did in Q2 [second quarter 2012]," and "opex capitalization increases EBITDA."

62.     In carrying out Takeyasu and Curran's direction to capitalize an additional $30 million to lower opex/boe, increase EBITDA, and therefore lower Penn West's ratio of senior debt to EBITDA, Grab and the Manager of Operations Analysis met the $30 million reclass to capital target to the dollar by making, or directing subordinates to make, six journal entries of approximately $5 million each.  In contravention of international accounting standards and Penn West's internal accounting controls, the journal entries were not backed by any support for the reclassification of the expenses.

63.     The table below lists the false journal entries, as well as an additional false entry for $10,000,000 in August 2012:

23

| Journal Entry Date | Amount (in Canadian Dollars) |
|---|---|
| 8/1/12 | $5,100,000 |
| 8/29/12 | $10,000,000 |
| 8/30/12 | $4,900,000 |
| 9/19/12 | $5,050,000 |
| 11/1/12 | $4,940,000 |
| 12/4/12 | $5,110,000 |
| 12/31/12 | $4,900,000 |
| **Total** | **$40,000,000** |

64.     Takeyasu and Curran discussed the amounts of the 2012 reclass to capital journal entries with Grab and other members of the accounting and finance teams at the monthly accrual meetings.  The accrual packets distributed by Grab to Takeyasu and Curran for July through December 2012 provided notice of the reclass to capital journal entries and their impact on Penn West's opex/boe.  One section of the accrual packets listed the monthly reclass to capital entries, referring to them as "significant items."  Another section referred to a $40 million capital "commitment" for reclass to capital entries.  The accrual packets included a drawdown of the $40 million budget "commitment" each month, until the reclass to capital target was hit at year end.  In a September 6, 2012 email to Takeyasu and Curran, Penn West's Manager of Capital Accounting, who reported to Grab, expressly confirmed that the capital forecast for the remainder of 2012 included the "OPEX [operating expense] to CAPEX [capital expenditure] reclass of $40M.  $10M done at the end of Q2 and $5M per month July through Dec."

65.     Curran and Grab took steps to hide the reclassification from Penn West's Board of Directors.  On January 4, 2013, during a discussion among senior accounting personnel concerning slides to be prepared for a meeting of Penn West's Board, Takeyasu asked for a slide to be

prepared highlighting 2012's final opex/boe.  After Grab expressed concern about showing a breakdown that would show the $40 million in reclassifications from operating expenses to capital expenditures, Curran instructed, "Agree—just bury it in Operated Opex."

66.     On September 18, 2014, Penn West reversed all of these journal entries—a total of $40 million in operating expenses improperly classified as capital expenditures—for lack of support.

### 3.     In 2013, Defendants Took Specific Steps in Furtherance of the Reclass to Capital Accounting Device

67.     In fall 2012, Takeyasu and Curran set an $85 million reclass to capital budget line item for 2013 to reduce Penn West's projected opex/boe for the year.  In an October 31, 2012 email to Penn West's Senior Vice President of Production, Takeyasu discussed the impact that the reclass to capital target would have on projected opex/boe for 2013.  Takeyasu wrote that Penn West's projected operating expenses of $1.026 billion in Canadian dollars would be decreased to $921 million via $20 million in real "cost savings," plus the capitalization of $85 million in "major R&M [repair and maintenance]."  As a result, Takeyasu projected that forecasted opex/boe for 2013 would be decreased from $20.01 to $17.96.

68.     To implement the reclass to capital accounting device, Takeyasu and Curran directed Grab to draw down from the $85 million reclass to capital amount each month as needed to meet opex/boe targets.  Rather than analyzing the true nature of the expenses being reclassified from operating expenses to capital expenditures, however, Grab instructed accounting staff to make large, round number adjustments.  Takeyasu and Curran knew that the internal target was being met at or very close to the dollar, and that it would have been extremely improbable that Penn West could have achieved this through legitimate reclassifications.  In response to a

November 2013 email from Penn West's Chief Executive Officer about how best to present Penn West's financial results, including opex/boe, Takeyasu acknowledged as much, stating, "on Opex we loosely have the R&M [repair and maintenance] of $85MM." Thus, Penn West used the reclass to capital practice essentially as a "cookie jar" account of capital to move out of operating expenses when deemed auspicious to Penn West's financial reporting by Takeyasu and Curran.

69.     Grab instructed the Manager of Operations Analysis and other accounting staff to make monthly journal entries for amounts that Grab determined were necessary to meet monthly and quarterly opex/boe targets. For example, after operating costs for January 2013 came in higher than anticipated, Grab instructed his accounting staff to book $14.1 million in reclass to capital journal entries to bring opex/boe below the internal corporate target set by Takeyasu with input from Curran.

70.     Similarly, at a July 2013 meeting, Grab informed the Manager of Operations Analysis that a reclass to capital journal entry was necessary to lower opex/boe for the second quarter of 2013, which had just ended. That same day, at Grab's direction, the Manager of Operations Analysis booked an unsupported $3,500,000 reclass to capital journal entry.

71.     Throughout 2013, Takeyasu and Curran monitored the amounts drawn down from the $85 million reclass to capital amount through conversations with Grab and at the monthly accrual meetings. In addition, Penn West's Manager of Operations Analysis added a summary opex/boe table to the accrual packets, so that a single table showed the unadjusted opex/boe, the impact of reclass to capital journal entries, and the false opex/boe that was publicly reported. For example, the accrual packet for January 2013 showed:

| 2013 | Unadjusted Opex/boe |
|------|---------------------|
| $16.76 | Acctg Period |
| 1.88 | UOCR impact |
| 3.19 | Reclass to capital impact |
| $21.83 | Unadjusted Opex/boe |

72.     Per this table, Penn West's actual opex/boe for January 2013 was $21.83, but was reduced by $3.19 due to "reclass to capital impact" and was further reduced by another $1.88 due to "UOCR," which, as discussed more fully below, consisted of the improper reclassification of operating expenses as royalty payments. All told, these improper reclassifications resulted in Penn West's publicly reporting opex/boe of $16.76—a full $5.07 below Penn West's actual opex/boe before Defendants' fraudulent accounting treatment.

73.     Takeyasu and Curran also used a second table contained in the accrual packets, which showed the annual reclass to capital target of $85 million, the amount "utilized," and the "reclass remaining," to monitor reclass to capital journal entries against the reclass to capital line item they established in the annual budget.

74.     Before Penn West's books for 2013 closed, Grab instructed his accounting staff to make a final reclass to capital journal entry for $7,921,218—the exact amount remaining in the reclass to capital budget for 2013. The accrual packet for December 2013, which Takeyasu and Curran received, noted the reclass to capital journal entry and the effect on Penn West's opex/boe. A table in the accrual packet highlighted that, even after some additional adjustments following the last reclass to capital entry, Penn West had come within approximately $500,000 of the $85 million reclass to capital target.

75.     On September 18, 2014, Penn West reversed all of the 2013 reclass to capital journal entries due to the complete lack of support for them.

### 4.      In 2014, Defendants Took Specific Steps in Furtherance of the Reclass to Capital Accounting Device

76.      Takeyasu, Curran, and Grab continued the improper reclass to capital practice into 2014.  In late 2013, Takeyasu and Curran were set a $79 million reclass to capital line item in the annual budget, and Takeyasu and Curran oversaw Grab's continued practice of using this line item in the same manner as in 2013 to lower Penn West's publicly reported operating expenses and opex/boe.

77.      As in 2012 and 2013, the true purpose of the reclass to capital line item in 2014 was not to allocate accurately expenses between operating expense and capital expenditure accounts, but rather, as Grab acknowledged in a February 28, 2014 email to a production manager, to act as "a 'Corporate' tool to help manage costs."

78.      Takeyasu and Curran continued to monitor the amount of reclass to capital entries through conversations with Grab and at the accrual meetings.  Accrual packets in 2014 contained the same tables as the 2013 packets, which highlighted the decreases to the reclass to capital line item due to the journal entries made to date, as well as the effect of those entries on improving Penn West's opex/boe.

79.      Before the improper accounting practice was finally halted by Penn West's new management in June 2014, Grab, at Takeyasu and Curran's direction, instructed accounting staff to make monthly reclass to capital journal entries totaling approximately $15.3 million.

80.      Among other improper journal entries in 2014, in March 2014, in accordance with Takeyasu and Curran's general directive to use monthly reclass to capital entries to reduce opex/boe, Grab specifically directed accounting staff to make a $4.1 million reclass to capital

journal entry to reduce February operating expenses.  This improper reclassification was reflected in the accrual packet for February 2014, which Takeyasu and Curran received.

81.     After Grab told Curran about this entry and the effect it would have on monthly operating expenses, Curran directed Grab to make an additional $2 million reclass to capital journal entry.  Grab instructed a subordinate to make this entry, which was made without any documentation supporting the reclassification of operating expenses.  The entry was reversed shortly thereafter, following a complaint from the Manager of Operations Analysis, as discussed further below.

82.     Following Takeyasu's termination in March 2014, Curran became Interim Chief Financial Officer.  As Interim Chief Financial Officer, Curran continued to monitor the amounts of the reclass to capital entries through conversations with Grab and at accrual meetings.  Curran continued to do so as Vice President of Accounting and Reporting from May 1, 2014 until the incoming Chief Financial Officer terminated him in June 2014.

83.     On September 18, 2014, Penn West reversed all of the 2014 reclass to capital journal entries due to a complete lack of support for them.

### D.     Penn West, Takeyasu, and Curran Improperly Reclassified Operating Expenses as Royalty Payments to Materially Understate Opex/BOE and Operating Expenses

84.     In furtherance of their scheme to lower operating expenses and opex/boe, Penn West, Takeyasu, and Curran also improperly oversaw, approved, and encouraged the movement of expenses from Penn West's operating expense accounts to its royalty accounts in contravention of international accounting standards and Penn West's internal accounting controls.  This practice was referred to internally as "reclass to royalty" (or "uniform operating cost reduction" or "UOCR") and was used to lower Penn West's reported operating expense and opex/boe levels.

85.     Penn West's royalty accounts were intended to reflect the total amount of royalties paid to the owners of the land on which Penn West drilled, including the Canadian provincial governments (referred to collectively as the "Crown") and other mineral rights owners.

86.     These royalty payments were reflected in Penn West's financial statements as deductions from gross revenue in Penn West's comprehensive statements of net income.

87.     The government of Alberta allowed Penn West and other gas producers to deduct from gas royalty payments a certain percentage of operating costs incurred in the production of the gas, referred to as a "gas cost allowance." This allowance decreased the amount of royalties actually paid by Penn West.

88.     Penn West, Takeyasu, and Curran exploited this gas cost allowance in furtherance of their accounting scheme. At the beginning of the year, Takeyasu and Curran would determine a target amount to be reclassified from operating expenses to royalties. Then, throughout the year, Penn West's Operations Controller for Revenue would reclassify a portion of Penn West's operating expenses, equal to the gas cost allowance, to one of Penn West's royalty accounts to hit the target. This reclassification was improper and resulted in false and misleading financial statements, because Penn West had not in fact paid that amount in royalties, nor was it ever obligated to do so.

89.     Moreover, Penn West, Takeyasu, and Curran also misstated Penn West's oil royalty payments. Oil royalty rates, unlike gas royalty rates, already take into account production costs. Thus, oil producers are not permitted to deduct production costs from oil royalty payments. Nonetheless, at the direction of Takeyasu and Curran, Penn West calculated costs associated with Penn West's production of oil royalty payments, and reclassified that amount out of operating

expenses into a royalty account.  This improper reclassification lowered operating expenses and increased the royalty payments line item in Penn West's income statement.

90.     These monthly reclassifications were made for the purpose of lowering Penn West's operating expenses and improving its opex/boe.

91.     Taken together, these reclassifications gave the appearance in Penn West's financial statements that Penn West's operating expenses were lower than they actually were, that its opex/boe numbers were better than they actually were, and that the company had paid more in royalties than it actually had.

92.     As with the reclass to capital journal entries, Penn West's reclass to royalty journal entries were not supportable.  Nor could they have been, since the reclass to royalty journal entries purported to account for royalty payments that were never owed and never made.

93.     The reclass to royalty practice was followed each month during the Relevant Period with the knowledge and approval of Takeyasu and Curran.  For example, in a July 11, 2013 email to Penn West's Chief Executive Officer, Takeyasu acknowledged that Penn West was "a bit unique with this reclass" (of operating expenses as royalties), but stated that Penn West was "quite hesitant to unwind this practice due to the optics around $2 per boe higher opex."  Thus, although Takeyasu expressed some concern about the reclass to royalty practice, he was more concerned about the impact on Penn West's reported accounting metrics.  In an August, 6, 2010 email, Takeyasu observed that:  "We have maintained this practice for many years.  Many would like these charges in Opex, but we haven't room to take the hit there."  Takeyasu forwarded this email to Curran.

94.     During the Relevant Period, a chartered accountant at Penn West who reported to Curran raised concerns to Takeyasu and Curran that the reclass to royalty practice was not proper

accounting.  In an email to Curran dated November 18, 2013, he stated that he personally would "eliminate" both reclass to capital and reclass to royalty, but "Todd [Takeyasu] thinks otherwise."

95.     Following the internal investigation in 2014, both Penn West and its independent auditor determined that Penn West's reclass to royalty accounting device was incorrect and required restatement.  Penn West subsequently reversed all of the reclass to royalty journal entries. Those adjustments resulted in $101 million being moved back to operating expenses from Penn West's royalty expense accounts for both 2012 and 2013.  Additionally, $19 million in expenses were reversed for the first quarter of 2014.

**E.      Defendants Improperly Used "Accrual Softening," in Furtherance of Their Scheme to Understate Opex/BOE and Operating Expenses**

96.     In furtherance of their accounting fraud scheme to lower reported opex/boe and operating expenses, Defendants also employed an improper accounting practice called "accrual softening."

97.     Accrual accounting is an accounting method that measures the performance and position of a company by recognizing economic events regardless of when cash transactions occur. The general idea is that economic events are recognized by matching revenues to expenses (the matching principle) at the time that the transaction occurs, rather than when payment is made (or received).

98.     Using the accrual accounting method, Penn West was required to book expenses at the time they were incurred, rather than when payment was made.  But Defendants exploited the accrual accounting method, by improperly booking expense amounts that exceeded the amounts actually spent, to build up excess accruals or accrual "cushions."

99.     Under IAS 37.59, Penn West was required to reverse any such excess accruals in its operating expense account at the end of each accounting period, by making journal entries to remove the excess accrued amounts from Penn West's operating expense account.

100.    Instead of removing the excess accrued amounts from Penn West's operating expense account at the end of each period, however, Defendants improperly carried them into subsequent accounting periods.  Defendants would then release amounts of accrued expenses, as needed, to cancel out operating expenses that had actually been incurred.

101.    Defendants used improper accrual softening to, among other things, help achieve their opex/boe targets and keep operating expenses artificially low.  In 2013, for example, after higher-than-expected operating expenses resulted in nearly all of the $85 million reclass to capital target being used up by the end of the second quarter, Defendants turned to accrual softening to ensure that Penn West would be able to continue to report artificially lower opex/boe for the remainder of the year.  Grab, after discussion with, and approval by, Takeyasu and Curran, improperly released excess operating expense accruals in June, July, and August 2013 in order to reduce Penn West's reported opex/boe for those months, enable Penn West to reverse the reclass to capital journal entries for those months, and free up those amounts to be used, as needed, for the remainder of 2013.

102.    As shown in a chart attached to a reclass to capital journal entry for December 2013, created by an accountant on Grab's staff, Penn West's use of this accrual softening practice in 2013 enabled Penn West to use *every* dollar of its reclass to capital budget line item through the end of the year.

|  | Reclass to Capital | Accrual Softening | Total |
|---|---|---|---|
| Reclass Available | 85,000,000 |  | 85,000,000 |
| January | (14,100,000) |  | (14,100,000) |
| February | (12,800,000) |  | (12,800,000) |
| March | (8,100,000) |  | (8,100,000) |
| April | (11,000,000) |  | (11,000,000) |
| May | (7,700,000) |  | (7,700,000) |
| June | (14,100,000) | 10,621,334 | (3,478,666) |
| July | (8,000,000) | 11,703,864 | 3,703,864 |
| August | (9,000,000) | 10,314,468 | 1,314,468 |
| September | - | - | - |
| October | - | - | - |
| November | (9,275,258) |  | (9,275,258) |
| December | (7,921,218) |  | (7,921,218) |
| Opex Reclass YTD | (101,996,476) | 32,639,666 | (69,356,810) |
| Surplus Sales | 4,028,650 |  | 4,028,650 |
| Capital | (19,671,839) |  | (19,671,839) |
| Reclass Remaining | (32,639,665) | 32,639,666 | 0 |

103.     Before Grab directed the accrual softening journal entries in June, July, and August 2013, Takeyasu and Curran discussed them, and their use to offset reclass to capital journal entries already made, with Grab.  Takeyasu and Curran also approved the entries before they were made.

104.     Accrual softening entries were also discussed in the accrual packets that were distributed to Takeyasu and Curran for several months in 2013.  For example, a variance statement in the accrual packet for July 2013 highlights a $7.2 million difference in reclass to capital amounts between July and June 2013, with the comment "RTC [reclass to capital] was $(3.5M) in Jun[e] and $3.7M in Jul[y] (Accrual softening Jan-Mar 2013 due to realized cost savings)."

105.     By the end of 2013, Takeyasu and Curran directed Grab and the Manager of Operations Analysis to record approximately $10 million in operating expense accrual, on top of

accruals projected to be necessary for the year.  This excess accrual was referred to at an accrual meeting as a "cushion."

106.    By March 2014, the Manager of Operations Analysis determined that Penn West not only did not require the accrual cushion added to operating expense accruals at the end of 2013, but was in fact carrying at least $24 million in excess accruals from 2013.  The correct accounting treatment, pursuant to IAS 37.59, would have been to immediately reverse these accruals.  To lower reported opex/boe, Takeyasu, Curran, and Grab instead directed the Manager of Operations Analysis to portion or "prorate" the excess accrual amount out over several months.

107.    On March 13, 2014, the Manager of Operations Analysis sent an email to Takeyasu, Curran, and Grab with the subject line "Opex/boe Forecast with Accrual Softening." The body of the email stated:  "As requested yesterday, here is the opex forecast including Feb[ruary] actuals and anticipated accrual softening."  The Manager of Account Operations Analysis attached a spreadsheet to the email, entitled "Operating Expenses—Excess Accrual Analysis Proration," which included a row for "excess accruals," broken down by month, reflecting $22 million being portioned out or "prorated" across several months in 3 to 4 million increments.  There was no disclosure that excess accruals were being managed in this way or the impact of the practice on operating expenses.  Nor could there have been, since the accruals should have been immediately reversed pursuant to IAS 37.59 instead of bled out across months to keep operating expenses artificially low.

**F.    Defendants Ignored Repeated Warnings by Employees About Penn West's Deficient Internal Accounting Controls and Improper Accounting Practices**

108.    From at least the end of 2012 through the first quarter of 2014, Defendants ignored repeated warnings from Penn West employees concerning deficient internal accounting controls and improper accounting practices.

**1.    The Business Controls and Risks Group Flagged Deficient Internal Accounting Controls, but Defendants Did Not Remedy Them**

109.    During the Relevant Period, Penn West's Business Controls and Risks ("BCR") group was charged with documenting and testing internal accounting controls that were established and maintained by Takeyasu and Curran.

110.    As part of its testing for the fourth quarter of 2012, the BCR group tested Penn West's journal entry policy and found that nearly one-third of the journal entries sampled lacked supporting documentation—the majority of which came from Grab's accounting group.  The head of the BCR group determined that the policy, as designed, was deficient.

111.    The head of the BCR group reported the group's findings to Takeyasu and Curran. Despite receiving notice that at least one-third of journal entries, mostly from Grab's group, lacked documentary support, Takeyasu and Curran did not speak with Grab about the finding, inspect the journal entries and documentation, or take affirmative steps to correct the internal accounting controls failure.

112.    The BCR group considered Penn West's journal entry policy to be "ineffective" for over a year.

### 2.    Penn West's Manager of Operations Analysis Sounded the Alarm About Improper Accounting Practices, but Defendants Ignored Her

113.    Penn West's Manager of Operations Analysis and a small group of accounting staff, all of whom reported up to Grab, were regularly required to make the false journal entries described above.

114.    Beginning in at least September 2013, the Manager of Operations Analysis repeatedly raised concerns with Curran and Grab regarding the propriety of the reclass to capital, reclass to royalty, and accrual softening practices.  Among other concerns, the Manager of Operations Analysis reported to Curran and Grab that accounting staff were being directed to make reclass to capital journal entries without any support or basis in operating expenses actually incurred, let alone support adequate to justify the alteration in accounting treatment.

115.    At the September 2013 accrual meeting, Curran belatedly asked Grab for a list of repair and maintenance projects capitalized to date.  Curran had not previously asked Grab for such information during the Relevant Period, despite Curran's responsibility for overseeing Grab's reclass to capital practices.  Following that meeting, Grab admitted to the Manager of Operations Analysis that no list of projects capitalized to date existed, and that Curran was aware of that fact. Shortly thereafter, on September 19, 2013, the Manager of Operations Analysis met with Curran and expressed her concern with the reclass to capital and other improper accounting practices, including her concern that she and her accounting staff were being instructed to make journal entries without adequate support.  After being told this, Curran took no action to stop the reclass to capital practice and reverse the prior, unsupported, journal entries, and did not obtain information to verify whether the journal entries were supported.

116.     In complying with Curran's instruction, the Manager of Operations Analysis emailed Grab and the Manager of Capital Accounting—who also reported to Grab and Curran— and reminded them to provide a list of projects supporting the reclass to capital journal entries booked to date and the rationale for them.  The Manager of Operations Analysis then forwarded that email to Curran, indicating her unwillingness to continue to assist with the accounting improprieties, stating, "[d]id what you suggested.  Don't know if I got through.  Indicated I am not doing any more 'stick handling'.  We'll see what happens[.]"  Curran does not appear to have responded in writing to this email.

117.     Other than his one request at the September 2013 accrual meeting, Curran did not ask Grab, or any member of the accounting staff, for supporting documentation or to reconcile the accounting entries for reclassifications against actual spending.

118.     Takeyasu never asked Grab, the Manager of Operations Analysis, or any member of the accounting staff to provide support for the reclassifications to capital or the reclassifications to royalty.  Nor did Takeyasu ask anyone to reconcile the accounting entries for reclassifications against actual spending.

119.     The Manager of Operations Analysis continued to request support to back up the accounting entries, which neither Grab nor Curran provided.

120.     Grab did not stop directing the Manager of Operations Analysis to make journal entries reclassifying operating expenses to capital accounts without documentation.  Nearly two months after her September meeting with Curran, on November 7, 2013, the Manager of Operations Analysis again emailed Curran, stating "I am going to be asked to record an operated reclass to capital entry this month and I still don't know how we are backing up about 52MM this

year that has already been recorded." Curran does not appear to have responded in writing to this email.

121.    Despite the Manager of Operations Analysis' statement that $52 million in operating expenses had been reclassified to capital expenditure accounts without supporting documentation, Defendants continued to use the reclass to capital practice during the remainder of 2013 and the first quarter of 2014.

122.    Frustrated that little had changed since she approached Curran in September 2013, the Manager of Operations Analysis raised concerns more sparingly in 2014.

123.    In March 2014, however, in addition to a $4.1 million reclass to capital journal entry that already had been recorded, Curran directed Grab to make a $2 million reclass to capital journal entry—a large, round number entry bearing no relation to operating expenses incurred on actual projects. When the Manager of Operations Analysis learned of this, she emailed Curran (not knowing that he had directed the journal entry). In her email, the Manager of Operations Analysis wrote: "We are starting again with the stupid stuff to make the numbers look better. My guys have spent the last day analyzing ... and because they can't logically find reductions in opex we are being told to play with the reclass again to get opex to a place where cost per BOE is reasonable." The Manager of Operations Analysis concluded the email by requesting a change in role so that she no longer would be required to make reclass to capital entries. Curran does not appear to have responded in writing to this email and did not recall doing so.

124.    In addition to Penn West's Manager of Operations Analysis, senior Penn West employees outside of Grab's group, including controllers of other divisions, raised questions about the reclass to capital practice with Curran. In the first quarter of 2014, for example, Penn West's Operations Controller for Revenue told Curran that he was concerned about the propriety of Penn

West's reclass to capital practice, including whether the reclass journal entries were supported by the requisite documentation.

125.    Despite the numerous complaints and concerns raised with Curran, however, Curran took no meaningful steps to address them—or to stop the fraudulent reclass to capital practice—and Penn West continued to use the reclass to capital, reclass to royalty, and accrual softening practices to lower Penn West's operating expenses and opex/boe until Curran's termination in June 2014.  Neither Grab, nor any of his accounting staff, ever provided documentary support to Curran.

**G.    Defendants Actively Concealed Penn West's Accounting Fraud From Its Independent Auditor**

126.    Takeyasu and Curran made, and caused others to make, materially false and misleading statements to Penn West's independent auditor during audits of Penn West's annual financial statements and quarterly reviews of Penn West's interim financial statements in 2012, 2013, and the first quarter of 2014.

127.    Takeyasu and Curran both signed quarterly and annual management representation letters to Penn West's independent auditor that contained false and misleading statements.  The independent auditor relied on these representations in performing its work and in issuing an audit opinion for Penn West's fiscal year 2012 and 2013 financial statements filed with the SEC.

128.    For example, on March 13, 2013, Takeyasu and Curran both signed a management representation letter concerning the independent auditor's audit of Penn West's financial statements for the years ended December 31, 2011 and December 31, 2012.  Takeyasu and Curran certified, among other things, that:  "We have fulfilled our responsibilities ... for ... the preparation and fair presentation of the financial statements and believe that these financial statements have

been prepared and present fairly in accordance with the relevant financial reporting framework ...."
Takeyasu and Curran further certified:  "We have communicated to you all deficiencies in the
design and implementation or maintenance of internal control over financial reporting of which
management is aware" and "have disclosed to you any known material weaknesses or significant
deficiencies in the design and implementation or maintenance of internal control over financial
reporting of which management is aware."  Takeyasu and Curran also certified that:  "We have
disclosed to you ... all information in relation to fraud or suspected fraud that we are aware of and
that affects the Company and involves:  management, employees who have significant roles in
internal control, or others, where the fraud could have a material effect on the financial
statements."  Takeyasu and Curran also certified that they had disclosed to the auditor "all
information in relation to allegations of fraud, or suspected fraud, affecting the Company's
financial statements, communicated by employees ...."

129.    Both Takeyasu and Curran knew or were reckless in not knowing that these
representations were false, as they were both aware or should have been aware of the ongoing
accounting fraud scheme and that the scheme had resulted in false and misleading statements in
Penn West's financial reports.  Both Takeyasu and Curran also knew or were reckless in not
knowing the numerous ways in which Penn West's internal accounting controls and international
accounting standards had been evaded or violated to perpetuate the fraud.

130.    Similarly, on March 6, 2014, Takeyasu and Curran both signed a management
representation letter to the independent auditor that contained representations in connection with
the audit of the financial statements for the years ended December 31, 2012 and December 31,
2013.  In that letter, Takeyasu and Curran made the same certifications as the prior year, including
a false certification that they had disclosed to the auditor "all information in relation to fraud or

suspected fraud that we are aware of and that affects the Entity and involves:  management, employees who have significant roles in internal control, or others, where the fraud could have a material effect on the financial statements ...."

131.    After Takeyasu's departure, Curran signed another management representation letter to the independent auditor, dated April 30, 2014, in connection with the auditor's interim review of Penn West's first quarter 2014 financial statements.  This management representation letter contained false and misleading statements similar to those contained in the earlier letters, including Curran's representation that he had disclosed to the auditor "all information in relation to fraud or suspected fraud that we are aware of and that affects the Company and involves: management, employees who have significant roles in internal control, or others, where the fraud could have a material effect on the financial statements."

132.    Both Takeyasu and Curran were on notice that their management representations were being made in connection with the preparation of Penn West's SEC filings and public disclosures.  For instance, the management representation letters signed by Takeyasu and Curran referenced Penn West's engagement letters with the audit firm, which were signed by Takeyasu, and which stated that a purpose of the audits was to prepare Penn West's Form 40-F annual financial report filings.

133.    Takeyasu and Curran were responsible for ensuring that Penn West's independent auditor knew about and understood Penn West's financial processes, controls, and support for reported figures.  Takeyasu and Curran were among the management group members to whom Penn West's auditor specifically posed questions concerning knowledge of fraud or accounting improprieties as part of the auditor's risk assessment process.

134.    Takeyasu and Curran nevertheless failed to disclose Defendants' use of the reclass to capital, reclass to royalty, and accrual softening practices to Penn West's auditor, and, on information and belief, only provided documents to Penn West's independent auditor that did not discuss the practices.

135.    On February 18, 2014, in response to a request from the independent auditor for Penn West's 2014 budget, Curran sent a senior audit manager a comprehensive and detailed budget for 2014, which included 2013 results for comparison.  The budget document failed to mention the reclass to capital, reclass to royalty, or excess accrual amounts.  Rather, the operating expense figures for 2013 and for 2014 reflected net expenses after the improper reclassifications were factored in.

### H.    Penn West's, Takeyasu's, and Curran's False and Misleading SEC Filings and Sarbanes-Oxley Certifications

136.    Defendants' accounting fraud scheme resulted in Penn West making numerous false and misleading filings with the SEC during the Relevant Period.  Penn West filed annual reports with the SEC on Form 40-F on March 15, 2013 (for the year ended December 31, 2012), and on March 7, 2014 (for the year ended December 31, 2013).  Penn West also furnished its quarterly financial results to the SEC on Form 6-K on May 4, 2012 (Q1 2012), August 10, 2012 (Q2 2012), November 2, 2012 (Q3 2012), February 14, 2013 (Q4 2012), May 2, 2013 (Q1 2013), August 8, 2013 (Q2 2013), November 6, 2013 (Q3 2013), and May 1, 2014 (Q1 2014).  Takeyasu signed the majority of these Form 40-F and Form 6-K submissions.  Curran signed Penn West's Form 6-K for Q1 2014.  These annual and quarterly reports contained Penn West's financial statements, and were submitted to SEC headquarters in Washington, D.C. via the SEC's internet-based EDGAR system, as required of all foreign issuers during the Relevant Period.

1.    **Penn West's False and Misleading Quarterly and Annual Filings with the SEC for Fiscal Year 2012**

137.    On May 4, 2012, attached to a Form 6-K signed by Takeyasu, Penn West submitted its announcement of its first quarter 2012 financial results with the SEC.  Penn West reported: (i) operating expenses of $273 million ($17.93/boe); (ii) netbacks of $27.34/boe; (iii) funds flow of $337 million; (iv) capital expenditures of $338 million; (v) royalties of $10.59/boe; and (vi) net income of $59 million.  The financial results set forth in Penn West's first quarter 2012 filing with the SEC were false and misleading and materially overstated the company's net income.

138.    On August 10, 2012, Penn West furnished its interim financial results for the second quarter of 2012 to the SEC on Form 6-K.  Penn West reported: (i) operating expenses of $255 million ($17.16/boe); (ii) royalties of $9.84/boe; and (iii) net income of $235 million.  The financial results set forth in Penn West's second quarter 2012 filing with the SEC were false and misleading and overstated Penn West's net income.  Takeyasu signed the Certification of Interim Filings submitted with Penn West's Q2 2012 financial results.

139.    On November 2, 2012, Penn West furnished its interim financial results for the third quarter of 2012 to the SEC on Form 6-K.  Penn West reported: (i) operating expenses of $248 million ($16.78/boe); (ii) netbacks of $28.28/boe; (iii) funds flow of $344 million; (iv) capital expenditures of $405 million; (v) royalties of $9.74/boe; and (vi) net loss of $67 million.  Penn West also stated that "[o]n a quarter over quarter basis, operating costs decreased from 2011 primarily due to reduced power costs and acquisition and disposition activity."  Takeyasu signed the Certification of Interim Filings submitted with Penn West's Q3 2012 financial results.

140.    The financial results set forth in Penn West's third quarter 2012 submission to the SEC were materially false and misleading, because Penn West's reported financial results

materially understated Penn West's net loss.  Further, Penn West's statement that its "decreased

operating costs" were primarily driven by legitimate factors was false and misleading, because the

company omitted to state that it in fact artificially reduced its reported operating costs through the

fraudulent accounting devices described above.

141.    On February 14, 2013, attached to a Form 6-K signed by Takeyasu, Penn West

furnished its announcement of its financial results for the fourth quarter of 2012 and its 2012 year-

end reserve results with the SEC.  For the fourth quarter of 2012, Penn West reported: (i) operating

expenses of $243 million ($17.16/boe); (ii) netbacks of $26.84/boe; (iii) funds flow of $295

million; (iv) capital dispositions of $916 million; (v) royalties of $10.10/boe; and (vi) net loss of

$53 million.  For the year-ended December 31, 2012, Penn West reported: (i) operating expenses

of $1.019 billion ($17.26/boe); (ii) netbacks of $26.58/boe; (iii) funds flow of $1.248 billion; (iv)

capital expenditures of $137 million; (v) royalties of $10.07/boe; and (vi) net income of $149

million.

142.    With regard to Penn West operating costs for fourth quarter 2012 and year-end

2012, Penn West expressly stated:

> For the fourth quarter of 2012 and on an annual basis in 2012,
> operating costs were lower than the comparative periods in 2011
> due to our focus on cost savings, lower electricity costs and
> acquisition and disposition activity.

143.    The financial results announced by Penn West for Q4 2012 in its Form 6-K were

materially false and misleading, because they materially overstated the company's funds flow.  The

financial results announced by Penn West's for year-end 2012 in this Form 6-K were materially

false and misleading, because they materially understated the company's operating expenses and

materially overstated the company's capital expenditures, royalties, and net income.  Likewise,

Penn West's statements regarding its operating costs were materially false and misleading, because they misleadingly attributed operating cost reductions to legitimate factors, rather than to the accounting fraud described herein.

144.     On March 15, 2013, Penn West filed its Management's Discussion and Analysis of Financial Condition and Results of Operations and Audited Consolidated Financial Statements for fiscal year ended December 31, 2012 on Form 40-F with the SEC.  Penn West's Form 40-F contained the same materially false and misleading financial results as in its Q4 2012 and year-end 2012 Form 6-K, and further stated:

> Operating costs were lower in 2012 than 2011 due to our focus on cost savings, lower electricity costs and acquisition and disposition activity.

145.     Penn West's statements regarding its operating costs were materially false and misleading, because Penn West misleadingly suggested that its cost reductions were driven by legitimate factors, including "cost savings, lower electricity costs, and acquisition and disposition activity," while failing to disclose that the company's reported costs were artificially reduced by the fraudulent accounting scheme described above.

146.     Takeyasu signed the Management Report submitted as part of Penn West's annual report and also certified that "[i]n connection with the Annual Report of Penn West Petroleum, Ltd. … on Form 40-F for the year ended December 31, 2012 … [t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

2.    **Penn West's False and Misleading Quarterly and Annual Filings with the SEC for Fiscal Year 2013**

147.    On May 2, 2013, attached to a Form 6-K signed by Takeyasu, Penn West furnished its financial results for the first quarter of 2013 to the SEC.  Penn West reported: (i) operating expenses of $217 million ($16.88/boe); (ii) netbacks of $27.76/boe; (iii) funds flow of $267 million; (iv) capital expenditures of $418 million; (v) royalties of $9.30/boe; and (vi) net loss of $97 million.  The company expressly stated that "[n]etbacks were $27.76 per boe compared to $27.34 per boe in the first quarter of 2012," and attributed the increase to "operating cost reductions and lower royalties, partially offset by lower realized prices."  Takeyasu signed the Form 6-K Certification submitted with Penn West's May 2, 2013 Form 6-K.

148.    The financial results set forth in Penn West's Q1 2013 report were materially false and misleading, because they materially understated Penn West's operating expenses and net loss, and materially overstated the company's capital expenditures, funds flow, netbacks, and royalties.  In addition, Penn West's claim that netbacks were increased due to "operating cost reductions and lower royalties" was false and misleading, because it misleadingly attributed the increase to legitimate factors, rather than the accounting fraud described herein.

149.    On August 8, 2013, attached to a Form 6-K signed by Takeyasu, Penn West furnished its financial results for the second quarter of 2013 to the SEC.  Penn West reported: (i) operating expenses of $214 million ($16.83/boe); (ii) netbacks of $30.68/boe; (iii) funds flow of $278 million; (iv) capital expenditures of $83 million; (v) royalties of $10.32/boe; and (vi) net loss of $40 million.  Takeyasu signed the Certification of Interim Filings submitted with Penn West's August 8, 2013 Form 6-K.

150.    The financial results set forth in Penn West's Q2 2013 report were materially false and misleading, because they materially understated Penn West's operating expenses and net loss, and materially overstated the company's funds flow, netbacks, and royalties.

151.    In the Management's Discussion and Analysis submitted with its Form 6-K, the company expressly stated that, "[o]ur operating costs have decreased from the comparative periods in 2012 due to our focus on operational efficiencies and acquisition and disposition activity that closed in late 2012.  Operating costs for the second quarter of 2013 include a realized gain on electricity contracts of $7 million (2012 – $2 million loss) and for the six months ended 2013 include a realized gain of $8 million (2012 – $1 million loss)."  This statement was materially false and misleading, because it misleadingly represented that Penn West had reduced its operating costs through legitimate means, including a "focus on operational efficiencies" and "realized gain[s] on electricity contracts," when, in reality, the company's operating costs resulted from the fraudulent accounting scheme described above.

152.    On November 6, 2013, attached to a Form 6-K signed by Takeyasu, Penn West furnished its financial results for the third quarter of 2013 to the SEC.  Penn West reported: (i) operating expenses of $218 million ($17.72/boe); (ii) royalties of $11.42/boe; and (iii) net income of $27 million.  Takeyasu signed the Certification of Interim Filings submitted with Penn West's November 6, 2013 Form 6-K.

153.    The financial results set forth in Penn West's Q3 2013 report were materially false and misleading, because Penn West materially understated the company's operating costs and net income and materially overstated the company's royalties.

154.    On March 7, 2014, Penn West furnished its financial results for the fourth quarter and year-ended December 31, 2013 on a Form 6-K submitted to the SEC.  For the fourth quarter

of 2013, Penn West reported: (i) operating expenses of $204 million ($17.86/boe); (ii) netbacks of $26.66/boe; (iii) funds flow of $216 million; (iv) capital expenditures of $265 million; and (v) royalties of $10.13/boe.  For fiscal year 2013, Penn West reported: (i) operating expenses of $853 million ($17.30/boe); (ii) netbacks of $29.69/boe; (iii) funds flow of $1.054 billion; (iv) capital expenditures of $291 million; and (v) royalties of $10.29/boe.

155.    The financial results set forth in Penn West's fourth quarter and year-end 2013 report were materially false and misleading, because they materially understated Penn West's operating expenses, and capital expenditures, and materially overstated the company's funds flow, netbacks, royalties, and net loss.

156.    On March 7, 2014, Penn West filed its Management's Discussion and Analysis of Financial Condition and Results of Operations and Audited Consolidated Financial Statements for the fiscal year ended December 31, 2013 on Form 40-F with the SEC.  Penn West's Form 40-F contained the same materially false and misleading financial results as in its Q4 2013 and year-end 2013 Form 6-K, and further stated:  "The reduction in operating costs in 2013 compared to 2012 is attributed to the asset dispositions that closed late in 2012 along with field staff reductions and other cost reduction initiatives in 2013 aimed at streamlining our operations."

157.    Penn West's statements regarding its operating costs were materially false and misleading, because Penn West misleadingly suggested that its cost reductions were driven by legitimate factors, including "cost savings, lower electricity costs, and acquisition and disposition activity," while failing to disclose that the company's reported costs were artificially reduced by the fraudulent accounting scheme described above.

158.    Takeyasu signed the Management Report submitted as part of Penn West's annual report and also certified that, among other things, "this report does not contain any untrue statement of a material fact …."

### 3.    Penn West's False and Misleading Quarterly Filing with the SEC for First Quarter 2014

159.    On May 1, 2014, Penn West furnished its financial results for the first quarter of 2014 to the SEC on Form 6-K.  For the first quarter of 2014, Penn West reported: (i) operating expenses of $176 million ($17.66/boe); (ii) netbacks of $36.67/boe; (iii) funds flow of $279 million; (iv) capital dispositions of $8 million; (v) royalties of $12.05/boe; and (vi) net loss of $96 million.  In his capacity as Penn West's Interim Chief Financial Officer, Curran signed the Certification of Interim Filings submitted to the SEC with Penn West's Q1 2014 financial report.

160.    The financial results set forth in Penn West's Q1 2014 report were materially false and misleading, because they materially understated the company's operating expenses, and materially overstated royalties and net loss.

161.    Penn West also stated in its Management's Discussion and Analysis that, "[o]perating costs were lower in 2014 compared to 2013 primarily due to lower labour, vehicle and electricity costs."

162.    Penn West's statements regarding its operating costs were materially false and misleading, because Penn West misleadingly suggested that its cost reductions were driven by legitimate factors, including "cost savings, lower electricity costs, and acquisition and disposition activity," while failing to disclose that the company's reported costs were artificially reduced by the fraudulent accounting scheme described above.

4. **Curran and Grab's False and Misleading Sub-Certifications and Curran's Certification of Interim Filings**

163. In at least 2013, and, on information and belief, from at least 2010 to 2014, Curran and Grab signed and submitted false and misleading quarterly sub-certifications. These sub-certifications were part of Penn West's internal controls process, and helped inform Takeyasu's annual certifications to the SEC, discussed in paragraphs 167-171, below.

164. In their quarterly sub-certifications, Curran and Grab certified, among other things:

> *I have reviewed and understood the corporate policies, including: Code of Business Conduct and Ethics ... [and] Code of Ethics for Directors, Officers, and Senior Financial Team ....*
>
> *I am accountable for maintaining an effective internal control structure in my assigned process(es).*
>
> The employees within my assigned areas of responsibility understand and are complying with the relevant policies, procedures and controls[.]
>
> I am maintaining sufficient evidence to provide reasonable support for any process review/assessment.
>
> I am not aware of any material or significant control deficiencies that may impact the governance structure of the organization, have significant impact to the corporate objectives, and/or the published financial statements[.]
>
> I have submitted any potentially material information (reportable events) to the Disclosure Committee for the purposes of the preparation of the required Canadian and United States regulatory filings and/or other disclosure documents, as per the Disclosure Policy.
>
> (emphasis added)

165. On each form, Curran and Grab checked a box confirming that "I understand that the Chief Executive Officer and the Executive Vice President and Chief Financial Officer will rely

on this certificate in making the Certifications required of them in filings with the U.S. Securities and Exchange Commission or other regulatory agencies."

166.    In addition, in his capacity as Interim Chief Financial Officer, following Takeyasu's termination from the company in March 2014, Curran signed and submitted a false and misleading Interim Certification in May 2014.  That certification was included in Penn West's filing with the SEC on Form 6-K on May 1, 2014, for the quarter ended March 31, 2014.  In his capacity as Penn West's Interim Chief Financial Officer, Curran signed the Certification of Interim Filings submitted to the SEC with Penn West's Q1 2014 financial report.

### 5.    Takeyasu's False and Misleading Sarbanes-Oxley Certifications

167.    Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") [15 U.S.C. § 7241], and the rules promulgated thereunder, Takeyasu, as Penn West's Chief Financial Officer, was required to certify the financial and other information contained in Penn West's annual reports filed with the SEC.  During the Relevant Period, Takeyasu signed and submitted two false and misleading annual certifications in connection with Penn West's submission of its fiscal year ended December 31, 2012 and fiscal year ended December 31, 2013 Annual Reports on Form 40-F.

168.    In his annual certifications, Takeyasu certified, among other things:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report.

169.    Takeyasu's annual certifications also included the following:

The issuer's other certifying officer and I … have (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer … is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles ….

170.    Takeyasu's annual certifications also stated:

The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent function): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and (b) *Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.* (emphasis added).

171.    Takeyasu also certified, pursuant to Section 906 of Sarbanes-Oxley [15 U.S.C. § 1350], "that to the best of my knowledge" the annual report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  As Takeyasu knew, or was reckless in not knowing, the annual reports did not fairly present the actual financial condition and results of operations of Penn West. As described above, Penn West's annual reports for fiscal years 2012 and 2013 results, repeatedly reported Penn West's operating expenses, capital expenditures, netbacks, funds flow, royalty

payments, and operating expenses per barrel of oil, all of which were impacted by the manipulation of expenses and royalty accounting that occurred under Takeyasu's direction.

172.    On January 12, 2011, Penn West registered a dividend reinvestment plan on Form F-3 offering Penn West's shareholders the opportunity to redeem dividends for newly issued shares.  The dividend reinvestment plan remained open until May 9, 2016.  The offering memorandum incorporated by reference financial statements in Penn West's Form 40-F for the year ended December 31, 2010, and "all subsequent Annual Reports on Form 20-F, Form 40-F or Form 10-K … that we file pursuant to the Exchange Act prior to the termination of this offering," including Penn West's Forms 40-F for the years ended December 31, 2012, and December 31, 2013 , which contained the misstated financial information described in this Complaint.

## I.    Penn West's New Management Discovered the Fraud and Restated the Company's Financial Statements

173.    Penn West's fraudulent accounting practices were discovered by the company's incoming Chief Financial Officer following the terminations of Takeyasu on March 24, 2014 and Curran on June 11, 2014.  At a June 2014 meeting of the new Chief Financial Officer with Penn West's accounting staff, the Manager of Operations Analysis raised her concerns about Penn West's improper accounting practices with the new Chief Financial Officer, who immediately reported the concerns to Penn West's new Chief Executive Officer and the audit committee of Penn West's Board of Directors, which commenced an internal company review.  The audit committee, comprised solely of independent directors, retained independent Canadian and U.S. legal counsel and an independent forensic accounting firm to assist the audit committee in conducting the review.

174.    On July 29, 2014, in the midst of the internal company review, Penn West issued a press release, stating, "[t]he Audit Committee and its independent advisors are examining certain entries which appear to have been made to reduce operating costs and increase the Company's reported capital expenditures and royalty expense, and that appear to have been made without adequate supporting documentation …."  Penn West reported the preliminary findings from the review as follows:  "For the fiscal year 2013, the Audit Committee and its independent advisors have identified approximately $70 million in operating expenses that were reclassified to property, plant and equipment as capital expenditures without adequate support.  For the fiscal year 2012, approximately $111 million in operating expenses were reclassified to property, plant and equipment as capital expenditures without adequate support.  As a result, the property, plant and equipment balances recorded on the Company's balance sheets in those fiscal years appear to be overstated."  Penn West further reported that the audit committee had identified approximately $100 million in operating expenses incorrectly reclassified as royalty expenses.

175.    On September 18, 2014, Penn West filed a Form 40-F/A with the SEC and officially restated its publicly reported financial statements for fiscal years 2012 and 2013 and the first quarter of 2014.  Penn West admitted that its accounting practices "had the effect of reducing the Company's previously reported operating expenses and increasing the Company's previously reported royalty expense and capital expenditures in 2014, 2013, 2012 and prior periods, which practices were not supportable and required adjustment."  Specifically, the restatement showed that Penn West's previously reported operating expenses were understated by 16% for 2012, 20% for 2013, and 16% for the first quarter of 2014.

176.    Penn West acknowledged that, during the Relevant Period, "little if any analysis was performed at the time of the entries to determine which entries ought to be capitalized," and

that, in some instances, "there appeared to be no contemporaneous support for the decision to reclassify operating expenses as property, plant, and equipment."

177.    In its restated Management's Discussion and Analysis, furnished to the SEC on Form 6-K/A, Penn West acknowledged that the accounting improprieties were designed and implemented at the highest levels of the company, stating that "senior finance and accounting personnel" and "senior accounting management" were involved in "the adoption and use of the accounting practices that led to the restatement." Penn West admitted that all of the reclassifications at issue were made at the corporate level, and placed responsibility for the fraud on employees who "ceased to be employed by the Company."

178.    On an investor call following Penn West's restatement, Penn West's new Chief Financial Officer summarized the restatement items and repeated the preliminary findings discussed in Penn West's July 29, 2014 press release, stating:

> We noted in our July 29 press release that certain transactions appeared to have been made to reduce operating expenses ... and appeared to have been made without adequate supporting documentation.  The accounting practices reviewed involved the capitalization of certain operating expenses as property, plant and equipment, the income statement classification of certain costs and credits, the timing of certain accruals relating to production, operating expenses and capital, and the timing for the recording of certain production volumes. Shortly thereafter, and based on preliminary findings from the review to that date, it was determined that the Company would be required to restate the annual audited financial statements for at least 2012 and 2013 and its un-audited interim financial statements for the first quarter of 2014 and 2013 and all related MD&A and other regulatory filings.

179.    Penn West's restatement also concluded that the company had identified "material weaknesses and a significant deficiency in our internal control over financial reporting as at December 31, 2013," and acknowledged that "[a]s a result of the material weakness, Penn West's

Chief Executive Officer and Chief Financial Officer have concluded that the Company's internal control over financial reporting was not effective as at December 31, 2013."

180.    Following Penn West's restatement, U.S. investors quickly sold off Penn West's stock, leading to a spike in the company's trading volume on July 30, 2014, the day after the restatement became public.  Penn West's stock price dropped precipitously—from USD $9.16 per share at the close of July 29, 2014 to close of USD $7.86 per share on July 30, 2014—a nearly 15 percent change.

## V.    CLAIMS FOR RELIEF

### A.    First Claim for Relief:  Penn West, Takeyasu, and Curran Violated Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c) Thereunder

181.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

182.    Penn West, Takeyasu, Curran, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or with severe recklessness: (a) used any device, scheme, or artifice to defraud; (b) made untrue statement of a material fact, or omitted to state any material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in any act, practice, or courses of business which operated or would operate as a fraud or deceit on any person.

183.    During the Relevant Period, Penn West, Takeyasu, and Curran, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.  Among other interstate contacts, Penn West filed annual

reports with the SEC on Form 40-F and furnished quarterly and other reports on Form 6-K. These SEC filings were submitted to SEC headquarters in Washington, D.C. via the SEC's internet-based EDGAR system, as required of all foreign issuers during the Relevant Period. Penn West also regularly held earnings calls, in which Takeyasu and Curran participated, which were attended telephonically by U.S.-based analysts. According to Penn West's SEC filings, Penn West's shares traded actively on the New York Stock Exchange throughout the Relevant Period, with Penn's West's trading volume on the New York Stock Exchange routinely exceeding its trading volume on the Toronto Stock Exchange.

184. Penn West, Takeyasu, and Curran acted knowingly, with intent to defraud, and with reckless disregard for the truth. Specifically, Penn West, Takeyasu, and Curran designed and implemented a multiyear scheme to defraud Penn West's shareholders, potential investors, and other members of the public by reclassifying certain operating expenses as capital expenditures and royalties in order to artificially reduce Penn West's publicly reported operating expenses and other important reported financial metrics.

185. Among other misconduct in furtherance of the scheme, detailed above, Takeyasu set annual targets for how many millions of dollars would be moved from operating expenses to capital expenditure accounts. Takeyasu established these goals based on the accounting maneuvers he calculated would be necessary in order to enable Penn West to report favorable results on important financial metrics. Takeyasu established these goals without any inquiry into the actual or anticipated operating or capital expenses of Penn West. Takeyasu then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Curran and Grab. Takeyasu repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round numbers,

without adequate documentary support or basis in reality.  Likewise, Takeyasu oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West owed or paid.  Takeyasu similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses, and directed Grab and the accounting staff to build up an accrual "cushion" that served no purpose other than to facilitate future manipulation of operating expenses.  Takeyasu ignored reports of internal accounting controls failures that were escalated to him, concealed the accounting fraud scheme from Penn West's Board and senior management, made misstatements and omissions to Penn West's independent auditor in his management representation letters, and signed Penn West's falsified financial statements and false certifications in connection with the company's periodic SEC filings.

186.    Among other misconduct in furtherance of the scheme, Curran assisted Takeyasu in establishing targets for how many millions of dollars would be reclassified from operating expense to capital expenditure accounts.  Curran oversaw, approved, and encouraged Grab and other accounting staff to make reclass to capital journal entries.  Curran then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Takeyasu and Grab.  Curran repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round number amounts, without adequate documentary support or basis in reality.  Likewise, Curran oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West ever owed or paid.  Curran similarly oversaw,

approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses.  Curran ignored repeated warnings about accounting improprieties from Penn West employees, concealed the accounting fraud scheme from Penn West's Board and senior management, made misstatements and omissions to Penn West's independent auditor in his management representation letters, and signed a false and misleading Form 6-K furnished to the SEC in first quarter 2014.

187.    Among other misconduct in furtherance of the scheme, Grab frequently made, or instructed his accounting staff to make, journal entries reclassifying operating expenses as capital expenditures and effectuating the "accrual softening" maneuver.  Grab knew that these accounting entries did not reflect actual economic activity at Penn West, but rather were calculated to enable the company to report favorable numbers on important financial metrics.  Grab directed the journal entries to be made even though he knew that there was not, and could not be, documentation supporting the accounting entries.  Grab ignored repeated warnings about accounting improprieties from his subordinates and made misstatements and omissions in his sub-certifications.

188.    Takeyasu and Curran signed Forms 40-F and 6-K during the Relevant Period that made untrue statement of a material fact, or omitted to state any material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.  These material misstatements and omissions are detailed above in Section IV.H.

189.    By virtue of the foregoing, Penn West, Takeyasu, and Curran violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a), (b), (c) thereunder [17 C.F.R. § 240.10b-5].

**B.** **Second Claim for Relief:  Grab Violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**

190.     Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

191.     Grab, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or with severe recklessness: (a) used any device, scheme, or artifice to defraud; and (c) engaged in any act, practice, or courses of business which operated or would operate as a fraud or deceit on any person.

192.     Among other misconduct in furtherance of the scheme, Grab frequently made, or instructed his accounting staff to make, journal entries reclassifying operating expenses as capital expenditures and effectuating the "accrual softening" maneuver.  Grab knew that these accounting entries did not reflect actual economic activity at Penn West, but rather were calculated to enable the company to report favorable numbers on important financial metrics.  Grab directed the journal entries to be made even though he knew that there was not, and could not be, documentation supporting the accounting entries.  Grab ignored repeated warnings about accounting improprieties from his subordinates and made misstatements and omissions in his sub-certifications.

193.     By virtue of the foregoing, Grab violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

**C.** **Third Claim for Relief:  Takeyasu and Curran Aided and Abetted Penn West's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

194.     Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

195.    Based upon the conduct described above, Penn West violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

196.    Takeyasu and Curran knowingly or recklessly provided substantial assistance that aided Penn West's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

197.    Among other misconduct, Takeyasu and Curran set targets for how many millions of dollars would be moved from operating expenses to capital expenditure accounts.  Takeyasu and Curran then monitored the reclass to capital practice at monthly accrual meetings.  Takeyasu and Curran repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round numbers, without adequate documentary support or basis in reality.  Likewise, Takeyasu and Curran oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West owed or paid.  Takeyasu and Curran similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses, and directed Grab and the accounting staff to build up an accrual "cushion" that served no purpose other than to facilitate future manipulation of operating expenses.  Takeyasu and Curran ignored repeated warnings raised by employees concerning internal accounting controls failures and accounting improprieties and concealed the accounting fraud scheme from Penn West's Board, senior management, and auditor. Takeyasu and Curran made misstatements and omissions to Penn West's independent auditor in their management representation letters, signed Penn West's falsified financial statements, and made false certifications in connection with the company's periodic SEC filings.

198.     By virtue of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Takeyasu and Curran aided and abetted Penn West's violations, and unless restrained and enjoined will again aid and abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**D.      Fourth Claim for Relief:  Penn West, Takeyasu, Curran, and Grab Violated Sections 17(a)(1) and (3) of the Securities Act**

199.     Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

200.     Penn West, Takeyasu, Curran, and Grab, in connection with the offer to sell or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, knowingly or recklessly used a device, scheme, or artifice to defraud someone, and, directly or indirectly and with negligence, engaged in any transaction, practice, or course of business which operated or would have operated as a fraud or deceit on purchasers of Penn West's securities.

201.     During the Relevant Period, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.  Among other interstate contacts, Penn West filed annual reports with the SEC on Form 40-F and furnished quarterly and other reports on Form 6-K.  These SEC filings were submitted to SEC headquarters in Washington, D.C. via the SEC's internet-based EDGAR system, as required of all foreign issuers during the Relevant Period.  Penn West also regularly held earnings calls, in which Takeyasu and Curran participated, including calls that were attended telephonically by U.S.-based analysts.

202.     Defendants acted knowingly, with intent to defraud, and with reckless disregard for the truth.  Specifically, Defendants designed and implemented a multiyear scheme to defraud the investing public by improperly reclassifying certain operating expenses as capital expenditures and royalties in order to artificially reduce Penn West's publicly reported operating expenses and other important reported financial metrics.

203.     Defendants also acted with an extreme departure from the standards of ordinary care, and created a substantial risk that investors would be misled, by adopting a policy and practice of achieving financial targets for key financial metrics at the expense of adhering to international accounting standards and Penn West's internal accounting controls.  Among other things, Defendants were negligent in ignoring warning signs of fraud, including large, round number entries, and failing to obtain all of the necessary documentation for their accounting entries.

204.     Among other misconduct in furtherance of the scheme, detailed above, Takeyasu set annual targets for how many millions of dollars would be moved from operating expenses to capital expenditure accounts.  Takeyasu established these goals based on the accounting maneuvers he calculated would be necessary in order to enable Penn West to report favorable results on important financial metrics.  Takeyasu established these goals without any inquiry into the actual or anticipated operating or capital expenses of Penn West.  Takeyasu then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Curran and Grab. Takeyasu repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round numbers, without adequate documentary support or basis in reality.  Likewise, Takeyasu oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying

operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West owed or paid. Takeyasu similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses, and directed Grab and the accounting staff to build up an accrual "cushion" that served no purpose other than to facilitate future manipulation of operating expenses. Takeyasu ignored reports of internal accounting controls failures that were escalated to him, concealed the accounting fraud scheme from Penn West's Board and senior management, made misstatements and omissions to Penn West's independent auditor in his management representation letters, and signed Penn West's falsified financial statements and false certifications in connection with the company's periodic SEC filings.

205.    Among other misconduct in furtherance of the scheme, Curran assisted Takeyasu in establishing targets for how many millions of dollars would be reclassified from operating expense to capital expenditure accounts. Curran oversaw, approved, and encouraged Grab and other accounting staff to make reclass to capital journal entries. Curran then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Takeyasu and Grab. Curran repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round number amounts, without adequate documentary support or basis in reality. Likewise, Curran oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West ever owed or paid. Curran similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses. Curran ignored repeated warnings

about accounting improprieties from Penn West employees, concealed the accounting fraud scheme from Penn West's Board and senior management, lied to Penn West's independent auditor in his management representation letters and signed a false and misleading Form 6-K furnished to the SEC in first quarter 2014.

206.    Among other misconduct in furtherance of the scheme, Grab frequently made, or instructed his accounting staff to make, journal entries reclassifying operating expenses as capital expenditures and effectuating the "accrual softening" maneuver.  Grab knew that these accounting entries did not reflect actual economic activity at Penn West, but rather were calculated to enable the company to report favorable numbers on important financial metrics.  Grab directed the journal entries to be made even though he knew that there was not, and could not be, documentation supporting the accounting entries.  Grab ignored repeated warnings about accounting improprieties from his subordinates and made misstatements and omissions in his sub-certifications.

207.    By engaging in the conduct described above, Penn West, Takeyasu, Curran, and Grab violated, and unless restrained and enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

**E.    Fifth Claim for Relief:  Penn West Violated Section 17(a)(2) of the Securities Act**

208.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

209.    Penn West, in connection with its offer to sell securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly and with negligence, obtained money or property using untrue statements of material fact or by omitting to state any material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

210.     Among other misconduct detailed above, during the Relevant Period, Penn West perpetuated a scheme to defraud its shareholders and investors by manipulating its operating expenses to artificially lower the company's reported opex/boe and operating expenses, metrics closely followed by analysts and investors as key indicators of Penn West's cost efficiency and overall financial health.

211.     As a result of the accounting fraud and Penn West's concealment of the fraud from Penn West's Board, senior management, and independent auditor, Penn West's financial statements contained materially false and misleading statements about, among other things, the level of its operating expenses, opex/boe, funds flow, netbacks, royalties, capital expenditures, and net income.  Penn West's materially false and misleading financial statements were filed with the SEC and disclosed to the public.  Penn West's SEC filings also falsely and misleadingly stated that Penn West had successfully embarked on a strategic project to improve its costs (which misleadingly omitted to state that improvements in reported costs were due to the accounting fraud described herein) and that Penn West had maintained an effective system of internal controls over financial reporting.

212.     As the direct and indirect consequence of the accounting fraud, Penn West obtained millions of dollars that it otherwise would not have.  Specifically, on January 12, 2011, Penn West registered a dividend reinvestment plan on Form F-3 offering Penn West's shareholders the opportunity to redeem dividends for newly issued shares.  The dividend reinvestment plan remained open until May 9, 2016.  The offering memorandum incorporated by reference financial statements in Penn West's Form 40-F for the year ended December 31, 2010, and "all subsequent Annual Reports on Form 20-F, Form 40-F or Form 10-K … that we file pursuant to the Exchange Act prior to the termination of this offering," including Penn Wests Forms 40-F for the years ended

December 31, 2012, and December 31, 2013 , which contained the misstated financial information

described in this Complaint.  By selling shares through this dividend reinvestment plan offering

memorandum, which incorporated the fraudulent financial statements for the Relevant Period,

Penn West obtained money or property using untrue statements of material fact or by omitting to

state any material fact necessary to make the statements made, in light of the circumstances under

which they were made, not misleading.

213.    By virtue of the foregoing, Penn West, unless restrained and enjoined will again

violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)].

**F.      Sixth Claim for Relief:  Takeyasu and Curran Aided and Abetted Penn West's**
**Violations Section 17(a) of the Securities Act**

214.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

215.    Based upon the conduct described above, Penn West violated Section 17(a)(1),

17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

216.    Takeyasu and Curran knowingly or recklessly provided substantial assistance that

aided Penn West's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].  Among

other misconduct, Takeyasu and Curran set targets for how many millions of dollars would be

moved from operating expenses to capital expenditure accounts.  Takeyasu and Curran then

monitored the reclass to capital practice at monthly accrual meetings.  Takeyasu and Curran

repeatedly approved financial books and records for closing and finalization, despite the fact that

they included reclass to capital journal entries made in suspicious large, round number amounts,

without adequate documentation or basis in reality.  Likewise, Takeyasu and Curran oversaw,

approved, encouraged, and received frequent updates on the regular practice of improperly

reclassifying operating expenses as royalty payments, even though the amounts at issue never

represented royalty payments that Penn West ever owed or paid.  Takeyasu and Curran similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses, and directed Grab and the accounting staff to build up an accrual "cushion" that served no purpose other than to facilitate future manipulation of operating expenses.  Takeyasu and Curran ignored repeated warnings raised by employees concerning internal accounting controls failures and accounting improprieties and concealed the accounting fraud scheme from Penn West's Board, senior management, and auditor. Takeyasu and Curran made misstatements and omissions to Penn West's independent auditor in their management representation letters, signed Penn West's falsified financial statements, and made false certifications in connection with the company's periodic SEC filings.

217.    By virtue of the foregoing, and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Takeyasu and Curran aided and abetted Penn West's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and, unless restrained and enjoined, will again aid and abet violations of Section 17(a).

**G.     Seventh Claim for Relief:  Penn West Violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16 Thereunder**

218.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

219.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20 and 13a-1 thereunder [17 C.F.R. §§ 240.12b-20 & 240.13a-1] require issuers of securities registered with the Commission to file with the Commission accurate information and documents and annual reports and to include such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading.

Rule 13a-16 [17 C.F.R. § 240.13a-16] requires every foreign private issuer, which is subject to

Rule 13a-1, to make reports on Form 6-K.

220.     During the Relevant Period, Penn West filed annual reports with the SEC on Form

40-F on March 15, 2013 (for the year ended December 31, 2012), and on March 7, 2014 (for the

year ended December 31, 2013).  Penn West also furnished quarterly reports with the SEC on

Form 6-K on May 4, 2012 (Q1 2012), August 10, 2012 (Q2 2012), November 2, 2012 (Q3 2012),

February 14, 2013 (Q4 2012), May 2, 2013 (Q1 2013), August 8, 2013 (Q2 2013), November 6,

2013 (Q3 2013), and May 1, 2014 (Q1 2014).  Takeyasu signed the majority of these Form 40-F

and Form 6-K submissions.  Curran signed Penn West's Form 6-K for first quarter 2014.  These

annual and quarterly reports contained Penn West's financial statements, and were submitted to

SEC headquarters in Washington, D.C. via the SEC's internet-based EDGAR system, as required

of all foreign issuers during the Relevant Period.  As detailed above in Section IV.H, these filings

were materially false and misleading.

221.     By virtue of the foregoing, Penn West violated, and unless restrained and enjoined

will again violate, Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17

C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-16].

### H.     Eighth Claim for Relief:  Takeyasu, Curran, and Grab Aided and Abetted Penn West's Violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16 Thereunder

222.     Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

223.     Based on the conduct described above, Penn West violated Section 13(a) [15

U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 &

240.13a-16] by filing materially false and misleading annual and quarterly reports for 2012, 2013,

and the first quarter of 2014.

224. Takeyasu, Curran, and Grab knowingly or recklessly provided substantial assistance that aided Penn West's violations of Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-16].

225. Specifically, Takeyasu and Curran made misstatements and omissions to Penn West's independent auditor in their management representation letters. Curran and Grab signed false and misleading sub-certifications, which were part of Penn West's internal controls process, and helped inform Takeyasu's false and misleading management representation letters, on which the auditor relied. Likewise, Grab signed false and misleading sub-certifications, which helped inform Curran's false and misleading management representation letters to the auditor, on which the auditor relied. Takeyasu, Curran, and Grab failed to disclose the fraudulent accounting devices to through which Penn West accomplished its fraud to Penn West's independent auditor. In addition, Takeyasu signed Penn West's materially false and misleading Forms 40-F and 6-K, and Curran signed Penn West's materially false and misleading Form 6-K for first quarter 2014. Through their concealment of information from Penn West's auditor, management representation letters and certifications, Takeyasu, Curran, and Grab each facilitated Penn West's preparation and filing with the SEC of materially false and misleading financial statements.

226. By virtue of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Takeyasu, Curran, and Grab aided and abetted Penn West's violations, and unless restrained and enjoined will again aid and abet violations, of Section 13(a) [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 & 240.13a-16].

I.      **Ninth Claim for Relief:  Penn West Violated Sections 13(b)(2)(A) and
        13(b)(2)(B) of the Exchange Act**

227.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

228.    Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§
78m(b)(2)(A) & (b)(2)(B)] require that issuers make and keep books and records that accurately
reflect the transactions of the company and design and maintain internal accounting controls
sufficient to provide reasonable assurances that the company's revenue was not being overstated.

229.    Penn West failed to make or keep books, records, and accounts which, in
reasonable detail, accurately and fairly reflected its transactions and disposition of its assets, in
violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  In addition,
Penn West failed to devise and maintain a system of internal accounting controls sufficient to
provide reasonable assurances that transactions are recorded in accordance with management's
general or specific authorization; that transactions are recorded as necessary to permit preparation
of financial statements in conformity with generally accepted accounting principles or any other
criteria applicable to such statements, and to maintain accountability for assets; that access to assets
is permitted only in accordance with management's general or specific authorization; and that the
recorded accountability for assets is compared with the existing assets at reasonable intervals and
appropriate action is taken with respect to any differences, in violation of Section 13(b)(2)(B) of
the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

230.    By virtue of the foregoing, Penn West violated, and unless restrained and enjoined
will again violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§
78m(b)(2)(A) & (b)(2)(B)].

**J.      Tenth Claim for Relief:  Takeyasu, Curran, and Grab Aided and Abetted Penn West's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**

231.     Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

232.     Based upon the conduct described above, Penn West violated Penn West violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].  Penn West failed to make or keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected its transactions and disposition of its assets, in violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  In addition, Penn West failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded in accordance with management's general or specific authorization; that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; that access to assets is permitted only in accordance with management's general or specific authorization; and that the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, in violation of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

233.     Takeyasu, Curran, and Grab knowingly or recklessly provided substantial assistance that aided Penn West's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].  Takeyasu set annual targets for how many millions of dollars would be moved from operating expenses to capital expenditure accounts. Takeyasu established these goals based on the accounting maneuvers he calculated would be necessary in order to enable Penn West to report favorable results on important financial metrics.

Takeyasu established these goals without any inquiry into the actual or anticipated operating or capital expenses of Penn West. Takeyasu then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Curran and Grab. Takeyasu repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal entries made in suspicious large, round numbers, without adequate documentary support or basis in reality. Likewise, Takeyasu oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West owed or paid. Takeyasu similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses, and directed Grab and the accounting staff to build up an accrual "cushion" that served no purpose other than to facilitate future manipulation of operating expenses. Takeyasu ignored reports of internal accounting controls failures that were escalated to him, concealed the accounting fraud scheme from Penn West's Board and senior management, made misstatements and omissions to Penn West's independent auditor in his frequent management representation letters, and signed Penn West's falsified financial statements and false certifications in connection with the company's periodic SEC filings.

234.    Curran assisted Takeyasu in establishing targets for how many millions of dollars would be reclassified from operating expense to capital expenditure accounts. Curran oversaw, approved, and encouraged Grab and other accounting staff to make reclass to capital journal entries. Curran then monitored the reclass to capital practice at monthly accrual meetings and in more frequent meetings with Takeyasu and Grab. Curran repeatedly approved financial books and records for closing and finalization, despite the fact that they included reclass to capital journal

entries made in suspicious large, round number amounts, without adequate documentary support or basis in reality.  Likewise, Curran oversaw, approved, encouraged, and received frequent updates on the regular practice of improperly reclassifying operating expenses as royalty payments, even though the amounts at issue never represented royalty payments that Penn West ever owed or paid.  Curran similarly oversaw, approved, and encouraged the practice of improperly using excess expense accruals from prior accounting periods to smooth and lower operating expenses.  Curran ignored repeated warnings about accounting improprieties from Penn West employees, concealed the accounting fraud scheme from Penn West's Board and senior management, made misstatements and omissions to Penn West's independent auditor in his management representation letters and signed a false and misleading Form 6-K furnished to the SEC in first quarter 2014.

235.    Grab frequently made, or instructed his accounting staff to make, journal entries reclassifying operating expenses as capital expenditures and effectuating the "accrual softening" maneuver.  Grab knew that these accounting entries did not reflect actual economic activity at Penn West, but rather were calculated to enable the company to report favorable numbers on important financial metrics.  Grab directed the journal entries to be made even though he knew that there was not, and could not be, documentation supporting the accounting entries.  Grab ignored repeated warnings about accounting improprieties from his subordinates and made misstatements and omissions in his sub-certifications.

236.    By virtue of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Takeyasu, Curran, and Grab aided and abetted Penn West's violations, and unless restrained and enjoined will again aid and abet violations, of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

**K.     Eleventh Claim for Relief:  Takeyasu, Curran, and Grab Violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 Thereunder**

237.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

238.    Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] provide that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of accounting controls, or knowingly falsify any book, record, or account."

239.    Takeyasu, Curran, and Grab knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, or accounts that Penn West was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].  In addition, Takeyasu, Curran, and Grab, directly or indirectly, falsified or caused to be falsified Penn West's books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

240.    Specifically, Takeyasu, Curran, and Grab repeatedly directed and implemented fraudulent accounting devices, as described above, which resulted in Penn West making numerous materially false and misleading accounting journal entries relating to reclassifications of capital, reclassifications to royalty, and accrual softening.  These entries, which had no adequate documentary support or basis in reality, rolled up into Penn West's annual and quarterly financial reports, which were submitted to the SEC and disclosed to the public.

241.    By virtue of the foregoing, Takeyasu, Curran, and Grab violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

**L.    Twelfth Claim for Relief:  Takeyasu and Curran Violated Rule 13b2-2 of the Exchange Act**

242.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

243.    Takeyasu and Curran, directly or indirectly, made materially false and misleading statements and omitted to state, or caused others to omit to state, material facts necessary in order to the make statements, in light of the circumstances under which statements were made, not misleading to accountants in connection with audits, reviews, and examinations of Penn West's financial statements and preparation and filing of documents required to be filed with the SEC.

244.    Specifically, Takeyasu and Curran made misstatements and omissions to Penn West's independent auditor in their management representation letters.  In addition, Takeyasu signed Penn West's materially false and misleading Forms 40-F and 6-K, and Curran signed Penn West's materially false and misleading Form 6-K for first quarter 2014.  Through their concealment of information from Penn West's auditor, management representation letters, and certifications, Takeyasu and Curran each facilitated Penn West's preparation and filing with the SEC of materially false and misleading financial statements.

245.    By virtue of the foregoing, Takeyasu and Curran violated, and unless restrained and enjoined will again violate, Exchange Act Rule 13b2-2 thereunder [17 C.F.R. § 240.13b2-2].

**M.    Thirteenth Claim for Relief:  Takeyasu Violated Rule 13a-14 of the Exchange Act**

246.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

247.    Rule 13a-14 of the Exchange Act requires that each principal executive and principal financial officer of an issuer, at the time of filing of a report, including reports on Form 40-F, must sign a certification at the time of filing averring, among other things, that the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to

make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report, and as to the company's internal controls over financial reporting.

248.    As the principal financial officer of Penn West, Takeyasu signed certifications in Penn West's annual reports filed on Form 40-F on March 15, 2013, for the year ended December 31, 2012, and on March 7, 2014, for the year ended December 31, 2013.  These certifications were materially false and misleading, as detailed herein.

249.    By virtue of the foregoing, Takeyasu violated, and unless restrained and enjoined will again violate, Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

**N.      Fourteenth Claim for Relief:  Takeyasu Violated SOX Section 304(a)**

250.    Paragraphs 1 through 180 are re-alleged and incorporated herein by reference.

251.    Penn West, by engaging in the conduct described above, filed Forms 40-F for the fiscal years 2012 and 2013 that were in material non-compliance with financial reporting requirements under the securities laws.

252.    Penn West's material non-compliance with its financial reporting requirements under the securities laws was the result of its misconduct that was designed to lower its publicly reported operating expenses and opex/boe by fraudulently reclassifying operating expenses as capital expenditures, reclassifying operating expenses as royalty payments, and improper accrual softening.

253.    Due to Penn West's material non-compliance with its financial reporting requirements under IFRS, Penn West materially misstated its publicly reported financial reports and was required to prepare a restatement for fiscal years 2012 and 2013 and the first quarter of 2014.

254. During the twelve-month period following Penn West's filing of its fraudulent Form 40-F for 2013 (*i.e.*, from March 15, 2013 to March 15, 2014), Takeyasu received $528,245 in non-discretionary incentive-based compensation, comprising a $225,000 cash bonus for 2013 and a $303,245 cash bonus for 2013 and 2014 under Penn West's "Performance Share Unit" program, a form of incentive-based compensation for meeting certain financial metrics. Takeyasu has never reimbursed Penn West for any portion of his bonus or performance share unit compensation.

255. The Commission has not exempted Takeyasu, pursuant to SOX Section 304(b) [15 U.S.C. § 7243(b)], from the application of SOX Section 304(a) [15 U.S.C. § 7243(a)].

256. By engaging in the conduct described above, Takeyasu violated, and unless ordered to comply will continue to violate, SOX Section 304(a) [15 U.S.C. §7243(a)].

## VI.  **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Judgment:

A. Finding that Penn West violated the statutes and rules set forth in Counts I, IV-V, VII, and IX of the Complaint;

B. Finding that Takeyasu violated the statutes and rules set forth in Counts I, IV, XI-XIV of the Complaint and aided and abetted Penn West's violations of the statutes and rules set forth in Counts III, VI, VIII, and X of the Complaint;

C. Finding that Curran violated the statutes and rules set forth in Counts I, IV, and XI-XII of the Complaint and aided and abetted Penn West's violations of the statutes and rules set forth in Counts III, VI, VIII, and X of the Complaint;

D.      Finding that Grab violated the statutes and rules set forth in Counts II, IV, and XI of the Complaint and aided and abetted Penn West's violations of the statutes and rules set forth in Counts VIII and X of the Complaint;

E.      Permanently restraining and enjoining Penn West, Takeyasu, Curran, and Grab, and all persons in active concert or participation with them, from violating the foregoing statutes and rules;

F.      Ordering Penn West, Takeyasu, Curran, and Grab to pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)];

G.      Ordering Penn West to disgorge all ill-gotten gains obtained and illegal losses avoided as a result of its unlawful conduct, plus prejudgment interest;

H.      Issuing a judgment, in a form consistent with Fed. R. Civ. P. 65(d), ordering Takeyasu to reimburse to Penn West for his bonus and other incentive-based compensation, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243;

I.      Permanently barring Takeyasu, Curran, and Grab from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 78t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

J.      Granting such other and further relief as the Court deems just and appropriate or necessary for the benefit of investors.

## VII.   <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.


Dated: June 28, 2017                    Respectfully submitted,

                                        By:   _Sarah Heaton Concannon_
                                              Sarah Heaton Concannon
                                              Matthew T. Spitzer*

                                              U.S. Securities and Exchange Commission
                                              100 F Street, N.E.
                                              Washington, D.C. 20549
                                              Telephone:  (202) 551-5361 (Concannon)
                                              Facsimile:  (202) 772-9282
                                              Email:  ConcannonS@sec.gov

                                              *Attorneys for Plaintiff U.S. Securities and
                                              Exchange Commission*

                                              * Not admitted to the United States District
                                              Court for the Southern District of New York

# Appendix III

The descriptions that appear below have been prepared by counsel for Todd Takeyasu and Jeffery Curran, Defendants in the U.S. Action,[1] in support of their joint application for the issuance of Letters Rogatory and orders permitting and, if necessary, compelling the testimony of the Resident Witnesses. Plaintiff SEC has advised Messrs. Takeyasu and Curran that, although the SEC contests certain of Messrs. Takeyasu and Curran's descriptions that appear below, it nonetheless consents to the joint application and likewise seeks an opportunity to examine the Resident Witnesses on the topics described herein so as to be in a position, among other things, to offer their testimony as affirmative evidence in the U.S. Action and/or rebut Messrs. Takeyasu and Curran's defenses. Because the Resident Witnesses are citizens and residents of Canada and are not parties to the U.S. Action, they cannot be compelled by any of the parties to the U.S. Action to appear and testify at trial.

### A. <u>Witnesses Previously Examined by the SEC and/or the ASC</u>

Messrs. Takeyasu and Curran seek the opportunity to examine 13 residents of Alberta who were previously examined by the SEC and/or the ASC in their respective investigations of certain accounting practices at Penn West.[2] Messrs. Takeyasu and Curran did not have an opportunity to participate in the questioning of the Previously Examined Witnesses and therefore could not memorialize testimony relevant to their defenses. Messrs. Takeyasu and Curran seek the opportunity to do so now and believe, for the reasons set forth below, that taking the Previously Examined Witnesses' testimony is necessary in the interests of justice.

For the convenience of the Court of Queen's Bench, the Previously Examined Witnesses are grouped below according to their work at Penn West and the knowledge that they possess that is relevant and material to the U.S. Action.

### 1. <u>Senior Accounting or Finance Personnel Who Participated in Penn West's Monthly Accrual Meetings</u>

The SEC Complaint refers repeatedly to discussions that occurred and documents that were reviewed at Penn West's accrual meetings—monthly meetings that were part of Penn West's internal controls process and held for the purpose of reviewing results of the previous

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Letters Rogatory to which this document is appended.

[2] Certain other individuals, some of whom were previously examined by the SEC or the ASC, are not included in this application because they are not residents of Alberta or because they have entered into oral or written agreements to permit examination without resort to the Letters Rogatory process. Separate applications are being made to the appropriate courts for the Non-Resident Witnesses. In addition, further application may be made to the Court of Queen's Bench of Alberta: (a) if individuals who previously agreed to examination without resort to the Letters Rogatory process subsequently seek to revoke those agreements; and/or (b) regarding one individual who is not included in this application due to health issues. With respect to the lattermost individual, counsel for that individual and the Non-Settling Parties are attempting to determine whether a set of accommodations and procedures can be agreed upon.

month, and that were routinely attended by Mr. Takeyasu, Mr. Curran, Rajesh Ghosh (Manager of Penn West's Business Controls and Risks Group ("BCR Group")) and various senior members of Penn West's Finance and Accounting Groups. (*See, e.g.*, Compl. ¶¶ 29, 51-56, 64, 71-73, 78, 82, 105, 115, 117.) In addition, the SEC Complaint expressly alleges that certain of the fraudulent accounting practices were discussed at the monthly accrual meetings (Compl. ¶¶ 51, 71-73, 78), and that certain tables in documents distributed at the monthly accrual meetings were reflective of intent to fraudulently understate Penn West's operating expenses. (Compl. ¶¶ 71-73, 78).

Messrs. Takeyasu and Curran accordingly seek an opportunity to examine the attendees of the monthly accrual meetings regarding their respective recollections and understandings of the accounting practices discussed at those meetings and the documents prepared in connection with those meetings. Messrs. Takeyasu and Curran further seek to examine those witnesses regarding: (a) their recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint (*see, e.g.*, Compl. ¶¶ 7, 30, 42, 44-83, 84-95, 96-107, 114, 125); (b) their communications with Messrs. Takeyasu and Curran, with others at Penn West, and with Penn West's external auditors, KPMG, to the extent that those communications are relevant to the SEC Complaint; (c) their knowledge and recollection of any of the events described or alluded to in the SEC Complaint—including any inquiries, requests, or directions by Mr. Takeyasu or Mr. Curran regarding any of the accounting practices or policies at issue in the SEC Complaint; (d) their role in fashioning, implementing, or overseeing the accounting practices or policies described in the SEC Complaint; and (e) their role, if any, in Penn West's restatement of its financial results for 2012, 2013, and the first quarter of 2014 (the "Restatement").

The individuals falling in this category are:

a.) **Gary Ross**, who served as Penn West's Manager of Capital Accounting during the time period relevant to the SEC Complaint, and who was examined by the SEC and the ASC in Calgary on February 26 and 27, 2015;

b.) **Richard Schiller**, who has served as Controller at Penn West since approximately 2016, and served as Finance Manager between 2005 and approximately 2015, and who was examined by the SEC and the ASC in Calgary on June 25, 2015; and

c.) **Geoffrey Rossos**, who served as Penn West's Corporate Controller during the time period relevant to the SEC Complaint, and who was examined by the SEC and the ASC in Calgary on March 18 and 19, 2015.[3]

---

[3] Certain other individuals who routinely participated in Penn West's monthly accrual meetings—namely, Operations Controller Waldemar Grab, Manager of Operations Analysis Susan Wenstrom, BCR Group Manager Rajesh Ghosh and Operations Controller David Saul—are not included in this application for the various reasons described in note 2 *supra*.

## 2. **Other Accounting or Finance Personnel**

Four other members of Penn West's Accounting and Finance Groups who previously were examined by the ASC and/or the SEC in their respective investigations also have specific and detailed knowledge of the accounting practices and policies at issue and various of the events described or alluded to in the SEC Complaint. The individuals falling in this category are:

a.) **Laurence Broos**, who served as Penn West's Treasurer and General Manager during the time period relevant to the SEC Complaint, who also served on the steering committee that assisted Penn West's BCR Group, which the SEC Complaint describes as "charged with documenting and testing internal accounting controls" (Compl. ¶¶ 109, 110), and who participated in a significant number of communications relevant to the SEC Complaint. Mr. Broos was examined by the SEC and the ASC in Calgary on June 22, 2015.

b.) **David Dyck**, who served as Penn West's Chief Financial Officer from May 1, 2014 through January 2017. Mr. Dyck participated in Penn West's internal investigation into certain accounting practices, oversaw Penn West's Restatement in September 2014, and communicated extensively with Penn West's external auditors during the Restatement process. Mr. Dyck was examined by the SEC and the ASC in Calgary on May 1, 2015.

c.) **Christopher Everett**, who served for a time as Manager of Equalization and Payouts at Penn West, and who worked at Penn West from September 2008 to January 2015. Mr. Everett has first-hand familiarity with certain practices followed by Mr. Grab, and had communications with various individuals at Penn West, including Mr. Grab and Mr. Curran, that are relevant to the SEC Complaint. Mr. Everett was examined by the SEC and the ASC in Calgary on April 30, 2015.

d.) **Derek Riewe**, who was a Senior Operations Analyst at Penn West during the time period relevant to the SEC Complaint. Mr. Riewe made various journal entries at the direction of Mr. Grab and/or Operations Manager Susan Wenstrom, received representations from Mr. Grab and/or Ms. Wenstrom relating to the propriety of those entries, and was among the recipients of an email relating to a reclassification in March 2014 that figures prominently in the SEC Complaint. (Compl. ¶ 123.) Mr. Riewe was examined by the SEC and the ASC in Calgary on April 26, 2016.

Messrs. Takeyasu and Curran seek to examine each of the foregoing individuals regarding: (a) their recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint (*see, e.g.*, Compl. ¶¶ 7, 30, 42, 44-

83, 84-95, 96-107, 114, 125); (b) their communications with Messrs. Takeyasu and Curran, with others at Penn West, and with Penn West's external auditors, KPMG, to the extent that those communications are relevant to the SEC Complaint; (c) their knowledge and recollection of any of the events described or alluded to in the SEC Complaint—including any inquiries, requests, or directions by Mr. Takeyasu or Mr. Curran regarding any of the accounting practices or policies at issue in the SEC Complaint; (d) their role in fashioning, implementing, or overseeing the accounting practices or policies described in the SEC Complaint; and (e) their role, if any, in Penn West's Restatement.

### 3. **Penn West's Former Chief Executive Officers**

On the date that the SEC Complaint was filed, the SEC publicly stated that its investigation found no personal misconduct by Murray Nunns or David Roberts—the two individuals who served as Chief Executive Officers at Penn West during the time period covered by Penn West's Restatement.[4] However, the SEC Complaint ascribes fraudulent intent to various email communications involving Messrs. Takeyasu and/or Curran and Messrs. Nunns and/or Mr. Roberts. (Compl. ¶¶ 26, 61, 68, 93).[5]

Messrs. Takeyasu and Curran accordingly seek an opportunity to examine:

a.) **Murray Nunns**, who served as Penn West's Chief Executive Officer from 2011 to 2013, and who was examined by the SEC in the U.S. on March 15, 2016; and

b.) **William Andrew**, who preceded Mr. Nunns as Penn West's Chief Executive Officer and served in that capacity from 2005 to 2011. Mr. Andrew was examined by the SEC in the U.S. on February 23, 2016.

Messrs. Takeyasu and Curran seek to examine the foregoing individuals regarding: (a) their recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint (*see, e.g.*, Compl. ¶¶ 7, 30, 42, 44-83, 84-95, 96-107, 114, 125); (b) their communications with Messrs. Takeyasu and Curran, with others at Penn West, and with Penn West's external auditors, KPMG, to the extent that those communications are relevant to the SEC Complaint; (c) their knowledge and recollection of any of the events described or alluded to in the SEC Complaint—including any inquiries, requests, or directions by Mr. Takeyasu or Mr. Curran regarding any of the accounting practices or policies at issue in the SEC Complaint; (d) their role in fashioning, implementing, or overseeing any of the accounting practices or policies described in the SEC Complaint; (e) their knowledge of Penn West's

---

[4] The SEC's statement was made in the context of announcing that clawback actions were not needed against Messrs. Nunns or Roberts because they had reimbursed Penn West for cash bonuses and certain stock awards they received during the relevant period.

[5] Mr. Roberts has since relocated to the United States, and the assistance of the Court of Queen's Bench accordingly is not needed to obtain his testimony.

budgeting process; and (f) their knowledge of Penn West's business and strategic plans, especially as they related to operating and capital efficiency.

### 4. Penn West's Senior Production Executives

A central theory of the SEC Complaint is that Messrs. Takeyasu and Curran allegedly established a budget for the reclassification of operating expenses to capital ("reclass to capital") that was a manipulative device rather than a "true budget," because it bore no relationship to economic reality or Penn West's actual operations activity throughout the year and was "generally established … without meaningful contribution from Penn West's production department, which was responsible for forecasting and analyzing the repair and maintenance capital costs to be incurred by Penn West." (Compl. ¶ 45.) Messrs. Takeyasu and Curran contend that: (a) any budgeted amounts for reclass to capital reflected good faith estimates of anticipated repair and maintenance ("R&M") costs that should be capitalized; and (b) as reflected in the documents produced by Penn West during the SEC's investigation, there was in fact substantial involvement by Penn West's Production Department—including, but not limited to, involvement by senior production executives—in budgeting and monitoring capital spending, including reclass to capital.

Messrs. Takeyasu and Curran accordingly seek an opportunity to examine:

    a.) **Mark Fitzgerald**, who was Penn West's Senior Vice President of Production from 2008 to 2011 and Penn West's Senior Vice President of Development from 2011 to 2014. Mr. Fitzgerald was examined by the ASC in Calgary on July 22, 2015.

    b.) **Gregg Gegunde**, who was Penn West's Senior Vice President of Production from 2011 to 2016. Mr. Gegunde was examined by the ASC and the SEC in Calgary on April 27, 2015.

Messrs. Takeyasu and Curran seek to examine Messrs. Fitzgerald and Gegunde regarding their respective understandings of the roles they and their Production Department colleagues played in establishing the reclass to capital budget and in forecasting and analyzing repair and maintenance ("R&M") capital and operating costs to be incurred by Penn West. Messrs. Takeyasu and Curran further seek to examine Messrs. Fitzgerald and Gegunde regarding: (a) their communications that relate to the allegations in the SEC Complaint that the reclass to capital budgets was established "without meaningful contribution" from Penn West's Production Department; (b) their recollections of meetings or presentations concerning budgeting at Penn West, including, but not limited to, R&M capital costs or the reclass to capital budget; (c) their roles in providing input to Penn West's reclass to capital budget, as reflected in emails and/or meeting invitations authored or received by Messrs. Fitzgerald and Gegunde and to or from other members of senior management, the Finance and Accounting Groups, and/or Production Department executives, including emails referencing budgeting and the transfer from operating expense to capital, their roles in such budgeting, and/or reclassifications related to royalty payments; (d) their familiarity with and recollection of Penn West's policy concerning the

classification of operating and capital expenses; (e) their recollection of interactions with members of the Production Department concerning R&M capital costs or the reclass to capital budget; (f) their recollection of interactions with finance and accounting personnel concerning R&M capital costs or the reclass to capital budget; and (g) their recollection of interactions with Messrs. Takeyasu or Curran or members of senior management concerning R&M capital costs or the reclass to capital budget.

### 5. Other Previously Examined Witnesses

Messrs. Takeyasu and Curran believe that two other witnesses previously examined by the SEC and/or the ASC likewise have first-hand information about matters relevant and material to a fair and just resolution of the U.S. Action. Those witnesses, and the topics on which Messrs. Takeyasu and Curran seek to examine them, are described below.

a.) **James Smith**, who served as Director of Penn West and Chair of Penn West's Audit Committee from 2005 to 2015. Mr. Smith was interviewed by the ASC in Calgary on November 2, 2015.

Messrs. Takeyasu and Curran seek to examine Mr. Smith regarding: (a) his attendance at audit committee meetings, including, but not limited to, his recollection of presentations by management and/or Penn West's external auditors KPMG; (b) his communications with Messrs. Takeyasu and Curran, with others at Penn West, and with KPMG, to the extent that those communications are relevant to the SEC Complaint; (c) his communications with members of the BCR group relating to Penn West's internal controls; (d) his role in Penn West's financial reporting; (e) his role in approving budgets and his recollection of conversations and meetings with senior management regarding the reduction of Penn West's reported operating expenses (Compl. ¶¶ 3, 28); (f) his recollection of information received by the Board of Directors concerning Penn West's internal controls and the accounting practices at issue in the SEC Complaint; and (g) his role in Penn West's Restatement.

b.) **Matthew Wetmore**, who is a Partner at PricewaterhouseCoopers ("PwC") in Calgary, Alberta. Mr. Wetmore was interviewed by the ASC in Calgary on November 30, 2015.

PwC was engaged by Penn West in July 2014 to provide day-to-day finance support during Penn West's internal investigation. Messrs. Takeyasu and Curran seek to examine Mr. Wetmore regarding: (a) his recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint; and (b) his role in Penn West's Restatement and the analysis underlying the Restatement.

**B. Witnesses Not Previously Examined by the SEC and/or the ASC**

Messrs. Takeyasu and Curran also seek the opportunity to examine 10 residents of Alberta who were not previously examined by the SEC and/or the ASC in order to memorialize testimony relevant to their defenses. Messrs. Takeyasu and Curran believe, for the reasons set forth below, that an opportunity to examine those witnesses is necessary and in the interests of justice. The SEC has informed Messrs. Takeyasu and Curran that it likewise seeks an opportunity to examine these witnesses, including to rebut Messrs. Takeyasu and Curran's defenses and potentially as affirmative testimony on behalf of the SEC. Once again, for the convenience of the Court of Queen's Bench, the witnesses are grouped below according to their work at Penn West and the knowledge that they possess that is relevant and material to the U.S. Action.

**1. Finance or Compliance Personnel**

a.) **Mark Chyc-Cies**, who worked at Penn West from February 2010 to March 2016, and was a manager at Penn West and a Senior Corporate Analyst during the period relevant to the SEC Complaint. Mr. Chyc-Cies was the recipient of an email that figures prominently in the SEC Complaint, and that is characterized as an instruction by Mr. Curran to conceal certain information from Penn West's Board of Directors. (Compl. ¶ 65.) Messrs. Takeyasu and Curran seek to examine Mr. Chyc-Cies regarding his recollection and understanding of the email at issue.

In addition, Messrs. Takeyasu and Curran seek to examine Mr. Chyc-Cies regarding: (a) his recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint (*see, e.g.*, Compl. ¶¶ 7, 30, 42, 44-83, 84-95, 96-107, 114, 125); (b) his communications with Messrs. Takeyasu and Curran, with others at Penn West, and with Penn West's external auditors, KPMG, to the extent that those communications are relevant to the SEC Complaint; and (c) his knowledge and recollection of any of the events described or alluded to in the SEC Complaint—including any inquiries, requests, or directions by Mr. Takeyasu or Mr. Curran regarding any of the accounting practices or policies at issue in the SEC Complaint.

b.) **Wendy Henkelman**, who was a Vice President of Treasury and Compliance from 2008 to November 2012. Ms. Henkelman also served as a member of the reporting committee of Penn West's BCR Group, which the SEC Complaint describes as "charged with documenting and testing internal accounting controls" (Compl. ¶¶ 109, 110). Ms. Henkelman is also understood to have attended certain of Penn West's monthly accrual meetings that, as described above, were typically

attended by Messrs. Takeyasu and Curran and various senior members of Penn West's Finance and Accounting Groups.

In addition, Ms. Henkelman participated in email exchanges relating to the participation of senior production executives and their teams in the establishment of Penn West's capitalization and reclass to capital budget. For example, on August 23, 2012, Gary Ross (Manager of Capital Accounting) forwarded to Ms. Henkelman an email from Mr. Ross to Mark Fitzgerald (Senior Vice President of Development) and Messrs. Takeyasu and Curran, listing capital commitments broken down by area and including "40 [million] R&M [repair and maintenance] OPEX to CAPEX Reclass." Ms. Henkelman forwarded the email chain to Mark Chyc-Cies (Senior Corporate Analyst) and Laurence Broos (Treasurer), writing, "FYI, Still $100 M too high but Mark's team is still working on numbers for the first week of September."

Messrs. Takeyasu and Curran seek to examine Ms. Henkelman regarding: (a) her recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint; (b) her communications with Messrs. Takeyasu and Curran, with others at Penn West, and with Penn West's external auditors, KPMG, to the extent that those communications are relevant to the SEC Complaint; (c) her role and responsibilities as a member of the BCR Group reporting committee, including meetings with members of the BCR Group relating to Penn West's internal controls; (d) her participation in monthly accrual meetings and recollections and understandings of the accounting practices discussed at those meetings; and (e) her understanding of the Production Department's role in providing input regarding Penn West's reclass to capital budget, described in the SEC Complaint as having generally been established "without meaningful contribution from Penn West's Production Department, which was responsible for forecasting and analyzing the repair and maintenance capital costs to be incurred by Penn West" (Compl. ¶ 45), as reflected in emails and/or meeting invitations authored or received by Ms. Henkelman.

c.) **Cory Bain**, who was an Operations Analyst at Penn West from 2009 to 2014.

Mr. Bain participated in email exchanges relating to the participation of production personnel in determining Penn West's reclass to capital budget. For example, on August 28, 2012, Susan Wenstrom (Manager of Operations Analysis) sent an email to Mr. Bain, Blair Grant, Kevin Radomske, and Darren Jackson (each of whom is further discussed below), stating, "Wally will be discussing the possibility of a reclass to/from capital with Todd and Jeff. Though

I understand the opex budget is your accountability we also need to ensure that corporately we have consistent accounting policies applied year over year and between op and non op." Also, in response to an email from Ms. Wenstrom dated September 14, 2010 directing Mr. Bain to "prepare the 2011 budget for each of the Corp Fields for the Sup[erintenden]ts," Mr. Bain wrote, with respect to reclass to capital, that he would "need to talk to Op . . . to find out how much of the R&M we will be reclassing," specifically identifying Senior Production Managers Darren Jackson and Cam King.

Messrs. Takeyasu and Curran seek to examine Mr. Bain regarding (a) his recollection and understanding of the accounting practices and policies in place at Penn West—including practices and policies relating to capitalization of costs, reclassification of royalty payments, treatment of accruals, and journal entries—to the extent that those practices and policies are relevant to the SEC Complaint; and (b) his understanding of the Production Department's role in providing input regarding Penn West's reclass to capital budget, described in the SEC Complaint as having been generally established "without meaningful contribution from Penn West's Production Department, which was responsible for forecasting and analyzing the repair and maintenance capital costs to be incurred by Penn West." (Compl. ¶ 45.)

## 2. **Production Management Personnel**

As noted above, the issue of the Production Department's role and responsibility in budgeting and monitoring capital spending, including reclassifications from operating expenses to capital expenses, is central to the U.S. Action because the SEC Complaint relies upon the alleged absence of meaningful involvement by the Production Department as support for its claim that Penn West's reclass to capital budget bore no relationship to economic reality. *See, e.g.*, Compl. ¶¶ 45, 46, 68, 74, 76, 77 (alleging that the reclass to capital line item in the budget bore no relationship to economic reality, was established "without meaningful contribution from Penn West's Production Department," and was "nothing more than a tool in furtherance of Defendants' fraud").

In addition to the individuals described above, Messrs. Takeyasu and Curran have identified seven individuals in Penn West's Production Department who, as indicated by the emails produced by Penn West during the SEC's investigation, can speak to the role that they and their production colleagues played in establishing the reclass to capital budget and in forecasting and analyzing R&M capital and operating costs to be incurred by Penn West.

The individuals falling in this category, all of whom worked in Penn West's Production Department during the period relevant to the SEC Complaint, are as follows:

a.) **Gord Aker (**General Manager of Maintenance Reliability);

b.) **Paul Weevers** (General Manager);

c.) **Garrett Wilson** (General Manager);

d.) **Blair Grant** (Production Manager and Superintendent);

e.) **Darren Jackson** (Senior Production Manager);

f.) **Cam King** (Senior Operations Manager); and

g.) **Kevin Radomske** (Production Manager).[6]

Messrs. Takeyasu and Curran seek to examine these witnesses regarding: (a) their recollection of interactions with other members of the Production Department concerning R&M capital costs or the reclass to capital budget; (b) their recollection of interactions with finance and accounting personnel concerning R&M capital costs or the reclass to capital budget; (c) their recollection of interactions with Messrs. Takeyasu or Curran, or members of senior management concerning R&M capital costs or the reclass to capital budget; (d) their familiarity with any meetings or presentations concerning budgeting at Penn West, including, but not limited to, R&M capital costs or the reclass to capital budget; and (e) their understanding of the Production Department's role in providing input regarding Penn West's reclass to capital budget or R&M capital cost forecasts and analysis.

Examples of the emails and other documents confirming that each of the individuals listed above has information that is relevant and material to a just resolution of the U.S. Action are provided below.

i.) With respect to Messrs. Wilson, Aker, Weevers, and Jackson, on March 3, 2014, Waldemar Grab (Operations Controller) sent a meeting invitation to each of those individuals, titled "Ca[]pital Reclass," stating that the purpose of the meeting is "to review the R&M Capital Reclass category." Also, on March 19, 2013, Tracey Parsons invited Mr. Grab, Gary Ross (Manager of Capital Accounting), Susan Wenstrom (Manager of Operations Analysis), Gregg Gegunde (Senior Vice President of Production) and Messrs. Weevers, Jackson, Aker, and Wilson to an opex and capex monthly production review meeting.

ii.) With respect to Messrs. Weevers, Wilson, and Jackson, on January 9, 2014, Mr. Weevers emailed various members of Penn West's Corporate Planning Group, copying Messrs. Gegunde, Aker, Jackson, Wilson, Grab, and Ross, with the subject line "R&M Reclass Capital," writing: "Please allocate $2MM of R&M reclass to the Jamaica disposition."

iii.) With respect to Messrs. Grant, Radomske, and Jackson, on August 28, 2012, Ms. Wenstrom sent an email to those individuals and Cory Bain (Operations Analyst),

---

[6] One additional Penn West production manager, Kimble Meagher, who Messrs. Takeyasu and Curran seek to examine, is a resident of Nova Scotia and thus is not included in the current application.

stating, "Wally will be discussing the possibility of a reclass to/from capital with Todd and Jeff. Though I understand the opex budget is your accountability we also need to ensure that corporately we have consistent accounting policies applied year over year and between op and non op." Mr. Grant responded, "[W]e will have the superintendent add comments to variances and justification." Also, on May 6, 2013, Ms. Wenstrom emailed Messrs. Radomske, Grant, Grab, and Trevor Gettis (Production Manager), with the subject "Opex forecast for April – Approval required," asking the recipients to "review and approve" the opex forecast for April.

iv.) With respect to Messrs. Grant and Jackson, regarding the 2012 budgeting process, on August 2, 2011, Ms. Wenstrom wrote a message to those individuals stating: "We need to discuss how to handle workover reclassification for the 2012 budget . . . . Wally [Grab] and Jeff [Curran] discussed 2011 actuals and what may need to be done with Gregg [Gegunde] about a month ago, just prior to him taking on his new role." On August 3, 2011, Ms. Wenstrom further wrote to Messrs. Jackson and Grant: "Wally and I have been discussing the op workover reclassification from operating to capital. Our proposal is that we include a $60M workover reclass in the initial budget numbers for 201[2] within the corporate fields for each Supt. We would distribute it based on the % of actual workovers for 2010 and YTD 2011. Then . . . . we could reallocate the $60M based on the planned workovers schedule. Do you support this approach?" Mr. Grant responded, "Agreed" and Mr. Jackson responded, "I support this."

v.) With respect to Messrs. Jackson and King, on October 9, 2009, Mark Fitzgerald (Senior Vice President of Development) sent an email to production team members Messrs. Gegunde, Jackson, and King, as well as Messrs. Takeyasu and Curran, with the subject line "Budget Comments." Among other items, Mr. Fitzgerald expressed his view that "[t]he roll-over of R&M expenses to the capital line must be considered," and noted that the issue should be discussed at a budget meeting to be held the following Tuesday. Also, on May 10, 2011, Mr. Fitzgerald sent an email to Ms. Wenstrom, copying Messrs. Gegunde, Jackson, King, Grab, and Ross, with the subject line "RE: Capitalizing Operating Costs on New Drills," stating "we also need to make sure that if there were omissions in the facility installs, equipping the wells etc[.] that we roll those costs through to the AFEs and not the opex. Something we can be diligent on . . . "

vi.) With respect to Mr. Jackson, on August 3, 2011, Mr. Grab sent a meeting invitation to Craig Buchanan (Senior Production Manager), Kimble Meagher (Production Manager), Messrs. Jackson and Gegunde, and Ms. Wenstrom with the subject, "June review of Opex/Capex numbers for Production." Also, on August 13, 2012, Mr. Curran wrote an email with the subject line "RE: 2013 Capex budget" to Gary Ross, copying Susan Wenstrom, stating: "Probably need to circle with Gegunde to see what he has in mind for R&M then make a call on what we can conclude is capital (vs[.]

opex)."  Mr. Ross then emailed Messrs. Gegunde and Jackson, copying James Burns (Vice President, Corporate Planning), Mr. Grab, Ms. Wenstrom and Mr. Curran, stating: "For 2013 we should put some thought into what [the capex budget] number will be, so we don't have unbudgeted capital spending.  Please let me know if you need any information from me to come up with the number."

# Appendix IV

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                Plaintiff,

                v.

PENN WEST PETROLEUM LTD., d/b/a
OBSIDIAN ENERGY LTD., TODD H.
TAKEYASU, JEFFERY A. CURRAN, and
WALDEMAR GRAB,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/13/17

No. 17 Civ. 4866 (GHW)

**STIPULATED**
**CONFIDENTIALITY**
**AGREEMENT AND [PROPOSED]**
**PROTECTIVE ORDER**

**MEMORANDUM ENDORSED**

GREGORY H. WOODS, District Judge:

WHEREAS, all of the parties to this action (collectively, the "Parties" and each individually, a "Party") request that this Court issue a protective order pursuant to Federal Rule of Civil Procedure 26(c) to protect the confidentiality of nonpublic and competitively sensitive information that they may need to disclose in connection with discovery in this action;

WHEREAS, the Parties, through counsel, agree to the following terms; and

WHEREAS, this Court finds that good cause exists for issuance of an appropriately tailored confidentiality order governing the pretrial phase of this action;

IT IS HEREBY ORDERED that the Parties to this action, their respective officers, agents, servants, employees, and attorneys, any other person in active concert or participation with any of the foregoing, and all other persons with actual notice of this Order will adhere to the following terms, upon pain of contempt:

        1.      All "Discovery Material" (*i.e.*, information of any kind produced or disclosed in the course of discovery in this action) shall be used solely for the prosecution and

defense of this action and any appeals thereto, and not for any other purpose or in any other litigation proceeding.  Nothing contained in this Order, however, will affect or restrict the rights of any Party with respect to its own documents or information produced in this action.

2.     With respect to Discovery Material that a person has designated as Confidential pursuant to this Order, no person subject to this Order may disclose such Confidential Discovery Material to anyone else except as expressly permitted hereunder.

3.     The Party or person producing or disclosing Discovery Material (each, "Producing Party") may designate as Confidential such material that it reasonably and in good faith believes consists of:

(a)     previously non-disclosed financial information (including without limitation profitability reports or estimates, percentage fees, design fees, royalty rates, minimum guarantee payments, sales reports, and sale margins);

(b)     previously non-disclosed material relating to ownership or control of any non-public company;

(c)     previously non-disclosed business plans, product-development information, or marketing plans or materials;

(d)     proprietary business information or communications, or other confidential research, development, or commercial information or communications;

(e)     any information of a personal or intimate nature regarding any individual, including, but not limited to, social security or other taxpayer identification numbers, home telephone numbers and addresses, banking

or other personal financial information, and information from employee personnel files;

(f)    any information for which applicable law—foreign or domestic—requires confidential treatment; or

(g)    any other category of information given confidential status by this Court after the date of this Order.

4.    With respect to Confidential Discovery Material other than deposition transcripts and exhibits, the Producing Party or its counsel may designate such Discovery Material as Confidential by stamping or otherwise clearly marking as "Confidential" the protected material in a manner that will not interfere with legibility or audibility.

5.    A Producing Party or its counsel may designate deposition exhibits or portions of deposition transcripts as Confidential Discovery Material either by:  (a) indicating on the record during the deposition that a question calls for Confidential information, in which case the reporter will bind the transcript of the designated testimony in a separate volume and mark it as "Confidential Information Governed by Protective Order;" or (b) notifying the reporter and all counsel of record, in writing, within 30 days after a deposition has concluded, of the specific pages and lines of the transcript that are to be designated Confidential, in which case all counsel receiving the transcript will be responsible for marking the copies of the designated transcript in their possession or under their control as directed by the Producing Party or that person's counsel. During the 30-day period following a deposition, all Parties will treat the entire deposition transcript and all deposition exhibits as if they had been designated Confidential.

6.    Any court reporter or videographer who transcribes or videotapes testimony at a deposition in this action containing Confidential Discovery Material shall:

(a) treat copies of any transcript, reporter's notes, videotapes, or any other transcription records as Confidential Discovery Material; and (b) deliver any transcript containing Confidential Discovery Material only to counsel, the witness, or the Court (filed under seal in accordance with Rule 4(A) of this Court's Individual Rules of Practice in Civil Cases ("Individual Practices")).  A Party who notices a deposition shall be responsible for notifying any court reporter or videographer of the existence of this Order.

7.       During a deposition, only persons to whom disclosure of Confidential Discovery Material is permitted under paragraph 12 of this Order shall remain present while Confidential Discovery Material is being used or discussed.

8.       If at any time before the termination of this action, a Producing Party realizes that it should have designated as Confidential some portion(s) of Discovery Material that it previously produced without a Confidential designation, the Producing Party may so designate such material by notifying all Parties in writing.  Thereafter, all persons subject to this Order will treat such designated portion(s) of the Discovery Material as Confidential.  In addition, the Producing Party shall provide each other Party with replacement versions of such Discovery Material that bear the Confidential designation within ten business days of providing such notice or, in the case of voluminous material or other exceptional circumstances, as soon as practicable.

9.       To the extent any Party or third party previously produced documents or information to the U.S. Securities and Exchange Commission ("Commission" or "SEC") in connection with the Commission staff's investigation conducted under File No. HO-12481 and wishes to designate portions of its production as Confidential, it will identify those documents and information by Bates number or range within fifteen business days of notice by the SEC of its intention to produce less than 20,000 such documents, or within twenty-five business days of

notice by the SEC of its intention to produce 20,000 or more such documents. The SEC will produce any documents and information so identified with a Confidential designation.

10. If at any time before the termination of this action, a Party—other than the Producing Party—believes that some portion(s) of Discovery Material were previously produced without a proper Confidential designation, that Party may notify all Parties and the Producing Party in writing. Thereafter, all persons subject to this Order will treat such designated portion(s) of the Discovery Material as Confidential until any dispute about the proper designation is resolved. If the Parties cannot reach agreement promptly regarding a Confidential designation, counsel for all affected Parties will address their dispute to this Court in accordance with Rule 2(C) of this Court's Individual Practices. In addition, the Producing Party shall provide each other Party replacement versions of such Discovery Material that bear the Confidential designation within ten business days of agreement upon such designation or resolution by the Court of any dispute or, in the case of voluminous material or other exceptional circumstances, as soon as practicable.

11. Nothing contained in this Order will be construed as: (a) a waiver by a Party or person of its right to object to any discovery request; (b) a waiver of any privilege or protection; or (c) a ruling regarding the admissibility at trial of any document, testimony, or other evidence.

12. Where a Producing Party has designated Discovery Material as Confidential, other persons subject to this Order may disclose, summarize, describe, characterize, or otherwise communicate or make available such information only to the following persons:

(a)     the Parties to this action, and with respect to Discovery Material designated as Confidential that was produced by a non-party, also to such non-party;

(b)     the Parties' insurers and counsel to their insurers;

(c)     the Parties' in-house counsel and outside counsel litigating and/or supervising this action, including any paralegal, clerical, or other assistant that such outside counsel employs and assigns to this matter;

(d)     outside vendors or service providers (such as copy-service providers and document-management consultants) that counsel hire and assign to this matter;

(e)     any mediator or arbitrator that the Parties engage in this matter or that this Court appoints, provided such person has first executed a Non-Disclosure Agreement in the form annexed as Exhibit A hereto;

(f)     as to any document, its author, its addressee, and any other person indicated on the face of the document as having received a copy;

(g)     any witness who counsel for a Party in good faith believes may be called to testify at trial, hearing, or deposition in this action or is called to testify at trial, hearing, or deposition in this action (and their counsel), provided such person has first executed a Non-Disclosure Agreement in the form annexed as Exhibit A hereto;

(h)     any person a Party retains to serve as an expert witness or otherwise provide specialized advice to counsel in connection with this action,

provided such person has first executed a Non-Disclosure Agreement in the form annexed as Exhibit A hereto;

(i)    stenographers engaged to transcribe depositions the Parties conduct in this action;

(j)    this Court, including any appellate court, its support personnel, and court reporters; and

(k)    any other person who the Producing Party, or other person designating the Discovery Material Confidential, agrees in writing may have access to such Discovery Material.

Any disclosure permitted by this paragraph may be made only to the extent reasonably necessary to prosecute and defend this action.

13.    Before disclosing any Confidential Discovery Material to any person referred to in subparagraphs 12(e), 12(g), or 12(h) above, counsel must provide a copy of this Order to such person, who must sign a Non-Disclosure Agreement in the form annexed as Exhibit A hereto stating that he or she has read this Order and agrees to be bound by its terms. Said counsel must retain each signed Non-Disclosure Agreement and, upon written request, produce it to opposing counsel before such person is permitted to testify (at deposition, hearing, or trial).

14.    This Order binds the Parties and certain others to treat as Confidential any Discovery Materials so classified. The Court has not, however, made any finding regarding the confidentiality of any Discovery Materials, and retains full discretion to determine whether to afford confidential treatment to any Discovery Material designated as Confidential hereunder. All persons are placed on notice that the Court is unlikely to seal or otherwise afford confidential

treatment to any Discovery Material introduced into evidence at trial, even if such material has previously been sealed or designated as Confidential.

15.      In filing Confidential Discovery Material with this Court, or filing portions of any pleadings, motions, or other papers that disclose such Confidential Discovery Material ("Confidential Court Submission"), the Parties shall publicly file a redacted copy of the Confidential Court Submission via the Electronic Case Filing System.  In accordance with Rule 4(A) of the Court's Individual Practices, the Parties shall file an unredacted copy of the Confidential Court Submission under seal with the Clerk of this Court, and the Parties shall serve this Court and opposing counsel with unredacted courtesy copies of the Confidential Court Submission.  In accordance with Rule 4(A) of this Court's Individual Practices, any Party that seeks to file Confidential Discovery Material under seal must file an application and supporting declaration justifying—on a particularized basis—the sealing of such documents.  The Parties should be aware that the Court will unseal documents if it is unable to make "specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006).

16.      If, in connection with this action, a Producing Party claims that it has produced Discovery Material that is subject to a claim of privilege, protection, or immunity, including without limitation attorney-client privilege, attorney work product protection, privileges and protections pursuant to Section 24(d), (e), and (f) of the Securities Exchange Act of 1934, and/or bank examination privilege ("Protected Disclosure"), such Protected Disclosure shall not constitute or be deemed a waiver or forfeiture of any claim or privilege or protection with respect to the Discovery Material or its subject matter in this case or in any other federal or

state proceeding.  This Order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

17.     If a Producing Party provides notice of Protected Disclosure in which the Producing Party affirmatively promises to maintain a copy of the information constituting a Protected Disclosure, then the receiving Party shall, within ten business days, return or destroy all copies of the disclosed information subject to the claim, and provide a written certification of counsel that all such information has been returned or destroyed.

18.     Within fourteen business days of the notification that information constituting a Protected Disclosure has been returned or destroyed, the Producing Party shall produce a privilege log with respect to the Protected Disclosure.

19.     If the Parties cannot reach agreement promptly regarding a Protected Disclosure, counsel for all affected Parties will address their dispute to this Court in accordance with Rule 2(C) of this Court's Individual Practices.  Any motion, letter, or other communication with the Court regarding a Protected Disclosure shall be filed under seal in accordance with Rule 4(A) of this Court's Individual Practices, shall not assert as a ground for entering an order to compel the fact or circumstances of the production, and shall not reveal or summarize any of the Protected Disclosure or any portion thereof.

20.     In the event a non-party has produced information in response to a subpoena or request, any Party receiving such information from the non-party shall ensure that all other Parties receive copies of the non-party's production within five business days of the receiving Party's receipt of such production, or in the case of voluminous material or other exceptional circumstances, the Party receiving such information from the non-party shall notify all other Parties of its receipt of such production within three business days, and shall provide

copies of the non-party production to all other Parties as soon as practicable.  Any Party who serves a subpoena on a non-party shall provide such non-party with a copy of this Order.

21.      Any Party who objects to any designation of confidentiality may at any time before the trial of this action serve upon counsel for the Producing Party a written notice stating with particularity the grounds of the objection.  If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with Rule 2(C) of this Court's Individual Practices.

22.      Any Party who requests additional limits on disclosure (such as "attorneys' eyes only" in extraordinary circumstances), may at any time before the trial of this action serve upon counsel for the recipient Parties a written notice stating with particularity the grounds of the request.  If the Parties cannot reach agreement promptly, counsel for all affected Parties will address their dispute to this Court in accordance with Rule 2(C) of this Court's Individual Practices.

23.      Nothing in this Order will prevent any Party from producing any Confidential Discovery Material in its possession in response to a lawful subpoena or other compulsory process, or if required to produce by law or by any government agency having jurisdiction, provided that such Party gives written notice to the Producing Party as soon as reasonably possible, and if permitted by the time allowed under the request, at least 10 days before any disclosure.  Upon receiving such notice, the Producing Party will bear the burden to oppose compliance with the subpoena, other compulsory process, or other legal notice if the Producing Party deems it appropriate to do so.

24.      Prior or subsequent production, whether voluntary, under subpoena, or otherwise, to any regulator (including any division of any federal, state, or local government in

the U.S. or abroad, any division of any foreign government, or any industry self-governing, licensing, or insuring entity) of any Confidential Discovery Material shall not affect such material's status as Confidential Discovery Material in this action.

25.     The undersigned agree to meet and confer concerning the use of any Confidential Discovery Material at hearings or at the trial of this action not fewer than five days prior to any such hearing or trial.  Where a hearing or trial is scheduled on fewer than five days' notice, the Parties agree to meet and confer as soon as practicable after receiving notice but, in any event, not fewer than twenty-four hours in advance of the hearing or trial.  ~~The use of Confidential Discovery Material at hearings or at trial shall not cause such Confidential Discovery Material to lose its status as Confidential Discovery Material.~~

26.     Each person who has access to Discovery Material designated as Confidential pursuant to this Order must take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

27.     Within 60 days of the final disposition of this action—including all appeals—all recipients of Confidential Discovery Material must either return it—including all copies thereof—to the Producing Party, or, upon permission of the Producing Party, destroy such material—including all copies thereof.  In either event, by the 60-day deadline, the recipient must certify its return or destruction by submitting a written certification to the Producing Party that affirms that it has not retained any copies, abstracts, compilations, summaries, or other forms of reproducing or capturing any of the Confidential Discovery Material.  Notwithstanding this provision, the attorneys that the Parties have specifically retained for this action may retain an archival copy of all pleadings, motion papers, transcripts, expert reports, legal memoranda, correspondence, or attorney work product, even if such materials contain Confidential Discovery

Material.  Any such archival copies that contain or constitute Confidential Discovery Material remain subject to this Order.

28.     This Order will survive the termination of the litigation and will continue to be binding upon all persons subject to this Order to whom Confidential Discovery Material is produced or disclosed.

29.     This Court will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

SO STIPULATED AND AGREED.

Dated: *September 8, 2017*

_____
Sarah Heaton Concannon
Thomas A. Bednar (*pro hac vice*)
Matthew T. Spitzer (*pro hac vice*)
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C. 20549
Tel: (202) 551-5361
Fax: (202) 772-9292
ConcannonS@sec.gov
BednarT@sec.gov
SpitzerM@sec.gov

*Counsel for Plaintiff U.S. Securities and
Exchange Commission*

_____
Richard F. Albert
Jasmine Juteau
Priya Raghavan
MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
ralbert@maglaw.com
jjuteau@maglaw.com
praghavan@maglaw.com

*Counsel for Defendant Todd H. Takeyasu*

_____
Robert J. Giuffra, Jr.
Matthew A. Schwartz
Julia A. Malkina
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
giuffrar@sullcrom.com
schwartzmatthew@sullcrom.com
malkinaj@sullcrom.com

*Counsel for Defendant Penn West
Petroleum Ltd.*

_____
Helen Gredd
Leigh G. Llewelyn
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York 10110
Tel: (212) 921-8399
Fax: (212) 764-3701
hgredd@lswlaw.com
lllewelyn@lswlaw.com

*Counsel for Defendant Jeffery A. Curran*

13

SO STIPULATED AND AGREED.

Dated:

_Sarah Heaton Concannon_
Sarah Heaton Concannon
Thomas A. Bednar (*pro hac vice*)
Matthew T. Spitzer (*pro hac vice*)
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street, N.E.
Washington, D.C.  20549
Tel: (202) 551-5361
Fax: (202) 772-9292
ConcannonS@sec.gov
BednarT@sec.gov
SpitzerM@sec.gov

*Counsel for Plaintiff U.S. Securities and
Exchange Commission*

Robert J. Giuffra, Jr.
Matthew A. Schwartz
Julia A. Malkina
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel: (212) 558-4000
Fax: (212) 558-3588
giuffrar@sullcrom.com
schwartzmatthew@sullcrom.com
malkinaj@sullcrom.com

*Counsel for Defendant Penn West
Petroleum Ltd.*

Richard F. Albert
Jasmine Juteau
Priya Raghavan
MORVILLO ABRAMOWITZ GRAND IASON &
ANELLO P.C.
565 Fifth Avenue
New York, New York  10017
Tel: (212) 856-9600
Fax: (212) 856-9494
ralbert@maglaw.com
jjuteau@maglaw.com
praghavan@maglaw.com

*Counsel for Defendant Todd H. Takeyasu*

Helen Gredd
Leigh G. Llewelyn
LANKLER SIFFERT & WOHL LLP
500 Fifth Avenue
New York, New York  10110
Tel: (212) 921-8399
Fax: (212) 764-3701
hgredd@lswlaw.com
lllewelyn@lswlaw.com

*Counsel for Defendant Jeffery A. Curran*

The Court endorses the parties' stipulated confidentiality agreement subject to the modification made by the Court to paragraph 25.

SO ORDERED.

Dated: September 13, 2017
New York, New York

_GREGORY H. WOODS_
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND :
EXCHANGE COMMISSION, :
 :
   Plaintiff, :
 :
   v. :  No. 17 Civ. 4866 (GHW)
 :
PENN WEST PETROLEUM LTD., d/b/a : **NON-DISCLOSURE AGREEMENT**
OBSIDIAN ENERGY LTD., TODD H. :
TAKEYASU, JEFFERY A. CURRAN, and :
WALDEMAR GRAB, :
 :
   Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   I,_____, acknowledge that I have read and understand the Protective

Order in this action governing the non-disclosure of those portions of Discovery Material that

have been designated as Confidential.  I agree that I will not disclose such Confidential

Discovery Material to anyone other than for purposes of this litigation and that at the conclusion

of the litigation I will return all discovery information to the Party or attorney from whom I

received it.  By acknowledging these obligations under the Protective Order, I understand that I

am submitting myself to the jurisdiction of the United States District Court for the Southern

District of New York for the purpose of any issue or dispute arising hereunder and that my

willful violation of any term of the Protective Order could subject me to punishment for

contempt of Court.

       _____
       Name:
       Date:

# Appendix V

## APPENDIX V

### Counsel for Non-Settling Parties

| | Party | U.S. Counsel | Canadian Counsel |
|---|---|---|---|
| 1 | United States Securities and Exchange Commission | Sarah Heaton Concannon<br>Thomas A. Bednar<br>Matthew T. Spitzer<br>United States Securities and Exchange Commission<br>100 F Street, NE<br>Washington, DC 20549 | David J. Corrigan<br>Erin Viala<br>HMC Lawyers LLP<br>#320, 903 - 8th Ave. SW<br>Calgary, AB T2P 0P7<br>(403) 261-3328 (Corrigan)<br>(403) 261-3333 (Viala) |
| 2 | Todd H. Takeyasu | Richard F. Albert<br>Jasmine Juteau<br>Morvillo Abramowitz Grand Iason & Anello LLP<br>565 Fifth Avenue, 10th Floor<br>New York, NY 1001<br>(212) 880-9560 | Gavin Matthews<br>Peacock Linder Halt & Mack LLP<br>Suite 4050, 400 – 3rd Avenue SW<br>Calgary, Alberta, T2P 4H2<br>(403) 296-2280 |
| 3 | Jeffery A. Curran | Helen Gredd<br>Leigh Llewelyn<br>Lise Rahdert<br>Lankler Siffert & Wohl LLP<br>500 Fifth Avenue<br>New York, NY 10110<br>(212) 921-8399 | Alex Kotkas<br>Fasken Martineau DuMoulin LLP<br>350 7th Avenue SW, Suite 3400<br>Calgary, Alberta T2P 3N9<br>(403) 261-5358 |

### Counsel for Resident Witnesses

| | Witness | Counsel |
|---|---|---|
| 1 | Gord Aker | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 2 | William Andrew | Seth Taube<br>Baker Botts LLP<br>30 Rockefeller Plaza<br>New York, NY 10112<br>(212) 408-2655 |

|   | **Witness** | **Counsel** |
|---|---|---|
| 3 | Cory Bain | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 4 | Laurence Broos | **[Counsel To Be Determined]** |
| 5 | Mark Chyc-Cies | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 6 | David Dyck | Andrea Laing<br>Blake, Cassels & Graydon LLP<br>199 Bay Street<br>Suite 4000, Commerce Court West<br>Toronto ON M5L 1A9<br>(416) 863-4159 |
| 7 | Christopher Everett | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 8 | Mark Fitzgerald | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 9 | Gregg Gegunde | Renee Reichelt<br>McCarthy Tétrault LLP<br>421 - 7th Avenue SW, Suite 4000<br>Calgary AB T2P 4K9<br>(403) 260-3630 |

|    | Witness | Counsel |
|----|---------|---------|
| 10 | Blair Grant | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 11 | Wendy Henkelman | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 12 | Darren Jackson | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 13 | Cam King | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 14 | Murray Nunns | Nancy Kestenbaum<br>Covington & Burling LLP<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY 10018<br>(212) 841-1125 |
| 15 | Kevin Radomske | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |

| | Witness | Counsel |
|---|---|---|
| 16 | Derek Riewe | Renee Reichelt<br>McCarthy Tétrault LLP<br>421 - 7th Avenue SW, Suite 4000<br>Calgary AB T2P 4K9<br>(403) 260-3630 |
| 17 | Gary Ross | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 18 | Geoffrey Rossos | Edward B. Horahan III<br>The Law Office of Edward B. Horahan III, PLLC<br>1828 L Street, NW<br>Suite 705<br>Washington, DC 20036<br>(202) 696-5553<br><br>Matthew R. Lindsay, Q.C.<br>Rose LLP<br>Suite 810, 333 – 5th Avenue SW<br>Calgary, AB, Canada  T2P 3B6<br>(403) 776-0525 |
| 19 | Richard Schiller | David Bishop<br>Gowling WLG<br>421 7th Ave SW #1600<br>Calgary, AB T2P 4K9<br>(403) 298-1941 |
| 20 | James Smith | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |

|    | Witness | Counsel |
|----|---------|---------|
| 21 | Paul Weevers | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 22 | Matthew Wetmore | **[Counsel To Be Determined]** |
| 23 | Garrett Wilson | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |

**<u>Counsel for Non-Resident Witnesses</u>**

|   | Witness | Counsel |
|---|---------|---------|
| 1 | Rajesh Ghosh | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |
| 2 | Kimble Meagher | Michael A. Marion<br>Borden Ladner Gervais LLP<br>Centennial Place, East Tower<br>520 3rd Avenue SW, Suite 1900<br>Calgary, AB T2P 0R3<br>(403) 232-9464 |