UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

U.S. SECURITIES AND EXCHANGE          :
COMMISSION,                           :
                                      :
                        Plaintiff,    :
                                      :
          -against-                   :
                                      :
TODD H. TAKEYASU and JEFFERY A.       :
CURRAN,                               :
                                      :
                        Defendants.   :
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  6/11/2018

1:17-cv-4866-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

Despite being one of Canada's largest oil producers, Defendant Penn West Petroleum Ltd. suffered from some of the highest production costs among its peers.  Defendants Todd Takeyasu and Jeffery Curran, Penn West executives, are alleged to have rigged an accounting scheme designed to artificially curb the company's operating expenses and lower the reported expenses per barrel of oil equivalent.  That scheme involved dumping operating expenses into the well of capital expenditures and royalty payments, regardless of any proper basis for such reclassifications.  To supplement this practice, Takeyasu and Curran are also accused of artificially inflating the company's operating expense account and releasing portions of accrued reserves when needed to cancel out operating expenses that were actually incurred.  Artificially reduced operating expenses were reported publicly until the second quarter of 2014, when new management took over and Penn West was forced to publicly restate its financial figures.  Following an investigation, the SEC filed this lawsuit, bringing a variety of securities fraud claims against Penn West, Takeyasu, Curran, and another Penn West employee, Waldemar Grab.  Penn West and Grab have consented to judgments against them.  Takeyasu and Curran have moved to dismiss the claims against them in their entirety.

Because the complaint raises a strong inference of scienter, Takeyasu and Curran's motions are DENIED.

## I.      BACKGROUND[1]

### A.  The Key Players

Penn West Petroleum Ltd., d/b/a Obsidian Energy Ltd., is one of the largest oil producers in Canada.  Compl. (ECF No. 2) ¶ 2.  Its common stock is registered with the Securities Exchange Commission ("SEC").  *Id.* ¶ 17.  At all relevant times, Penn West shares were listed and traded on the Toronto Stock Exchange and the New York Stock Exchange.  *Id.*  On June 26, 2017, Penn West's shareholders approved the change of the company's name to Obsidian Energy Ltd.  *Id.*

Todd Takeyasu is a Canadian chartered accountant.  *Id.* ¶ 18.  He served as Penn West's Chief Financial Officer ("CFO") from 2006 until his termination on March 24, 2014.  *Id.*  Prior to that, Takeyasu held the position of Penn West's Vice President of Finance.  *Id.*  Takeyasu was also a member of Penn West's Disclosure Committee, the committee responsible for reviewing the company's financial disclosures.  *Id.* ¶ 3.  Among Takeyasu's responsibilities were establishing Penn West's annual budgets, obtaining approval of those budgets from the Board of Directors and other senior executives, ensuring that effective internal controls over financial reporting were implemented, and ensuring the accuracy of the company's financial statements and public disclosures.  *Id.*

Jeffery A. Curran is also a Canadian chartered accountant.  *Id.* ¶ 19.  He served as Penn West's Vice President of Accounting and Reporting from 2008 until March 2014.  *Id.*  During that time, Curran reported directly to Takeyasu.  *Id.*  Like Takeyasu, Curran served on the company's

---

[1] Unless otherwise noted, the facts are taken from the complaint and are accepted as true for the purposes of this motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Disclosure Committee. *Id.* ¶ 4.  Curran was also responsible for ensuring the accuracy of Penn West's financial statements and disclosures. *Id.*  This included a duty to ensure that the accounting staff complied with appropriate accounting rules and processes, with Penn West's internal controls, and with the applicable international accounting standards. *Id.*  After Takeyasu was terminated, Curran assumed the position of interim CFO, which he held until May 1, 2014. *Id.* ¶ 19.  His employment with Penn West was terminated on June 11, 2014. *Id.*

Waldemar Grab was employed as Penn West's Operations Controller for Revenue, Expenses, and Capital from June 2005 until 2008. *Id.* ¶ 20.  In 2008, he assumed the position of Operations Controller for Expenses and Capital. *Id.*  He held that position until his termination on June 19, 2014. *Id.*  At all relevant times, Grab reported directly to Curran. *Id.*  Grab was responsible for ensuring that Penn West's accounting statements reflected accurate statements of the company's expenditures and that all expenditures were properly documented and supported. *Id.* ¶ 5.  Unlike Takeyasu and Curran, Grab was not a chartered accountant. *Id.* ¶ 20.

### B.  Penn West's Accounting Standards and Controls

Takeyasu and Curran were subject to Penn West's Code of Ethics for Directors, Officers and Senior Financial Management. *Id.* ¶ 32.  Pursuant to that Code, Takeyasu and Curran were required, to the best of their knowledge and ability, to, among other things:  "[k]eep and present all of Penn West's records in accordance with the appropriate laws, regulations and all applicable professional standards"; "[e]nsure that all books, records and accounts fairly and accurately reflect in reasonable detail Penn West's assets, liabilities, equity, revenues and expenses and do not contain any false or misleading information"; and "[e]nsure that no employee, or no person acting on the direction of an employee, will take an action to contravene our accounting policies or circumvent our systems of internal control." *Id.* (alterations in original).  The company's Code of Business

Conduct and Ethics further emphasized the Individual Defendants' obligation to ensure that company books and records were maintained accurately. *Id.*

On January 1, 2011, Penn West adopted a set of accounting standards used in several countries outside of the United States known as the International Financial Reporting Standards ("IFRS"). *Id.* ¶ 33. Those standards include the International Accounting Standards ("IAS"), which pre-dated IFRS. *Id.* The International Accounting Standards Board, which developed the IFRS, has also promulgated "Conceptual Frameworks" to serve as guidance where no IFRS or IAS standard applies. *Id.*

The IAS Conceptual Framework provides that financial statements must be verifiable. *Id.* ¶ 34. This assures users that the information contained in the statements is in fact representative of the economic metrics that the statements purport to represent. *Id.* It permits "independent observers [to] reach consensus, although not necessarily complete agreement, that a particular depiction is a faithful representation." *Id.*

Penn West had in place an internal journal entry procedure to ensure compliance with the IAS verifiability requirement. *Id.* ¶ 35. Operating expenses were reflected in these electronic journal entries. *Id.* Entries described, for example, the amount and nature of the expense, the accounting period in which it was incurred, and the accounting treatment that the expense was to receive. *Id.* After a journal entry was made by one member of the accounting staff, another accounting staff member was required to approve it. *Id.* Pursuant to Penn West's journal entry procedure, all entries were required to be supported by documentation that showed the nature of the entry and the manner in which the dollar amounts were calculated. *Id.* Supporting documentation typically included invoices, memoranda describing the transaction and the reasons for the proposed accounting treatment, spreadsheet analyses, and other relevant documents. *Id.* Supporting documentation was to be scanned and uploaded to the company's accounting system as an

attachment to the journal entry.  *Id.*  Employees were also required to provide the supporting documentation to the authorizing employee for review.  *Id.*

In preparing its financial statements, Penn West used the "accrual method" in accordance with the IAS and with the IFRS Conceptual Framework.  *Id.* ¶ 36.  This required Penn West to record expenses on its income statements in the period in which they were incurred.  *Id.*  It also required Penn West to state capital expenditures on property, plant, and equipment at the time of occurrence.  *Id.*

Under the IFRS, expenses that are incurred in the production of oil and gas are usually treated as operating expenses.  *Id.* ¶ 37.  They are charged against the company's revenue in calculating net income.  *Id.*  In some circumstances, pursuant to IAS 16, an expense can be classified as a capital expenditure and listed as an asset on a balance sheet, rather than as an operating expense on the income statement.  *Id.* ¶ 38.  This is appropriate when the expense serves to extend the useful life of property, plant, and equipment, including oil.  *Id.*  The determination of whether an expense may be listed as a capital expenditure instead of an operating expense is made by exercising professional judgment in evaluating the circumstances of the expenditure.  *Id.* ¶ 39.  A similar Penn West property, plant, and equipment accounting policy permitted certain expenditures for repairs and maintenance to be listed as capital expenditures "provided it is probable that future economic benefits in excess of cost will be realized and such benefits are expected to extend beyond the current operating period."  *Id.* ¶ 40.

### C.  Defendants' Alleged Scheme to Defraud

Penn West struggled to keep its operating expenses under control.  *Id.* ¶ 23.  For many years, it was considered one of the highest-cost producers in the oil and gas industry.  *Id.*  Despite implementing cost-cutting measures, Penn West trailed behind other Canadian oil and gas producers in the key metric of operating expense per barrel of oil equivalent, or "opex/boe."  *Id.*  The

opex/boe metric is closely tracked by securities analysts and investors. *Id.* ¶ 21. Indeed, analysts followed Penn West's opex/boe and publicly reported on the company's poor numbers relative to its peers. *Id.* ¶ 27.

Reducing reported operating expenses was, thus, a frequent topic at meetings of Penn West's senior management. *Id.* ¶ 28. Senior executives also discussed the issue on earnings calls. *Id.* ¶ 26. During an earnings call on August 10, 2012 in which Takeyasu participated, for example, Penn West's Chief Operating Officer ("COO") explained the company's cost-cutting initiatives, stating, "While weakness in the commodity prices is outside our control, we've been very active in addressing our costs, both capital expenditures and operating expenses." *Id.* The COO failed to mention the allegedly improper cost-reducing accounting practices, described below. *Id.* In another earnings call on November 6, 2013, in which Takeyasu also participated, the company's Chief Executive Officer ("CEO") assured investors that Penn West's cost structure was "under control and moving downward" and that the opex/boe "will be going down, aided by production growth, to be sure, but largely driven by our control of the gross number." *Id.* The following year, during an earnings call on May 1, 2014 attended by Curran, Penn West's Investor Relations Manager explained that the company continued to "work hard on reducing costs in the business and realized a CAD28 million decrease in operating expenses, which represents a 14% reduction from the fourth quarter of 2013." *Id.* At monthly "accrual meetings," during which accounting and finance issues were discussed, Takeyasu shared senior management's concerns about operating expenses with Curran and Grab. *Id.* ¶ 29.

Reduction of operating costs was a concern as early as 2005. In a November 2005 email, Grab commented to Takeyasu that, in an upcoming meeting, they should "understand [Penn West's] tolerance towards costs that are *truly* Opex [operating expenses] but will remain in Capex [capital expenses] . . . . The intent is to have as much remaining in Capex without raising flags with our

external auditors." *Id.* ¶ 41 (alterations in original). Ultimately, the cost-reduction concerns led Defendants to devise and implement a scheme to reduce the company's reported opex/boe ratio, as well as its overall operating expenses. *Id.* ¶ 30. Defendants carried out the alleged scheme by reclassifying operating expenses as capital expenditures, reclassifying expenses as royalty payments, and by accrual softening. *Id.*

### 1. Reclassifying Operating Expenses as Capital Expenditures

As a key to implementing the alleged accounting scheme, Takeyasu and Curran created a "reclass to capital" line item in the annual internal budget. *Id.* ¶ 44. Takeyasu and Curran set that line item amount based on their estimate of the total sum that would have to be reclassified as capital expenditures over the course of the following year in order to meet investor and Penn West management expectations. *Id.* This number was set without seeking input from Penn West's production department, the department responsible for forecasting and analyzing the repair and maintenance capital expenditures to be incurred by the company. *Id.* ¶ 45.

Once the "reclass to capital" line item figure was established, Takeyasu and Curran would direct Grab to "draw" from that amount throughout the year by instructing his staff to make reclass-to-capital journal entries or by making entries himself. *Id.* ¶ 47. Grab, in turn, calculated the anticipated opex/boe figures on a monthly basis to determine if the figures were higher than expected. *Id.* ¶ 48. Supervising the accounting staff responsible for making journal entries, Grab would direct his staff to make entries reclassifying operating expenses as capital expenditures whenever needed to bring the opex/boe numbers down to meet expectations. *Id.* These journal entries lacked the requisite supporting documentation, yet were approved at Grab's direction. *Id.* ¶ 49. As Grab explained in an August 2009 email to Curran, "the field guys don't have much say," but the practice of making "transfers from opex to capex" "is done Corporately to meet guidelines communicated to the shareholders." *Id.* ¶ 46.

In addition to lacking documentary support, the reclass entries also differed in other respects from entries of actual operating expenses.  For example, the reclass entries often reflected large, round number sums, whereas actual operating expenses were usually recorded in non-round numbers.  *Id.* ¶ 50.  Also, unlike with other entries, Grab directed that the amounts of the reclass entries be apportioned to operations groups on a *pro rata* basis.  *Id.*

Takeyasu and Curran discussed the reclass practices with Grab and other members of the accounting and finance teams at the monthly accrual meetings.  *Id.* ¶ 51.  Among those with whom the practices were discussed were the Manager of Operations Analysis, who reported directly to Grab, and the accounting staff responsible for making the journal entries.  *Id.*  During, and prior to, the accrual meetings, Takeyasu and Curran "routinely" asked questions about the company's operating expenses, the opex/boe numbers, and adjustments to the reported operating expenses that were required to meet opex/boe expectations.  *Id.* ¶ 52.  Grab and his staff prepared "accrual packets" for Takeyasu and Curran that contained monthly reports outlining, among other things, the figures that had already been reclassified as capital expenditures, or that needed to be so reclassified, to achieve the target opex/boe numbers for the month.  *Id.* ¶ 53.  Takeyasu and Curran would then approve the preceding month's books for closing, including the reclass-to-capital amounts.  *Id.* ¶¶ 51, 54.  This was done without asking Grab or the accounting staff to reconcile the month's reclass-to-capital journal entries with actual project costs to confirm the accuracy of the entry amounts.  *Id.* ¶ 56.  At the conclusion of each accrual meeting, Curran and Grab both signed a cover sheet to the accrual packets, the "Accruals Review Checklist," verifying that "[o]perating costs for the [m]onth" and "[c]ost per boe" were reviewed.  *Id.* ¶ 55 (alterations in original).

During 2012, 2013, and the first quarter of 2014 (the "Relevant Period"), the Individual Defendants "closely monitored" Penn West's monthly operating expenses.  *Id.* ¶¶ 2, 43.  Most of the accrual packets that Grab presented to Takeyasu and Curran at the accrual meetings during that

period reflected the reclassification of large sums of operating expenses as capital expenditures in order to achieve the opex/boe target numbers established by Takeyasu and Curran.  *Id.* ¶ 53.

### a.  2012 Reclass-to-Capital Practices

In July 2012, Takeyasu received a report by an industry analyst announcing a downgrade of Penn West stock from "2-Equal Weight" to "3-Underweight" due in part to the analyst's assessment that Penn West had the highest operating expenses among its peers.  *Id.* ¶ 57.  Shortly after receiving that report, Takeyasu, along with Curran, directed Grab and the Manager of Operations Analysis to reclassify $10 million[2] in operating expenses to capital expenditures to reduce the opex/boe ratio for the previous quarter.  *Id.*  Penn West's June 2012 books had already closed.  *Id.* ¶ 58.  Nonetheless, the company reopened its books, with the approval of Penn West's corporate controller and finance manager.  *Id.*  The Manager of Operations Analysis then made the $10 million reclass-to-capital journal entry as instructed.  *Id.*

Also by mid-2012, the ratio of Penn West's senior debt to EBITDA, "an accounting metric measuring earnings before interest, taxes, depreciation, and amortization," had climbed to 2.9.  *Id.* ¶ 59.  Penn West's outstanding debt covenants at the time forbade the company from exceeding a 3.0 senior-debt-to-EBITDA ratio.  *Id.*  Penn West executives were concerned that the company would fall out of compliance with its debt covenants, thereby triggering contractual penalties.  *Id.*  Around the same time that Takeyasu directed Grab to make the $10 million reclass-to-capital entry, Takeyasu and Curran also directed Grab and the Manager of Operations Analysis to transfer an additional $30 million in reclass-to-capital entries.  *Id.* ¶ 60.  This was done by making six separate entries of approximately $5 million each, with two such entries made in August, one in September, one in November, and two in December 2012.  *Id.* ¶¶ 62-63.  None of the entries was backed by supporting documentation, as required by Penn West's internal accounting controls and the

---

[2] All dollar amounts are stated in Canadian dollars, unless otherwise noted.  *See* Compl. ¶ 25 n.1

international accounting standards.  *Id.* ¶ 62.  The $30 million in reclass entries lowered the reported operating expenses and increased Penn West's EBITDA, keeping the debt-to-EBITDA ratio from exceeding the 3.0 ceiling.  *Id.* ¶ 60.

On September 6, 2012, Penn West's Manager of Capital Accounting, who reported to Grab, confirmed in an email to Takeyasu and Curran that the capital forecast for the remainder of 2012 included the "OPEX [operating expense] to CAPEX [capital expenditure] reclass of $40M.  $10M done at the end of Q2 and $5M per month July through Dec."  *Id.* ¶ 64 (alterations in original). Two weeks later, in a September 20, 2012 email to other Penn West senior executives, Takeyasu wrote:  "There are rumours apparently out of London on our debt covenants.  Getting calls.  With the hedge monetization and opex of $40, we forecast that at year end 2012 we will be around 2.7 (senior debt to EBITDA) . . . and 2.9 times without the hedges and opex."  *Id.* ¶ 61.  In response to a question about the $40 opex reference, Takeyasu replied:  "We are capitalizing an additional $40 [million] of opex, $10 [million] of which we did in Q2 [second quarter 2012]," and "opex capitalization increases EBITDA."  *Id.* (alterations in original).

Takeyasu and Curran discussed the 2012 reclass-to-capital entries with Grab and other members of the accounting team at the monthly accrual meetings.  *Id.* ¶ 64.  The accrual packets provided by Grab to Takeyasu and Curran for the months of July through December of that year contained notice of the reclass entries and their impact on opex/boe.  *Id.*  The reclass entries were referred to as "significant items."  *Id.*  The packets also listed the $40 million reclass budget as a "commitment" and included monthly drawdowns until the reclass-to-capital target was met at year end.  *Id.*

During the fourth quarter of 2012, Penn West's Business Controls and Risks ("BCR") group tested the journal entry policy and determined that one-third of the tested entries lacked supporting documentation.  *Id.* ¶ 110.  Most of those deficient entries were made by Grab's accounting group.

*Id.*  The BCR notified Takeyasu and Curran of the deficient internal controls.  *Id.* ¶ 111.  Takeyasu and Curran, however, did not speak with Grab, review the journal entries, or otherwise take any action to correct the deficiencies.  *Id.*  For more than a year thereafter, the BCR considered Penn West's journal entry policy "ineffective."  *Id.* ¶ 112.

In early 2013, preparations were made for a slide presentation to the Penn West board of directors.  *Id.* ¶ 65.  Takeyasu requested that a slide be included to show the 2012 final opex/boe numbers.  *Id.*  Grab expressed his concern about providing the board with a breakdown showing the $40 million reclassified from operating expenses to capital expenditures.  *Id.*  Curran agreed and responded, "just bury it in Operated Opex."  *Id.*

### b.   2013 Reclass-to-Capital Practices

In preparing the 2013 budget, Takeyasu and Curran set the reclass-to-capital budget line item at $85 million.  *Id.* ¶ 67.  Takeyasu explained in an October 31, 2012 email to Penn West's Senior Vice President of Production that the company's projected 2013 operating expenses of $1.026 billion would be decreased to $921 million by $20 million in "cost savings" and capitalization of the $85 million in "major R&M [repair and maintenance]."  *Id.* (alterations in original).  The result, Takeyasu predicted, would be a decrease in opex/boe from $20.01 to $17.96.  *Id.*  In order to meet the target opex/boe numbers for 2013, Takeyasu and Curran instructed Grab to draw down from the $85 million reclass amount each month as needed to meet targeted opex/boe.  *Id.* ¶ 68.

Grab followed these directions, instructing accounting staff to make large, round-number adjustments.  *Id.*  In January that year, operating expenses proved higher than anticipated.  *Id.* ¶ 69.  Grab directed his staff to reclassify $14.1 million to bring the opex/boe down.  *Id.*  The accrual packet for that month showed that Penn West's opex/boe of $21.83 was reduced by $3.19 due to the reclassification to capital.  *Id.* ¶¶ 71-72.  In July, Grab caused the Manager of Operations Analysis to reclassify another $3.5 million to capital for the second quarter of 2013.  *Id.* ¶ 70.

Throughout the year, Takeyasu and Curran monitored the drawdown amounts from the $85 million reclass budget through conversations with Grab and review of the accrual packets at the monthly accrual meetings. *Id.* ¶ 71.  The packets for 2013 included tables showing the unadjusted opex/boe numbers as well as the adjusted numbers, accounting for the reclass entries. *Id.*  The packets also contained a running tally of the reclass budget, with monthly figures showing the amount of reclass "utilized" and the "reclass remaining." *Id.* ¶ 73.

At the September 2013 accrual meeting, Curran asked Grab for a list of the repair and maintenance projects that had been capitalized to date. *Id.* ¶ 115.  This was Curran's first request for such information during the Relevant Period. *Id.*  After the meeting, Grab explained to the Manager of Operations Analysis that no such project list existed and that Curran was aware of that. *Id.*  On September 19, 2013, the Manager of Operations Analysis met with Curran and expressed her concern about the reclass-to-capital and other allegedly improper accounting practices. *Id.*  She was particularly apprehensive of the instructions given to accounting staff to make journal entries without adequate support. *Id.* ¶¶ 114-15.  After emailing Grab and the Manager of Capital Accounting to remind them to produce a list of capitalized projects to support the reclass-to-capital journal entries and the rationale for them, the Manager of Operations Analysis wrote to Curran, stating, "[d]id what you suggested.  Don't know if I got through.  Indicated I am not doing any more 'stick handling.'  We'll see what happens[.]" *Id.* ¶ 116 (alterations in original).  Curran did not respond in writing to the email, nor did he make any further requests for documentation supporting the reclass-to-capital entries.  Id ¶¶ 116-17.  Similarly, Takeyasu took no steps to request support for the reclass-to-capital entries, and he made no request to reconcile the entries against actual spending. *Id.* ¶ 118.

Despite the concerns raised by the Manager of Operating Analysis, Grab continued to direct her to make the reclass-to-capital journal entries. *Id.* ¶ 120.  In November 2013, the Manager of

Operations Analysis emailed Curran again, stating, "I am going to be asked to record an operated reclass to capital entry this month and I still don't know how we are backing up about 52MM this year that has already been recorded." *Id.*

Before the company's 2013 books closed, Grab directed his staff to make one final reclass-to-capital entry in the amount of $7,921,218. *Id.* ¶ 74. This represented the amount remaining in the reclass budget for the year. *Id.* The December 2013 accrual packet provided to Takeyasu and Curran noted this journal entry. *Id.* That packet showed that, after additional adjustments were made following the last reclass entry, the total reclass-to-capital entries for the year were within $500,000 of the $85 million target. *Id.*

### c.   2014 Reclass-to-Capital Practices

In late 2013, Takeyasu and Curran set the reclass-to-capital budget line item for 2014 at $79 million. *Id.* ¶ 76. Grab continued to draw down from this amount as he had the previous year. *Id.* The accrual packets also reflected the same categories of information as in 2013, with tables showing the withdrawals from the reclass-to-capital budget. *Id.* ¶ 78. In a February 28, 2014 email to a production manager, Grab described the drawdowns as "a 'Corporate' tool to help manage costs." *Id.* ¶ 77.

In March of that year, Grab directed his staff to make a journal entry reclassifying $4.1 million to capital to reduce February operating expenses. *Id.* ¶ 80. This reclassification was noted in the February accrual packet provided to Takeyasu and Curran. *Id.* After Grab explained this entry to Curran and the impact that it would have on the monthly operating expense numbers, Curran instructed him to make another reclass entry in the amount of $2 million. *Id.* ¶ 81. That entry was made without any supporting documentation. *Id.* The Manager of Operations Analysis emailed Curran in response, not knowing that Curran had directed the entry, writing:  "We are starting again with the stupid stuff to make the numbers look better.  My guys have spent the last day analyzing . . .

13

and because they can't logically find reductions in opex we are being told to play with the reclass again to get opex to a place where cost per BOE is reasonable." *Id.* ¶ 123 (omission in original).  At the end of her email, the manager requested a change in her role so that she would no longer be required to make the reclass-to-capital journal entries. *Id.*  Curran did not respond in writing to the email. *Id.*  Also during the first quarter of 2014, Penn West's Operations Controller for Revenue expressed his concerns to Curran about the propriety of the reclass-to-capital practices and the lack of supporting documentation for those entries. *Id.* ¶ 124.

By June 2014, a total of $15.3 million had been reclassified to capital. *Id.* ¶ 79.  No supporting documentation was ever provided to Curran in support of the reclass entries. *Id.* ¶ 125.

### 2.   Reclassifying Operating Expenses as Royalty Payments

In addition to reclassifying operating expenses as capital expenditures, Penn West, Takeyasu, and Curran supervised, approved, and even encouraged the reclassification of operating expenses as royalty payments. *Id.* ¶ 84.  The Alberta government permitted Penn West, like other gas producers, to deduct from its gas royalty payments a certain percentage of operating costs, known as a "gas cost allowance." *Id.* ¶ 87.  This allowance served to decrease the total amount paid in royalties to the owners of the land on which Penn West drilled and to other mineral rights owners. *Id.* ¶¶ 85, 87.

Royalty payments were listed in Penn West's financial statements as deductions from gross revenue. *Id.* ¶ 86.  Like the reclass-to-capital practices, reclass to royalty was intended to lower Penn West's opex/boe. *Id.* ¶ 84.  At the beginning of each year during the Relevant Period, Takeyasu and Curran would establish a target amount to be reclassified from operating expenses to royalty payments. *Id.* ¶¶ 88, 93.  Throughout the year, the Operations Controller for Revenue would then reclassify operating expenses in an amount equal to the gas cost allowance to one of Penn West's royalty accounts. *Id.* ¶ 88.  This was done despite the fact that Penn West did not pay those amounts in royalties and was never obligated to do so. *Id.*

14

The complaint alleges that, in reclassifying operating expenses in this way, Penn West, Takeyasu, and Curran also misstated the company's oil royalty payments.  *Id.* ¶ 89.  Unlike with gas royalty rates, production costs are already factored into oil royalty rates.  *Id.*  Therefore, oil producers are not permitted to deduct production costs from oil royalty payments.  *Id.*  Nevertheless, Penn West, at Takeyasu and Curran's direction, calculated production costs associated with oil royalty payments and then moved that amount of operating expenses into royalty accounts.  *Id.*  This resulted in lowered reported operating expenses and increased reported royalty payments.  *Id.*  Penn West's reclass-to-royalty journal entries, like the reclass-to-capital entries, were unsupported by documentation.  *Id.* ¶ 92.

As with "reclass-to-capital," the reclass-to-royalty practice was implemented prior to the Relevant Period.  *See id.* ¶ 93.  In an August 2010 email, which Takeyasu forwarded to Curran, Takeyasu noted:  "We have maintained this practice for many years.  Many would like these charges in Opex, but we haven't room to take the hit there."  *Id.*  The reclassification practice survived for several years and was implemented each month during the Relevant Period with the knowledge and approval of Takeyasu and Curran.  *Id.*  The accrual packets for each month in 2013 and first quarter 2014 contained a table showing the unadjusted opex/boe, line items for the impact of reclass-to-capital and reclass-to-royalty adjustments, and the final reported opex/boe.  *Id.* ¶ 71.  The table listed in the January 2013 accrual packet, by example, listed the unadjusted opex/boe at $21.83, with deductions of $3.19 for reclass-to-capital and $1.88 for reclass-to-royalty, for a final opex/boe of $16.76.  *Id.* ¶¶ 71-72.

In a July 11, 2013 email, Takeyasu recognized that Penn West was "a bit unique with this reclass" but explained that the company was "quite hesitant to unwind this practice due to the optics around $2 per boe higher opex."  *Id.* ¶ 93.  In a November 18, 2013 email to Curran, a chartered accountant at Penn West raised his concern about the reclass-to-royalty practices, noting that he

would "eliminate" both the reclass-to-capital and reclass-to-royalty practices but that "Todd [Takeyasu] thinks otherwise." *Id.* ¶ 94 (alteration in original).  At no point did Takeyasu ask the accounting staff to provide support for the reclass-to-royalty journal entries. *Id.* ¶ 118.

### 3.  Accrual Softening Practices

To further reduce Penn West's operating expenses, Defendants also relied on an accounting practice known as "accrual softening." *Id.* ¶ 96.  Accrual accounting "measures the performance and position of a company by recognizing economic events regardless of when cash transactions occur." *Id.* ¶ 97.  Under this accounting method, revenues are matched to expenses at the time of the transaction rather than at the time of payment. *Id.*  Using this method, Defendants booked expenses exceeding the amounts actually incurred in order to build accrual "cushions." *Id.* ¶ 98.  Rather than making journal entries at the end of each accounting period to remove the accrued excess amounts, as Penn West was required to do under IAS 37.59, Defendants carried over the excess amounts to the next accounting period. *Id.* ¶¶ 99-100.  Defendants would then "release" portions of the accrued excesses as needed to cancel the operating expenses that had actually been incurred. *Id.* ¶ 100.  This "accrual softening" permitted Penn West to achieve the target opex/boe and to keep operating expenses artificially low. *Id.* ¶ 101.

In 2013, Defendants relied on accrual softening after nearly all of the $85 million reclass-to-capital budget was used by the end of the second quarter. *Id.*  After receiving approval from Takeyasu and Curran, Grab released excess operating expense accruals in June, July, and August 2013 to reduce the reported opex/boe for those months. *Id.*  This also allowed Penn West to reverse the reclass-to-capital entries in those months and free up those reclass amounts for use during the later part of the year. *Id.*  In fact, Penn West was able, as a result, to use every dollar of its reclass-to-capital budget for 2013. *Id.* ¶ 102.  The accrual-softening journal entries were also noted in several of the monthly accrual packets presented to Takeyasu and Curran in 2013. *Id.* ¶

104.  In the July packet, for example, a variance statement highlighted a $7.2 million difference in reclass-to-capital amounts between June and July 2013, with a notation that "RTC [reclass to capital] was $(3.5M) in Jun[e] and $3.7M in Jul[y] (Accrual softening Jan-Mar 2013 due to realized cost savings)."  *Id.* (alterations in original).  By the end of 2013, Takeyasu and Curran had instructed Grab and the Manager of Operations Analysis to enter approximately $10 million in operating expense accrual.  *Id.* ¶ 105.  This accrual was in addition to the accruals that were projected as necessary for the year and was referred to in an accrual meeting as a "cushion."  *Id.*

By March of the next year, the total accrual cushion had grown to $24 million.  *Id.* ¶ 106. The IAS required that this amount be immediately reversed.  *Id.*  However, Takeyasu, Curran, and Grab directed the Manager of Operations Analysis to prorate the accrual cushion over several months.  *Id.*  The Manager of Operations Analysis created a spreadsheet showing a total of $22 million in excess accrual prorated across several months in $3 to 4 million increments.  *Id.* ¶ 107. The Manager of Operations Analysis emailed this spreadsheet to Takeyasu, Curran, and Grab on March 13, 2014.  *Id.*  In the body of that email, the manager explained:  "As requested yesterday, here is the opex forecast including Feb[ruary] actuals and anticipated accrual softening."  *Id.* (alteration in original).

### D.  Defendants' Representations to Penn West's Independent Auditor

Penn West engaged an independent auditor in connection with the preparation of the company's SEC filings and public disclosures.  *Id.* ¶ 132.  Takeyasu signed the engagement letters with the audit firm, which explained that the purpose of the audits was to prepare Penn West's 40-F annual financial report filings.  *Id.*  Takeyasu and Curran were responsible for ensuring that the auditor knew about and understood the company's financial processes and its internal controls.  *Id.* ¶ 133.  They were also responsible for ensuring that the auditor understood the support for reported financial figures.  *Id.*  While working with the audit firm, Takeyasu and Curran signed quarterly and

17

annual management representation letters addressed to the auditor.  *Id.* ¶ 127.  The auditor, in turn, relied on these letters in connection with its audit opinions for Penn West's 2012 and 2013 financial statements, which were filed with the SEC.  *Id.*  In conducting its risk assessment, the auditor also questioned Takeyasu and Curran regarding their knowledge of fraud or accounting improprieties at Penn West. *Id.* ¶ 133.  Takeyasu and Curran were both on notice that their representations to the auditor were made in connection with the preparation of Penn West's SEC filings and public disclosures. *Id.* ¶ 132.

On March 13, 2013, Takeyasu and Curran signed a management representation letter in connection with the audit of Penn West's financial statements for the years ended December 31, 2011 and December 31, 2012.  *Id.*  ¶ 128.  By signing that letter, Takeyasu and Curran certified that they had "fulfilled [their] responsibilities . . . for . . . the preparation and fair presentation of the financial statements" and that they believed that the "financial statements ha[d] been prepared and present[ed] fairly in accordance with the relevant financial reporting framework."  *Id.*  Takeyasu and Curran also affirmed that they had disclosed to the auditor "any known material weaknesses" and "all deficiencies in the design and implementation or maintenance of internal control over financial reporting of which management [was] aware."  *Id.*  Additionally, Takeyasu and Curran certified that they had disclosed all information related to "fraud or suspected fraud" of which they were aware. *Id.*  This included fraud or suspected fraud that affected Penn West and that involved "management, employees who have significant roles in internal controls, or others, where the fraud could have [had] a material effect on the financial statements."  *Id.*  It also included "allegations of fraud, or suspected fraud, affecting the Company's financial statements, communicated by employees."  *Id.*

The following year, on March 6, 2014, Takeyasu and Curran similarly signed a management representation letter that contained representations related to the audit of financial statements for years ended December 31, 2012 and December 31, 2013.  *Id.* ¶ 130.  The same certifications were

made as those made the previous year. *Id.* On April 30, 2014, after Takeyasu's termination, Curran signed another management representation letter in connection with the auditor's review of Penn West's first quarter 2014 financial statements. *Id.* ¶ 131. In that letter, Curran again certified that he had disclosed all information relating to fraud or suspected fraud. *Id.*

Despite their certifications, Takeyasu and Curran did not disclose to the auditor the reclass-to-capital practices, reclass-to-royalty practices, or the use of accrual softening. *Id.* ¶ 134. The SEC also alleges on information and belief that Takeyasu and Curran failed to provide the auditor with any document that discussed those accounting practices. *Id.* In February 2014, Curran responded to the auditor's request for Penn West's 2014 budget by providing a detailed and comprehensive budget. *Id.* ¶ 135. The budget included 2013 results for comparison, but made no mention of the reclassified amounts or the excess accrual. *Id.* Instead, the operating expense figures were listed as net expenses, after the reclassifications had already been factored in. *Id.*

### E. The Allegedly False and Misleading Public Statements

The complaint alleges that many of Penn West's SEC filings, sub-certifications, and Sarbanes-Oxley certifications during the Relevant Period contained false and misleading statements.

#### 1. Penn West's SEC Filings

Each of Penn West's quarterly Forms 6-K and annual Forms 40-F during the Relevant Period, according to the complaint, contained false and misleading statements. These statements include allegedly misleading financial figures and misleading explanations of reductions in those figures, as detailed below.

Penn West reported its operating expenses, opex/boe, netbacks, and funds flow in the Management's Discussion and Analysis ("MD&A") sections of its quarterly and annual SEC filings. *Id.* ¶ 24. According to the complaint, the company's quarterly Forms 6-K for the first and second quarters of 2012 materially overstated Penn West's net income. *Id.* ¶¶ 137-38. Penn West's third

quarter 2012 Form 6-K materially understated the company's net loss and misleadingly explained that "decreased operating costs" were driven by "reduced power costs and acquisition and disposition activity" rather than the reclass and accrual softening practices described earlier.  *Id.* ¶¶ 139-40.  The company's fourth quarter 2012 Form 6-K is also alleged to be misleading as it overstated Penn West's funds flow.  *Id.* ¶¶ 140, 143.  The fourth quarter 2012 6-K also stated that "[f]or the fourth quarter of 2012 and on an annual basis in 2012, operating costs were lower than the comparative periods in 2011 due to our focus on cost savings, lower electricity costs and acquisition and disposition activity."  *Id.* ¶ 142.  This statement, according to the complaint, misleadingly attributed the reduction in operating costs to "legitimate factors" instead of the allegedly improper accounting practices.  *Id.* ¶ 143.  The year-end financial metrics contained in that 6-K are also alleged to be false and misleading because they materially understated Penn West's operating expenses and overstated capital expenditures, royalties, and net income.  *Id.*

Penn West's Form 40-F for fiscal year ended December 31, 2012 contained similar statements.  *Id.* ¶ 144.  The Form 40-F reflected the same figures stated in the fourth quarter and year-end Form 6-K and additionally represented that "[o]perating costs were lower in 2012 than 2011 due to [Penn West's] focus on cost savings, lower electricity costs and acquisition and disposition activity."  *Id.*  This statement, according to the complaint, again misleadingly suggested that the reduction in operating expenses was due to "legitimate factors."  *Id.* ¶ 145.

The complaint alleges that Penn West's Forms 6-K for 2013 similarly reflected false or misleading financial figures.  The Form 6-K for the first quarter of 2013 materially understated the company's operating expenses and net loss while overstating Penn West's capital expenditures, funds flow, netbacks, and royalties.  *Id.* ¶ 148.  That filing also claimed that Penn West's netbacks had increased due to "operating cost reductions and lower royalties, which the complaint alleges to be misleading because the statement suggested that legitimate factors were responsible for the

reductions, not the accounting practices. *Id.* The second quarter 6-K is alleged to have materially understated the company's operating expenses and net loss and overstated funds flow, netbacks, and royalties. *Id.* ¶ 150. The MD&A submitted with that Form 6-K stated, "[o]ur operating costs have decreased from the comparative periods in 2012 due to our focus on operational efficiencies and acquisition and disposition activity that closed in late 2012. Operating costs for the second quarter of 2013 include a realized gain on electricity contracts of $7 million (2012 – $2 million loss) and for the six months ended 2013 include a realized gain of $8 million (2012 – $1 million loss)." *Id.* ¶ 151. According to the complaint, these statements were false and misleading because they hid the true reason for the reductions in operating costs—the company's accounting practices. *Id.* The third quarter 2013 6-K is also alleged to be misleading, understating Penn West's operating costs and net income and overstating the company's royalties. *Id.* ¶ 153. Similarly, the fourth quarter and year-end 6-K allegedly understated the company's operating expenses and capital expenditures, while overstating Penn West's funds flow, netbacks, royalties, and net loss. *Id.* ¶ 155.

The SEC further alleges that the MD&A of Financial Condition and Results of Operations and Audited Consolidated Financial Statements filed on Penn West's Form 40-F for the year ended December 31, 2013 contained the same false and misleading financial figures as the company's fourth quarter Form 6-K. *Id.* ¶ 156. The 40-F additionally stated: "The reduction in operating costs in 2013 compared to 2012 is attributed to the asset dispositions that closed late in 2012 along with field staff reductions and other cost reduction initiatives in 2013 aimed at streamlining our operations." *Id.* That statement, the SEC claims, was materially false and misleading because it suggested that any cost reductions were, again, the result of "legitimate factors" and failed to disclose that the figures had in fact been artificially reduced. *Id.* ¶ 157.

Penn West's first quarter 2014 filings fare no better according to the SEC. The figures reflected in that 6-K also allegedly understated Penn West's operating expenses and overstated

royalties and the company's net loss.  *Id.* ¶ 160.  The MD&A explained that "[o]perating costs were lower in 2014 compared to 2013 primarily due to lower labour, vehicle and electricity costs."  *Id.* ¶ 161.  Once again, the SEC alleges, that statement concealed the artificial reductions resulting from the allegedly fraudulent accounting practices while suggesting that reduced reported costs were the product of "legitimate factors," including "cost savings, lower electricity costs, and acquisition and disposition activity."  *Id.* ¶ 162.

Takeyasu signed the Forms 6-K for the first quarter of 2012, fourth quarter and year-end 2012, first quarter of 2013, second quarter of 2013, and third quarter of 2013.  *Id.* ¶¶ 137, 141, 147, 149, 152.  He also signed certifications filed in connection with the company's Forms 6-K for the second quarter of 2012, third quarter of 2012, first quarter of 2013, second quarter of 2013, and third quarter of 2013.  *Id.* ¶¶ 138, 139, 147, 149, 152.  Takeyasu also signed the Management Reports submitted as part of Penn West's annual report for 2012 and 2013.  *Id.* ¶¶ 146, 158.  By signing the 2012 Report, Takeyasu certified that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  *Id.* ¶ 146.  By signing the 2013 Report, he certified that "this report does not contain any untrue statement of a material fact."  *Id.* ¶ 158.

After Takeyasu's termination, Curran, in his capacity as the Interim CFO, signed the certification of interim filings submitted to the SEC with Penn West's first quarter 2014 financial report.  *Id.* ¶ 159.

### 2.  Curran and Grab's Sub-Certifications

The SEC alleges that Curran and Grab signed and submitted false and misleading sub-certifications for each quarter of 2013 and, on information and belief, for each quarter from 2010 to 2014.  *Id.* ¶ 163.  In those sub-certifications, Curran and Grab certified, among other things, the following:

> I have reviewed and understood the corporate policies, including: Code of Business Conduct and Ethics . . . [and] Code of Ethics for Directors, Officers, and Senior Financial Team . . . .
>
> I am accountable for maintaining an effective internal control structure in my assigned process(es).
>
> The employees within my assigned areas of responsibility understand and are complying with the relevant policies, procedures, and controls[.]
>
> I am maintaining sufficient evidence to provide reasonable support for any process review/assessment.
>
> I am not aware of any material or significant control deficiencies that may impact the governance structure of the organization, have significant impact to the corporate objectives, and/or the published financial statements[.]
>
> I have submitted any potentially material information (reportable events) to the Disclosure Committee for the purposes of the preparation of the required Canadian and United State regulatory filings and/or other disclosure documents, as per the Disclosure Policy.

*Id.* ¶ 164.  In addition, Curran and Grab checked a box on each sub-certification attesting that "I understand that the Chief Executive Officer and the Executive Vice President and Chief Financial Officer will rely on this certificate in making the Certifications required of them in filings with the U.S. Securities and Exchange Commission or other regulatory agencies."  *Id.* ¶ 165.

### 3.  Takeyasu's Sarbanes-Oxley Certifications

As Penn West's CFO, Takeyasu was required under Section 302 of the Sarbanes-Oxley Act, 15 U.S.C. § 7241, to certify the financial and other information in Penn West's annual reports that were filed with the SEC.  ¶ 167.  The SEC alleges that, during the Relevant Period, Takeyasu signed and submitted two false and misleading certifications in connection with Penn West's annual report for the year ended December 31, 2012 and the year ended December 31, 2013.  *Id.*  Those certifications confirmed the following:

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this report. . . .

The issuer's other certifying officer and I . . . have (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer . . . is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles . . . .

The issuer's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the issuer's auditors and the audit committee of the issuer's board of directors (or persons performing the equivalent function): (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the issuer's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the issuer's internal control over financial reporting.

*Id.* ¶¶ 168-70.  In addition, pursuant to Section 906 of the Sarbanes-Oxley Act, 15 U.S.C. § 1350, Takeyasu certified that, "to the best of my knowledge," each annual report "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934." *Id.* ¶ 171.  He additionally certified that the "information contained in [each] Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.*  The SEC alleges that these certifications were false or misleading because the financial figures in the annual reports

did not reflect true opex/boe, but instead figures that were artificially reduced by Defendants' accounting practices. *Id.*

### F.  Penn West Restates Its Financial Figures

Takeyasu was terminated on March 24, 2014, and Curran was terminated on June 11, 2014. *Id.* ¶ 173.  During a June 2014 meeting following those Defendants' termination, the Manager of Operations Analysis voiced her concerns about the accounting practices to the new CFO, who then reported the concerns to the company's new CEO.  *Id.*  The concerns were also shared with the audit committee of Penn West's board of directors, and an internal audit was initiated.  *Id.*  The audit committee was comprised exclusively of independent directors.  *Id.*  It retained independent Canadian and U.S. counsel, as well as an independent forensic accounting firm to aid in the audit. *Id.*

On July 29, 2014, Penn West issued a press release, explaining that "[t]he Audit Committee and its independent advisors are examining certain entries which appear to have been made to reduce operating costs and increase the Company's reported capital expenditures and royalty expense, and that appear to have been made without adequate supporting documentation."  *Id.* ¶ 174.  In its preliminary findings, the audit committee determined that approximately $111 million in 2012 reclass-to-capital entries and approximately $70 million in 2013 reclass-to-capital entries lacked adequate support.  *Id.*  As a result, Penn West reported that "the property, plant and equipment balances recorded on the Company's balance sheets in those fiscal years appear to be overstated." *Id.*  The audit committee also identified approximately $100 million in operating expenses that had inappropriately been classified as royalties.  *Id.*

In September 2014, Penn West reversed all of the 2012-2014 journal entries reclassifying costs that lacked support.  *Id.* ¶¶ 66, 75, 83.  On September 18, 2014, Penn West filed a Form 40-F/A, restating its publicly reported financial statements for 2012, 2013, and first quarter 2014.  *Id.* ¶

175.  The restatement acknowledged that Penn West's accounting practices "had the effect of reducing the Company's previously reported operating expenses and increasing the Company's previously reported royalty expense and capital expenditures in 2014, 2013, 2012 and prior periods, which practices were not supportable and required adjustment." *Id.*  Penn West also recognized that "little if any analysis was performed at the time of the entries to determine which entries ought to be capitalized" and that in some cases "there appeared to be no contemporaneous support for the decision to reclassify operating expenses as property, plant, and equipment." *Id.* ¶ 176.  The restatement also explained that Penn West had identified "material weaknesses and a significant deficiency in our internal control over financial reporting as at December 31, 2013." *Id.* ¶ 179.  The company further explained that, "[a]s a result of the material weakness, Penn West's Chief Executive Officer and Chief Financial Officer have concluded that the Company's internal control over financial reporting was not effective as at December 31, 2013." *Id.*  According to the restatement, the previously reported operating expenses had been understated by 16% for 2012, 20% for 2013, and 16% for the first quarter of 2014.  *Id.* ¶ 175.

Penn West also filed a Form 6-K/A.  *Id.* ¶ 177.  In the restated MD&A, the company stated that "senior finance and accounting personnel" and "senior accounting management" had been involved in "the adoption and use of the accounting practices that led to the restatement." *Id.*  The restated MD&A also acknowledged that all of the reclassifications had been made at the corporate level, and that those responsible "ceased to be employed by the Company." *Id.*

After the restatement, Penn West held an investor call, during which the company's new CFO summarized the audit committee's preliminary findings and the items presented in the restatement.  *Id.* ¶ 178.  The CFO stated during that call:

> We noted in our July 29 press release that certain transactions appeared to have been made to reduce operating expenses . . . and appeared to have been made without adequate supporting documentation.  The

> accounting practices reviewed involved the capitalization of certain operating expenses as property, plant and equipment, the income statement classification of certain costs and credits, the timing of certain accruals relating to production, operating expenses and capital, and the timing for the recording of certain production volumes. Shortly thereafter, and based on preliminary findings from the review to that date, it was determined that the Company would be required to restate the annual audited financial statements for at least 2012 and 2013 and its un-audited interim financial statements for the first quarter of 2014 and 2013 and all related MD&A and other regulatory filings.

*Id.*

On July 30, 2014, the day after the press release, U.S. investors sold off Penn West stock, and the stock price dropped from USD $9.16 per share at close of July 29, 2014 to USD $7.86 per share at close of July 30, 2014. *Id.* ¶ 180.

### G.  Procedural History

The SEC filed this action on June 28, 2017, bringing claims against Penn West, Takeyasu, Curran, and Grab.  ECF No. 1.  On June 6, 2017, Grab consented to the entry of a final judgment against him.  ECF No. 14-1.  In light of that consent, on July 25, 2017, the Court entered a final judgment against Grab.  ECF No. 28.  On November 3, 2017, Takeyasu and Curran filed motions to dismiss the complaint.  ECF Nos. 57, 60.  On November 13, 2017, Penn West agreed to the entry of a final judgment against it, and on November 20, 2017, the Court entered a final judgment against the company.  ECF Nos. 67-1, 68.  The SEC filed its opposition to Takeyasu and Curran's motions to dismiss on December 13, 2017.  ECF No. 69.  Takeyasu and Curran filed their replies on January 8, 2018.  ECF Nos. 72, 73.

## II.   LEGAL STANDARD

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com,*

*Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). While the SEC must meet Rule 9(b)'s pleading requirement, it is not required to satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). *See SEC v. Dunn*, 587 F. Supp. 2d 486, 501 (S.D.N.Y. 2008) ("Any argument that Congress intended to apply the provisions of the PSLRA to SEC enforcement actions ignores the statute's plain language."); *see also* 15 U.S.C. § 78u-4(a)(1).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted), including documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## III. DISCUSSION

The SEC brings several claims against Takeyasu and Curran, including claims for violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b), and (c); aiding and abetting liability under Section 10(b) of the Exchange Act and Rule 10b-5; violations of Section 17(a)(1) and (3) of the Securities Act; aiding and abetting liability under Section 17(a) of the Securities Act; aiding and abetting liability under Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-16; aiding and abetting liability under Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; violations of Section 13(b)(5) of the Exchange Act and Rule 13b2-1; and violations of Rule 13b2-2 under the Exchange Act. The SEC brings additional claims against Takeyasu for violations of Rule 13a-14 under the Exchange Act and violations of Section 304(a) of the Sarbanes-Oxley Act. Takeyasu and Curran do not attack the adequacy of the SEC's allegations regarding the allegedly false and misleading statements at issue. Rather, they move to dismiss all of the SEC's claims against them on the basis that the SEC has insufficiently pleaded scienter.

Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a plaintiff must "allege facts giving rise to 'a strong inference of fraudulent intent,'" *Novak*, 216 F.3d at 306 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "The requisite 'strong inference' of fraud may be established either by (a) alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994); *see also In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 481 (S.D.N.Y. 2013). "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (quoting *Shields*, 25 F.3d at 1130). "[C]onclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." *Shields*, 25 F.3d at 1129.

### A.  Motive and Opportunity to Defraud

The Court agrees with Defendants that the SEC's allegations fail to adequately plead a motive and opportunity to commit fraud. The complaint alleges that the purpose of the alleged scheme was "to deceive the investing public by understating Penn West's publicly reported operating expenses and related financial metrics and making the company appear to be managing costs more efficiently than it actually was." Compl. ¶ 2; *see also id.* ¶¶ 6, 21-30. The complaint also alleges that Takeyasu and Curran implemented the allegedly fraudulent accounting scheme in order to artificially lower Penn West's debt-to-EBITDA ratio. *Id.* ¶¶ 59-62. Overall, the SEC claims that the Individual Defendants were motivated to commit fraud by their desire to: "silence" public criticism of the company's operating expenses and opex/boe; make the company appear to be a

more efficient oil producer than it actually was; "ensure compliance with debt covenants"; prevent a downgrade of Penn West stock; and "keep afloat a company that had been at the bottom of the league for operating efficiency 'for many years.'" Pl.'s Memorandum in Opposition to Motions to Dismiss (ECF No. 69) ("Pl.'s Opp.") at 30-31 (citing Compl. ¶¶ 2-3, 6, 21-30, 57-66, 210).

These allegations, however, sound of "[m]otive that are generally possessed by most corporate directors and officers." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Such allegations "do not suffice." *Id.* Rather, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* (citing *Novak*, 216 F.3d at 307-08). Because the complaint fails to allege such a personal benefit, it does not adequately plead scienter based on a motive and opportunity theory. *See Egan*, 994 F. Supp. 2d at 565 (finding that the SEC failed to allege an improper motive when it "attributed no motive to [the defendant's] conduct in the Complaint other than implying a general 'desire for the corporation to appear profitable'" (citing *Kalnit*, 264 F.3d at 139)); *SEC v. Yorkville Advisors, LLC*, ___ F. Supp. 3d ___, 2018 WL 1725555, at *15 (S.D.N.Y. Mar. 29, 2018) ("To accept a generalized allegation of motive . . . would read the scienter requirement out of the statute.").

**B.  Conscious Misbehavior or Recklessness**

In the absence of allegations of improper motive, the SEC may plead facts that constitute circumstantial evidence of conscious misbehavior or recklessness in order to raise the requisite inference of scienter. *See Shields*, 25 F.3d at 1128. However, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks omitted). "Recklessness sufficient to establish scienter involves conduct that is 'highly unreasonable and . . . represents an extreme departure from the standards of ordinary care.'" *SEC v. Mudd*, 885 F. Supp. 2d 654, 661 (S.D.N.Y. 2012) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)). "Where the complaint alleges that defendants knew facts or had access to non-public information

contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2011) (citing *Novak*, 216 F.3d at 308, 311). Alternatively, a complaint adequately pleads recklessness when it alleges that the defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. An "egregious refusal to see the obvious, or to investigate the doubtful" can also establish recklessness. *Id.*

Courts generally find that a complaint pleads scienter when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Varghese v. China Shenghou Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)). Importantly, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 487 (S.D.N.Y. 2007) (quoting *Tellabs, Inc.*, 551 U.S. at 322-23).

Here, the crux of the claims against Takeyasu and Curran is that they filed financial statements that reflected financial figures arrived at in violation of adopted international standards of accounting and Penn West's internal controls as part of a scheme to artificially lower the company's reported operating expenses and opex/boe, and thereby defraud Penn West investors. As noted earlier, Defendants' only argument in support of dismissal of the complaint is the SEC's failure to plead scienter. In advancing this argument, Takeyasu and Curran argue that the accounting practices were not improper *per se*. *See* Takeyasu Memorandum in Supp. of Mot. to Dismiss (ECF No. 61) ("Takeyasu Mem.") at 10-14; Curran Memorandum in Supp. of Mot. to Dismiss (ECF No. 59) ("Curran Mem.") at 1 n.1 (adopting those arguments raised by Takeyasu insofar as they apply also to

Curran).  Curran additionally contends in a footnote that the complaint fails to allege with

particularity that the accounting practices were incorrect.  Curran Mem. at 14 n.13.

Takeyasu and Curran correctly point out that several of the allegations in the SEC's

complaint are conclusory or lacking in sufficient detail to satisfy Rule 9(b).  By example, the

complaint contains various allegations that Grab and other accounting staff made various journal

entries "with Takeyasu and Curran's knowledge and oversight" or at their direction.  *See, e.g.*, Compl.

¶¶ 48, 50, 79, 80, 89.  Such allegations by themselves are insufficient to plead Takeyasu and Curran's

participation in the alleged fraud.  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017)

(collecting cases and explaining that conclusory assertions that allegedly fraudulent activities were

performed at defendants' direction or with their knowledge do not suffice to plead participation in

fraud).

Nonetheless, the complaint also includes sufficiently particularized allegations of the

impropriety of the accounting practices to pass muster at this stage of litigation.  The SEC alleges

that Takeyasu and Curran set the reclass-to-capital line items at $85 million for 2013 and $79 million

for 2014 "without meaningful contribution from Penn West's production department, which was

responsible for forecasting and analyzing the repair and maintenance capital costs to be incurred by

Penn West."  Compl. ¶¶ 44-45.[3]  The complaint also explains that reclassification of operating

expenses to capital expenditures was only appropriate under IAS 16 when the costs being

---

[3] Takeyasu argues that this allegation is belied by the email correspondence to which the complaint refers.  In the
October 31, 2012 email chain between Takeyasu and Penn West's Senior Vice President of Production, who Takeyasu
identifies as Gregg Gegunde, Gegunde wrote to Takeyasu, "I agree that we have not been capitalizing enough $$, that's
why our opex appears high relative to other producers . . . ."  Declaration of Richard F. Albert (ECF No. 62) ("Albert
Decl."), Ex. 2.  Takeyasu points to that remark as evidence that Takeyasu did in fact seek input from the production
team in establishing the $85 million reclass-to-capital budget for 2013.  However, Takeyasu's response to Gegunde's
email states:  "BTW this landed as . . . Production capital – major R&M 85 . . . ."  *Id.*  That response suggests that
Takeyasu was informing Gegunde of the established target, after the dollar amount had already been determined.
Nowhere in the email chain does Gegunde provide Takeyasu with any information regarding actual capital expenditures
that the production team anticipated for 2013.  Therefore, this email exchange does not, on its face, undermine the
veracity of the SEC's allegation.  While the email chain may raise a question, in deciding this motion, the Court views the
alleged facts in the light most favorable to the SEC.

reclassified were incurred in order to "extend the useful life of property, plant, and equipment," and under Penn West's accounting policy when costs were expended on repair and maintenance.  *Id.* ¶¶ 38, 40.  While an innocent reclassification procedure exists, the complaint alleges specific facts from which a reasonable inference can be drawn that at least certain of the reclass-to-capital journal entries were not based on actual repair and maintenance expenses.  For example, the complaint alleges that, shortly after Takeyasu received the analyst report downgrading Penn West stock in July 2012, he and Curran instructed Grab to reclassify $10 million of operating expenses as capital expenditures.  *Id.* ¶ 57.[4]  This allegation regarding the timing of the reclassification supports an inference that the $10 million reclassification was in direct response to the downgrade of stock, rather than a recording of true capital expenditures.  The complaint also alleges that Takeyasu wrote in a September 10, 2012 email that "[w]ith the hedge monetization and opex of $40, we forecast that at year end 2012 we will be around 2.7 times (senior debt to EBITDA) . . . *and 2.9 times without the hedges and opex*."  *Id.* ¶ 61 (emphasis added).  This note that the debt-to-EBITDA ratio would be higher without the reclassified $40 million suggests that the reclassified amount was optional, and not truly reflective of actual costs that qualified for capitalization under IAS 16.

Additionally, Takeyasu's July 11, 2013 email acknowledging that the reclass-to-royalty practices were "unique" but that Penn West was hesitant to put an end to those practices "due to the optics around $2 per boe higher opex" suggests that those reclassification practices were not in accord with standard accounting procedures.  *See id.* ¶ 93.  Furthermore, the SEC alleges that the accrual softening practices were in direct violation of IAS 37.59.  *Id.* ¶ 99.  Therefore, while not all of the complaint's allegations may be said to comply with Rule 9(b)'s particularity requirement, viewing

---

[4] As the Individual Defendants argue, the complaint is silent as to the specific circumstances in which this instruction to Grab was made.  The complaint's allegation that Takeyasu confirmed the $10 million reclassification in a September 10, 2012 email, however, demonstrates that he was aware of that reclassification and of the effect that it would have on the senior-debt-to-EBITDA ratio.

the totality of the facts in the light most favorable to the SEC, the complaint sufficiently pleads "the first paragraph of any newspaper story" with respect to the alleged impropriety of each of the accounting practices at issue. *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (Easterbrook, J.)).

Defendants additionally argue that the complaint fails to plead that Takeyasu and Curran were aware of any accounting improprieties. The Court disagrees. True, allegations of violations of standard accounting procedures, without more, do not establish scienter. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 569 (S.D.N.Y. 2004); *see ECA Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."). Similarly, conclusory allegations that defendants created "cookie jar" reserves are insufficient. *See Acito*, 47 F.3d at 53; *Shields*, 25 F.3d at 1128-29. Instead, when a plaintiff relies on violations of standard accounting practices, it "must allege facts demonstrating that [d]efendants knew or should have known that the reserves were inappropriate at the time they were established." *Bristol-Myers Squibb*, 312 F. Supp. 2d at 569 (citing *Shields*, 25 F.3d at 1128-29; *Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 172 (S.D.N.Y. 2002)).

While the complaint does allege that the international accounting standards were violated, as just discussed, it does not stop there. The SEC pleads additional facts which, taken together, give rise to a strong inference of scienter. First, the complaint alleges that both Takeyasu and Curran knew of the reclass-to-capital entries. The complaint alleges that Takeyasu and Curran created the reclass-to-capital budget line item and set annual target reclass amounts during the Relevant Period.[5]

---

[5] Curran correctly notes that the circumstances surrounding the creation of the target reclass-to-capital amounts, as well as the reclass-to-royalty amounts, are not pleaded with particularity in the complaint. The SEC alleges, without pleading any specific facts regarding the target amount calculations, that the target amounts "represented Takeyasu and Curran's

Takeyasu and Curran are also alleged to have known that the internal reclass targets were being met nearly to the dollar, through reports provided to them at the monthly accrual meetings.  The accrual packets for July through December of 2012, for example, provided notice of the reclassifications and their impact on the opex/boe.  Takeyasu and Curran also were the alleged recipients of a September 6, 2012 email from Penn West's Manager of Capital Accounting reporting that the capital forecast for the remainder of that year included the $40 million that had been reclassified from operating expenses to capital expenditures.  The accrual packets during the Relevant Period are alleged to have included a showing of the total reclass target, the drawdowns from that target, and the remaining reclass budget available from which to draw.  The accrual packets for 2013 and the first quarter 2014 additionally contained a table showing the unadjusted opex/boe, the impact of the reclass-to-capital and reclass-to-royalty adjustments, and the reported opex/boe.  Both Individual Defendants also approved the amounts already moved to capital expenditures or to be moved, and Curran signed the monthly Accruals Review Checklists affirming that he had reviewed the opex/boe figures.  Therefore, the SEC alleges with sufficient particularity that Takeyasu and Curran had knowledge of the reclass-to-capital practices.

The complaint's allegations also suggest that Takeyasu and Curran were aware that the reclass-to-capital journal entries were being made without adequate support yet did nothing to ensure that the entries were properly documented.  The BCR group is alleged to have notified Takeyasu and Curran of its fourth quarter 2012 findings that one third of the journal entries examined lacked supporting documents.[6]  Yet, according to the SEC, neither Individual Defendant

---

estimate of how many millions of dollars in operating expenses would need to be reclassified as capital expenditures over the course of the coming year for Penn West's reported opex/boe to meet management and investor expectations." Compl. ¶ 44.  Nonetheless, as explained above, the SEC's failure to plead this issue with particularity does not prevent the complaint overall from raising a strong inference of scienter.

[6] Defendants argue that this allegation does not support scienter because the complaint fails to identify the number of entries examined and misleadingly suggests that one-third of *all* journal entries, rather than of those sampled, were deficient.  Takeyasu has filed copies of Excel spreadsheets that he claims are the documents relied upon by the SEC in

spoke with Grab about the BCR's findings, inspected the entries, or otherwise took steps to correct the failed internal controls. Curran's early 2013 email response to Grab's concern about showing the board of directors the $40 million in reclassified operating expenses—"just bury it in Operated Opex"—further supports an inference that Curran knew of the impropriety of the practice. The Manager of Operations Analysis also raised concerns, notifying Curran during a September 19, 2013 meeting that she and her staff were being asked to make journal entries without adequate support. Again, Curran is alleged to have taken no action to verify whether the reclass entries were properly supported. Two months later, the Manager emailed Curran advising him that she was going to be asked to enter a reclass-to-capital entry and explaining that she still was unaware of the support for the $52 million that had been reclassified that year. And again, there was no response from Curran. Instead, Takeyasu and Curran are alleged to have continued with the reclass practices into the first

---

making the allegations regarding the BCR findings. *See* Albert Decl., Ex. 3, 4. A comment on one of the spreadsheets states: "Our inquiry indicated that supporting documentation relating to multiple entries are not recreated and attached to each applicable entries [*sic*]. Such documentation are attached to only one of the entries. The other entries do no [*sic*] provide information of where or who to contact to locate the supporting documentation." Albert Decl., Ex. 3 at 7. Takeyasu reads this comment as indicating that "the issue was that backup for multiple entries was attached to only one of the entries, and not adequately cross-referenced to the others: not that it was missing, not that it did not exist, and not that it did not adequately support the relevant entries." Takeyasu Memorandum in Supp. of Mot. to Dismiss (ECF No. 61) ("Takeyasu Mem.") at 21. This reading of the spreadsheets, however, is misleading. The full text reads:

> We reviewed the 20 OPEX-related accrual entries posted into QByte FM in Sept. 2012 and 10 in Dec. 2012. Our review indicated that:
> (1) not all entries (9 out of 30) have supporting documentation (or information on where or who to contact to locate them);
> (2) not all supporting documentation (all 10 Dec. 2012 vouchers) are sent for scanning within the required time line of 2 weeks from posting date; and
> (3) not all journal entries (16 out of 30) were authorized by a Supervisor or higher level.
>
> Our inquiry indicated that supporting documentation relating to multiple entries are not recreated and attached to each applicable entries [*sic*]. Such documentation are attached to only one of the entries. The other entries do no [*sic*] provide information of where or who to contact to locate the supporting documentation.

Albert Decl., Ex. 3 at 7. Given the text preceding that quoted by Takeyasu, it is far from clear that the missing supporting documentation for all of the unsupported entries was due to a failure to cross-reference documentation. In any event, the spreadsheet comment indicates that internal controls requiring supporting documentation for each entry were not being followed. For purposes of this motion, the Court considers the BCR allegations in conjunction with the other facts pleaded in the complaint in concluding that the SEC sufficiently pleads scienter.

quarter of 2014.  This was done despite the fact that Curran never received the documentation that he had requested to support the reclass entries.  These allegations of failing internal controls, to which the Individual Defendants turned a blind eye, support an inference of scienter.  *See Novak*, 216 F.3d at 308 (An "egregious refusal to see the obvious, or to investigate the doubtful" can establish recklessness.); *Varghese*, 672 F. Supp. 2d at 608 (finding allegations that company had weak internal controls and that defendants were aware of the weak controls to support a strong inference of scienter).

In addition to the Individual Defendants' knowledge of the unsupported entries and failure to ensure that internal controls were properly implemented, the complaint also creates an inference of scienter based on the timing of reclassification entries.  As discussed earlier, the SEC alleges that Takeyasu and Curran instructed Grab to reclassify $10 million shortly after Takeyasu received an analyst report downgrading Penn West stock in July 2012.  Around the same time, Penn West's debt-to-EBITDA had creeped up to 2.9, dangerously close to the 3.0 ceiling imposed by its debt covenants.  Takeyasu and Curran directed Grab to reclassify an additional $30 million, and Takeyasu acknowledged in a September 2012 email that, with the reclassification, the debt-to-EBITDA ratio was expected to decrease to 2.7.  The timing of these reclassifications suggests that the entries were not made in connection with actual operating expenses and serves to lend further fuel to the scienter fire.  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 86 (2d Cir. 1999) (finding that timing of misrepresentations contributed to pleading of scienter); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658-60 (S.D.N.Y. 2007) (finding sufficient allegations of scienter when complaint alleged "the appearance and disappearance of large receivables at the end of financial reporting periods" and noting that the timing of the transactions could be a "significant red flag"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n. 174 (S.D.N.Y. 2007) ("Even though a GAAP violation itself is insufficient to establish scienter, that is not to say that it can never weigh in favor of scienter.  To the

contrary, when the number, size, timing, nature, frequency, and context of the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter . . . ." (internal quotation marks, brackets, and citation omitted)).

Additionally, the SEC alleges that Takeyasu and Curran knew of the reclass-to-royalty entries and that those entries were improper.  The SEC alleges that these reclassification practices were in place for years prior to the Relevant Period, as reflected in Takeyasu's August 6, 2010 email. According to the complaint, both Individual Defendants set the target reclass-to-royalty numbers during the Relevant Period.  Takeyasu acknowledged in a July 2013 email that Penn West was "a bit unique with this reclass" but that the company was "quite hesitant to unwind this practice due to the optics around $2 per boe higher opex."  Compl. ¶ 93.  This allegation suggests that the aim of the reclass-to-royalty accounting was to control "optics" rather than to appropriately apportion expenses.  It also suggests that Takeyasu was aware that the reclass-to-royalty entries were not in accord with standard accounting practices.  Despite a November 2013 email from a Penn West accountant to Curran raising concerns about the propriety of the reclass-to-royalty practices, both Takeyasu and Curran are alleged to have continued with the practice into 2014.  Ultimately, these practices led to the reclassification of $100 million in royalties.  These allegations also contribute support to a strong inference of scienter.  *See Egan*, 994 F. Supp. 2d at 566 (holding that allegations that "a defendant is responsible for revenue recognition policies during a time of large-scale, long-term GAAP violations sufficiently alleges circumstantial evidence of actual knowledge").

With respect to accrual softening, the SEC alleges that Takeyasu and Curran discussed the accrual softening journal entries with Grab and approved the entries before they were made.  Those entries were made, according to the complaint, in direct violation of the IAS, which required that excess accrual be removed from the operating expense account at the end of each accounting

period.  Despite this accounting standard, Penn West carried over excess accruals from accounting period to accounting period.  In doing so, Takeyasu and Curran are alleged to have directed the Manager of Operations Analysis to prorate the excess accrual amount over several months.  The July 2013 accrual packet provided to Takeyasu and Curran contained information regarding the effect that accrual softening was having on the reclass-to-capital amounts, thereby alerting the Individual Defendants to the impact that these accounting practices were having on the financial figures.  As experienced chartered accountants, Takeyasu and Curran would have, or should have, been aware of the IAS standard adopted by Penn West that required removal of excess accrual at the end of the accounting period.  But the complaint alleges that Takeyasu and Curran continued with the accrual softening practices into the first quarter of 2014.

Takeyasu and Curran were experienced designated accountants, Penn West's CFO and Vice President of Accounting and Reporting, and members of the company's Disclosure Committee.  As such, they were uniquely situated to control the company's books and public filings.  Indeed, Takeyasu signed the certifications to Penn West's annual 40-F filings in 2012 and 2013, as well as the certifications of the company's interim filings in 2012 and 2013.  And Curran certified the interim filing for the first quarter of 2014.  Their positions within the company, coupled with the allegations of the accounting practices, provide additional support for a strong inference of scienter.  *See In re Alstom SA*, 406 F. Supp. 2d 433, 460 (S.D.N.Y. 2005) (finding that allegations regarding the direct involvement of corporate officers in the "day-to-day operations of the company," the "magnitude" of the allegedly improper financing arrangements, and the "significant length of time (several years) during which the arrangements were not disclosed" created a strong inference of recklessness); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter sufficiently pleaded when the complaint alleged that the company's revenues were "radically

inflated" and the comptroller and CFO of the company were "uniquely situated to control the revenue recognition procedures" of the company).

The Court acknowledges that the SEC alleges that a procedure existed for the legitimate use of at least the reclass-to-capital practices. The Court nonetheless finds that, in light of all of the facts alleged, the SEC sufficiently pleads that Takeyasu and Curran were at least aware of improper accounting practices and did nothing to correct them or to otherwise ensure the strength of Penn West's internal controls. The SEC alleges repeated violations of the international accounting standards, which necessitated a financial restatement. The complaint points to several warnings made to Takeyasu and Curran about Penn West's weak internal controls as evidence that those Defendants were aware of the deficiencies and that those deficiencies were likely influencing reported financial metrics. Yet, as the complaint makes clear, Takeyasu and Curran did nothing to correct course. Thus, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Varghese*, 672 F. Supp. 2d at 607 (quoting *Tellabs*, 551 U.S. at 324).

### C. Defendants' Arguments for Dismissal of the Entire Complaint

In its opposition, the SEC argues that only its claims under Section 10(b), Rule 10b-5, Section 17(a)(1), Section 13(b)(5), and Rule 13a-14 require a showing of scienter. SEC Opposition (ECF No. 69) at 11 & n.6. The SEC then proceeds to explain why it believes that it has stated a claim with respect to the other claims asserted against Takeyasu and Curran. *Id.* at 36-45. Takeyasu and Curran do not substantively address these other arguments in their reply briefs, but simply argue that the entire complaint sounds in fraud and is subject to Rule 9(b)'s heightened pleading requirement. Takeyasu Reply (ECF No. 73) at 10; Curran Reply (ECF No. 72) at 10. Because the Individual Defendants present no other argument for the dismissal of any claims that may not require a showing of scienter, the Court need not determine whether all of the SEC's claims sound

in fraud so as to require a pleading of scienter.  Having concluded that the complaint raises a strong

inference of scienter with respect to the alleged accounting scheme, the Court denies Takeyasu and

Curran's respective motions to dismiss.

## IV.      CONCLUSION

For the reasons stated herein, Defendants Takeyasu and Curran's motions to dismiss are

DENIED.  The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 57 and 60.

SO ORDERED.

Dated:  June 9, 2018
New York, New York

_____
                    GREGORY H. WOODS
                  United States District Judge